UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

TRIGEANT HOLDINGS, LTD., et al

Debtor.

Chapter 11 Case
Case No.: 14-29027-EPK
(Jointly Administered)

_____/

In re:

TRIGEANT, LTD.,

Debtor.

Chapter 11 Case
Case No.: 14-30727-BKC-EPK
(Joint Administration Pending)

_____/

**DEBTORS' EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364(C)(1), 364(C)(2), 364(C)(3), AND 364(E), BANKRUPTCY RULES 2002, 4001, 6004 AND 9014 AND LOCAL RULES 9013-1(H) AND 9075-1 (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND (II) SCHEDULING FINAL HEARING**
(Emergency hearing requested)

**Statement of Exigent Circumstances**

Contemporaneously with the filing of this Motion, the Debtors have filed their joint plan of reorganization.  The plan provides for the sale of Trigeant, Ltd.'s assets to the Gravity Midstream Corpus Christi, LLC (the "Purchaser") for $100 million (plus assumed liabilities), an amount sufficient to pay, or reserve for, all claims asserted against the Debtors and make a distribution to equity holders.  The Debtors have insufficient working capital to finance their operations pending court approval of the sale.  Therefore, the Debtors seek entry of interim and final orders authorizing them to obtain post-petition financing to pay necessary expenses, including Trigeant, Ltd.'s payroll, insurance and utilities. The Debtors request that the Court consider this motion as quickly as the Court's calendar permits.

Trigeant, Ltd., Trigeant Holdings Ltd., and Trigeant LLC (collectively, the "Debtors"),

by and through undersigned counsel, pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1),

364(c)(2), 364(c)(3), and 364(e), Fed. R. Bankr. P. 2002, 4001, 6004 and 9014, and Local Rules 9013-1(H) and 9075-1, files this *Emergency Motion, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e), and Fed. R. Bankr. Pr. Rules 2002, 4001, 6004 and 9014 and Local Rules 9013-1(H) and 9075-1 (I) Authorizing the Debtors to Obtain Postpetition Financing, and (II) Scheduling Final Hearing* (the "Motion") seeking entry of interim and final orders authorizing the Debtors to obtain postpetition financing.  In support of this Motion, the Debtors respectfully represent as follows:

## I.        Jurisdiction

1.        This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this District pursuant to 28 U.S.C. § 1408.

## II.        Material Terms of Financing

2.        By this Motion, the Debtors seek permission to borrow up to a principal amount of $1,200,000.00 (plus any interest capitalized and added to principal) from Gulf Coast Asphalt Company, L.L.C. or its designee, successor or assignee (the "DIP Lender") on the following key terms (the definitive documentation thereof, the "DIP Loan Documents"), all of which are more fully described in the form of order (including the exhibits thereto) attached hereto as **Exhibit "A"** (the "Interim Order"):

(i)    **Commitment Amount:        Up to $1,200,000.00 in principal amount to be funded in periodic weekly advances in accordance with a budget delivered to the DIP Lender (subject to allowed variance).**

(ii)    **Interest; Interest Rate:        Eight and one-half percent (8.5%) per annum, payable monthly in-kind; from and after the occurrence of an Event of Default, the interest rate shall increase by an additional 2%.**

(iii)    **Maturity Date:        The obligations under the DIP Facility (as defined below) mature on the earlier of (i) December 12, 2014, (ii) the termination of the Plan Support Agreement (as defined below), (iii) 30**

days after the entry of the Interim Order, if the entry of a final order approving the DIP Financing (the "<u>Final Order</u>") has not occurred prior to the expiration of such period, or (iv) the effective date of a confirmed Chapter 11 plan of reorganization for any one or more of the Debtors.

(iv)     <u>Guarantors</u>:    The obligations under the DIP Credit Facility owed to the DIP Lender shall be guaranteed by Dan Sargeant, Harry Sargeant, Jr., and Janet Sargeant (the "<u>Guarantors</u>").

(v)      <u>Events of Default</u>:    The DIP Loan Documents include "Events of Default" with respect to the Debtors and the Guarantors that are usual and customary for credit extensions of this type, including, but not limited to: (i) nonpayment of principal, interest, fees or any other amounts; (ii) any representation or warranty proving to have been incorrect in any material respect when made or confirmed; (iii) failure to perform or observe covenants set forth in the Interim Order and the Final Order; and (iv) any material provision of the Plan Support Agreement ceasing to be in full force and effect.

(vi)     <u>Collateral</u>:    (i) Perfected first priority security interests in all of the Debtors' property that is not subject to prior perfected liens; and (ii) a junior lien on all property of the Debtors.

(vii)    <u>Priority</u>:    The obligations under the DIP Credit Facility owing to the DIP Lender shall constitute superpriority administrative expense claims against each of the Debtors and their estates.

(viii)   <u>Repayment Terms</u>:    Interest is payable monthly, in-kind, during the term of DIP Credit Facility, with balance of all obligations owing to the DIP lending under the DIP Credit Facility due at maturity.

(ix)     <u>Origination Fee and other Fees</u>:    None.

(x)      <u>Conditions Precedent to Advances</u>:    The DIP Loan Documents include conditions precedent to advances that are usual and customary for credit extensions of this type, including, but not limited to, entry of the Interim Order and the Final Order authorizing the financing in the form of the DIP Documents attached to the Interim Order.

(xi)     <u>Right to Credit Bid</u>:  The  DIP Lender shall have the right to credit bid all or a part of the obligations owing to the DIP Lender under the DIP Credit Facility, pursuant to 11 U.S.C. §§ 363(k), 1129(b)(2)(A)(ii), 1129(b)(2)(A)(iii), or any other applicable Section of the Bankruptcy Code.

## II.    Background

3.    On August 25, 2014, (the "Initial Petition Date") Trigeant Holdings, Ltd. and Trigeant, LLC (together, the "Initial Debtors") filed voluntary petitions for relief under Chapter 11, Title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

4.    On September 16, 2014 (the "Trigeant Petition Date"), Trigeant, Ltd. ("Trigeant") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the relief described in paragraph 3 and this paragraph 4, the "Chapter 11 Cases").

5.    The Debtors are operating their business and managing their affairs as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

6.    No trustee, or examiner or committee has been appointed in the Chapter 11 cases.

7.    Trigeant is the owner of a crude processing unit and terminal facility located in Corpus Christi, Texas, along with all related property interests (collectively, the "CPU").  Prior to the Trigeant Petition Date, Trigeant commenced a prior bankruptcy case in this Court.  *In re Trigeant Ltd.*, Case No 13-3850-EPK (Bankr. S.D. Fla. 2013) (the "First Trigeant Case").  In the First Trigeant Case, Trigeant proposed to sell the CPU (based on an initial proposal of approximately $30 million).  Trigeant could not advance the sale in light of a then-pending appeal involving a dispute over Trigeant's ownership of the CPU.

8.    Given the competing claims to ownership of the CPU, Trigeant could not attract new business, has not generated any meaningful revenue in the past year, and has not generated any revenue since the dismissal of the First Trigeant Case.

9.    The appeal has since been dismissed, and Trigeant is the undisputed owner of the CPU.

10.     With the dismissal of the appeal resulting in title to the CPU vesting exclusively in Trigeant, Trigeant recommenced efforts to attract a buyer for, or investor in, the CPU.

11.     Those efforts lead to the execution of a Plan Support Agreement among Trigeant, certain indirect holders of equity interests therein, and the Purchaser (the "Plan Support Agreement"). The Plan Support Agreement provides, *inter alia*, for Trigeant to advance a sale of the CPU to the Purchaser (the "Sale Transaction") under a plan of reorganization (the "Plan") and pursuant to the Asset Purchase Agreement (substantially in the form attached as an exhibit to the Plan, the "Asset Purchase Agreement"). Subject to the Asset Purchase Agreement, at closing the Purchaser shall pay $100 million to Trigeant to acquire title to the CPU. On the Trigeant Petition Date, the Purchaser posted an initial deposit of $1.5 million in escrow, which deposit shall be credited against the purchase price upon consummation of the Sale Transaction contemplated by the Asset Purchase Agreement.

12.     The Sale Transaction will provide the Debtors will sufficient cash proceeds to pay, or reserve for, the full amount of all claims asserted against the Debtors, plus applicable interest.

13.     Given Trigeant's limited operations and, thus, its limited liquidity, Trigeant needs financing in order to fund its operating and other administrative expenses.

14.     In order to finance its operations through the consummation of the Sale Transaction, Trigeant has obtained a commitment from the DIP Lender for a $1,200,000 multi-draw term loan (the "DIP Credit Facility").

### III.    Requested Relief and Basis Therefor

15.    By this Motion, the Debtors seek authority pursuant to §§105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e), Fed. R. Bankr. P. 4001(b) and 9014, and Local Rules 9013-1(H) and 9075-1, to obtain financing from the DIP Lender.

A.    The DIP Credit Facility Satisfies the Standards of Bankruptcy Code Section 364.

16.    The Debtors are unable to procure credit required to fund their postpetition business operations in the form of unsecured credit or unsecured credit with an administrative expense priority under Bankruptcy Code section 503(b)(1).

17.    The procurement of postpetition credit is governed by Bankruptcy Code section 364. In relevant part, that section provides:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503 (b)( 1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or incurring of debt --
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

18.    The Debtors, seeking financing under Bankruptcy Code section 364(c), must make a reasonable effort to seek other sources of unsecured credit available but are "not required to seek credit from every possible source," and are granted considerable deference in acting in accordance with their business judgment. *In re Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085 (4th Cir. 1986); *In re Ames Department Store, Inc.,* 115 B.R. 34 (S.D.N.Y. 1990).

19.    The Debtors do not have any other financing source to fund the amounts needed to sustain their businesses during these Chapter 11 Cases. The DIP Lender has agreed to provide

the Debtors with the requisite credit availability.  Because of the Debtors' financial condition and capital structure, the Debtors reasonably believe that they could not have obtained such financing on more favorable terms than those offered by the DIP Lender.

20.    Having determined that postpetition financing was available only under Bankruptcy Code section 364(c), the Debtors and the DIP Lender negotiated the DIP Credit Facility in good faith, at arms' length, and in accordance with the Debtors' sound business judgment.  In negotiating debtor-in-possession financing arrangements, courts "permit debtors in possession [or trustee] to exercise their basic business judgment consistent with their fiduciary duties." *Id.* at 38.  Courts will evaluate the facts and circumstances of a debtor's case and will accord significant weight to the necessity for obtaining financing so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code.  *See, e.g., In re Snow Shoe,* 789 F.2d 1085 (4th Cir. 1986) (approving postpetition financing necessary to sustain seasonable business); *Ames,* 115 B.R. at 40 ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").  Courts generally will not override the debtor's prudent and responsible exercise of its business judgment consistent with its fiduciary duties to the bankruptcy estate and its creditors in negotiating an appropriate financing package. *See In re Simasko Prod Co.,* 47 B.R. 444 (Bankr. D. Colo. 1985) (noting that business judgment should be left to the boardroom and not to the bankruptcy courts).

21.    The financing contemplated by the DIP Credit Facility benefits the Debtors, their estates and their creditors.  The financing is critical to the preservation of the value of the Debtors'

assets.  With the credit provided under the DIP Credit Facility, the Debtors will be able to fund ongoing expenses, including paying their employees, maintaining adequate cash balances, and operating their business in order to preserve the ongoing value of their assets.

22.     Moreover, the implementation of the DIP Credit Facility will also likely be viewed favorably by the Trigeant's employees, customers and vendors, thus helping to promote the Debtors' successful reorganization through a sale.  Without the financing furnished by the DIP Credit Facility, the Debtors will not be able to meet their payroll and other direct operating expenses, will suffer irreparable harm, and their entire reorganization effort through a sale will be jeopardized.  Accordingly, this Court should authorize the Debtors to obtain postpetition financing to the extent and pursuant to the terms contained in the DIP Loan Documents and the proposed Interim and Final Orders.

23.     The terms and conditions of the DIP Credit Facility are fair and reasonable and were negotiated by the parties in good faith and at arm's length.  Accordingly, the DIP Lender should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of the DIP Credit Facility.

B.     Collateral Under Section 364(c)(2) and (3)

24.     As collateral for the DIP Credit Facility, the Debtors shall grant the DIP Lender:

   a. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on or as of the Initial Petition Date or the Trigeant Petition Date, as applicable, or thereafter acquired, that, on or as of the Initial Petition Date or the Trigeant Petition Date, as applicable, is not subject to valid, perfected, enforceable and unavoidable liens or are not subject to valid, enforceable and unavoidable liens perfected subsequent to the Initial Petition Date or the Trigeant Petition Date, as applicable, as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property"); and

b.    Pursuant to section 364(c)(3) of the Bankruptcy Code a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property of the Debtors (other than the property described in clause (a) of this paragraph 24, as to which the DIP Liens will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected, enforceable and unavoidable liens in existence immediately prior to the Petition Date (including, for avoidance of doubt, the liens of BTB Refining, LLC and PDVSA Petroleo, S.A. to the extent such liens are valid, perfected, enforceable and unavoidable) or to valid, enforceable and unavoidable liens in existence immediately prior to the Initial Petition Date or the Trigeant Petition Date, as applicable,  that are perfected subsequent to the Initial Petition Date or the Trigeant Petition Date, as applicable, as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Lender are immediately junior only to such valid, perfected and unavoidable liens.

25.    The DIP Credit Facility will not be secured by any priming liens.

C.    Super-Priority Administrative Expense Claim.

26.    As a further inducement for the DIP Lender to provide the DIP Credit Facility, the Debtors have agreed to provide, pursuant to section 362(c)(1), a priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code.

**Conclusion**

27.    Based on the foregoing, the Court should enter the Interim Order and the Final Order (a) granting the Debtors the authority to enter into the DIP Credit Facility and grant security interests thereunder and approving all of the terms and conditions of the DIP Credit Facility and the DIP Loan Documents, (b) approving the form of notice of and scheduling a final hearing, and (c) granting the Debtors such other legal and equitable relief to which they are entitled.

**Notice**

28.    Notice of the Motion and the relief requested therein was served by the Debtors by either electronic mail, facsimile or overnight mail to: (a) the Office of the United States

Trustee**,** 51 SW First Avenue, Room 1204 Miami, FL 33130; (b) the creditors holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated basis); (c) Kaye Scholer LLP, 425 Park Avenue, New York NY 10022, Attn: Benjamin Mintz and Neal Hampton, and Salazar Jackson, 201 Alhambra Circle, Suite 1205, Coral Gables, FL 33134, Attn: Luis Salazar**,** attorneys to the DIP Lender; (d) Thompson & Knight LLP, One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, TX 75201, Attn: David Bennett, attorneys to Encap Flatrock Midstream Fund II, L.P.; (e) Furr & Cohen, P.A., One Boca Place, Suite 337W, 2255 Glades Road, Boca Raton FL 33431, counsel to the Guarantors; (f) Kozyak, Tropin & Throckmorton, P.A., 2525 Ponce de Leon Blvd., 9th Floor, Coral Gables, FL 33134, counsel for BTB Refining, LLC; and (g) Curtis Mallet-Prevost & Mosle, LLP, 101 Park Avenue, New York, NY 10178, counsel for PDVSA Petroleo, S.A.  Under the circumstances, the notice given by the Debtors of the Motion and the relief requested therein constitutes appropriate, due and sufficient notice thereof, complies with the Bankruptcy Rules and the Local Bankruptcy Rules, and no further notice of the relief granted herein is necessary or required.

**WHEREFORE**, the Debtor respectfully request that the Court enter an Interim Order, in the form attached hereto as **<u>Exhibit "A:"</u>** (i) granting this Motion; and (ii) granting such other and further relief as the Court deems just and proper.

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and that I am in compliance with the additional qualifications to practice before this Court as set forth in Local Rule 2090-1(A).

Dated:  September 17, 2014        Respectfully submitted,

BERGER SINGERMAN LLP
*Proposed Counsel for Debtor-in-Possession*
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile:  (305) 714-4340

By:   */s/ Isaac M. Marcushamer*
      Jordi Guso
      Florida Bar No. 863580
      jguso@bergersingerman.com
      Isaac M. Marcushamer
      Florida Bar No. 060373
      imarcushamer@bergersingerman.com

# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

|  |  |
|---|---|
| TRIGEANT HOLDINGS, LTD., et al | Chapter 11 Case<br>Case No.: 14-29027-EPK<br>(Jointly Administered) |

Debtor.

_____/

In re:

|  |  |
|---|---|
| TRIGEANT, LTD., | Chapter 11 Case<br>Case No.: 14-30727-BKC-EPK<br>(Joint Administration Pending) |

Debtor.

_____/

**INTERIM ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, 364(c)(1),
364(c)(2), 364(c)(3), AND 364(e) AND BANKRUPTCY RULES 2002, 4001, 6004 and 9014
(I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING,
AND (II) SCHEDULING FINAL HEARING**

**THIS CAUSE** came before the Court on  September [__], 2014 (the "Interim Hearing")

upon the motion, dated September 17, 2014 [ECF No _____] (the "Motion"), of Trigeant, Ltd.

("Trigeant"), Trigeant Holdings, Ltd. ("Holdings") and Trigeant, LLC ("LLC" and, collectively

with Trigeant and Holdings, the "Borrowers" or the "Debtors"), each as debtors and debtors-in-

possession in the above-captioned cases (the "Cases") for interim and final orders under sections

105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(e) and 507(b) of title 11 of the United

States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), and Rules 2002,

4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the

"Bankruptcy Rules"), and the local bankruptcy rules for the United States Bankruptcy Court for

the Southern District of Florida (the "Local Bankruptcy Rules"), seeking:

5936259-11

(a)        authorization (i) for the Borrowers to obtain up to $1,200,000 in principal amount of postpetition financing (plus any interest capitalized and added to such principal amount), (collectively, the "DIP Financing"), all on the terms and conditions set forth in this Interim Order and the Debtor-in-Possession Promissory Note, dated as of September 16, 2014, among the Borrowers and Gulf Coast Asphalt Company, L.L.C. or its designee or assignee (the "DIP Lender") (substantially in the form attached to this Interim Order as Exhibit A, and as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Note"); together with all agreements, documents, instruments and/or amendments delivered in connection therewith, including the budget annexed hereto as Exhibit B (the "Budget") and the Guaranty, dated as of September 16, 2014, among Harry Sargeant, Jr., Janet Sargeant and Daniel Sargeant, jointly and severally (each, a "Guarantor"; and collectively, the "Guarantors"), as guarantors of the Borrower's obligations in respect of the DIP Financing, and the DIP Lender (substantially in the form attached hereto as Exhibit C, and as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "Guaranty" and, collectively with the DIP Note and the Budget, the "DIP Documents");

(b)        authorization for the Debtors to execute and deliver the DIP Note and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(c)        to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing on the Motion to be held before this Court to consider entry of the proposed interim order annexed to the Motion (the "Interim Order") authorizing the Borrower, on an interim basis, to borrow under this

2

Interim Order and the DIP Note up to $400,000, plus interest and fees as described in paragraph 5(a) below, and

(d)    to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") on the Motion to be held before this Court to consider entry of a final order (the "Final Order") authorizing and approving, on a final basis, the transactions described in the foregoing clauses (a) through (c) pursuant to the Final Order;

The Interim Hearing having been held by the Court to consider the relief sought in the Motion, and upon the record of the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED**, that:

1.    *Disposition*.  The Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the interim relief sought in the Motion with respect to the entry of this Interim Order that have not been previously withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.    *Jurisdiction and Venue.*  This Court has core jurisdiction over the jointly administered Cases commenced on August 25, 2014 and September 16, 2014 (the "Petition Dates"), the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 6004 and the Local Bankruptcy Rules.

3.    *Notice*.  Notice of the Motion, the relief requested therein and the relief sought at the Interim Hearing was served by the Debtors by either electronic mail, facsimile or overnight

mail to: (a) the Office of the United States Trustee**,** 51 SW First Avenue, Room 1204 Miami, FL 33130; (b) the creditors holding the thirty largest unsecured claims against the Debtors' estates (on a consolidated basis); (c) Kaye Scholer LLP, 425 Park Avenue, New York NY 10022, Attn: Benjamin Mintz and Neal Hampton, and Salazar Jackson, 201 Alhambra Circle, Suite 1205, Coral Gables, FL 33134, Attn: Luis Salazar**,** attorneys to the DIP Lender; (d) Thompson & Knight LLP, One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, TX 75201, Attn: David Bennett, attorneys to Encap Flatrock Midstream Fund II, L.P.; (e) Furr & Cohen, P.A., One Boca Place, Suite 337W, 2255 Glades Road, Boca Raton FL 33431, counsel to the Guarantors; (f) Kozyak, Tropin & Throckmorton, P.A., 2525 Ponce de Leon Blvd., 9th Floor, Coral Gables, FL 33134, counsel for BTB Refining, LLC; and (g) Curtis Mallet-Prevost & Mosle, LLP, 101 Park Avenue, New York, NY 10178, counsel for PDVSA Petroleo, S.A. Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and the Interim Hearing constitutes appropriate, due and sufficient notice thereof, complies with Bankruptcy Rules 4001(b) and (c) and the Local Bankruptcy Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4. *Findings Regarding the DIP Financing*.

(a) Good and sufficient cause has been shown for the entry of this Interim Order.

(b) The Debtors have an immediate need to obtain the DIP Financing to preserve their assets, including to pay insurance, taxes and payroll. The Debtors' access to and use of the proceeds of the DIP Financing is necessary and vital to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the value of their estates and to facilitate a sale of the Debtors' assets.

4

(c)      The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lender pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents without the Debtors granting the DIP Liens (as defined in paragraph 7 below) and the Superpriority Claims (as defined in paragraph 6 below) under the terms and conditions set forth in this Interim Order and the DIP Documents.

(d)      The terms of the DIP Documents pursuant to this Interim Order and the DIP Note are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)      The DIP Documents and the DIP Financing have been the subject of extensive negotiations conducted in good faith and at arms'-length among the Debtors, the DIP Lender, and the Guarantors, and all of the Debtors' obligations and indebtedness arising under or in connection with the DIP Financing, including, without limitation, (i) all loans made to the Debtors pursuant to the DIP Documents and (ii) all other obligations of the Debtors under the DIP Documents or this Interim Order owing to the DIP Lender (collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Lender and its affiliates in "good faith", as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

5

(f)     The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Financing in accordance with the terms of this Interim Order and the DIP Documents is therefore in the best interests of the Debtors' estates and is consistent with the Debtors' exercise of their fiduciary duties.

5.     *Authorization of the DIP Financing and the DIP Documents*.

(a)     The Debtors are hereby authorized to execute, enter into and perform under the DIP Documents and to borrow thereunder up to an aggregate principal amount of $400,000 (plus interest, including any interest capitalized and added to such principal amount, fees and other expenses provided for in the DIP Documents), pending entry of the Final Order, all of the foregoing in accordance with the terms of this Interim Order, the DIP Note and the other DIP Documents.  All of the amounts borrowed shall be used solely for the purposes permitted under this Interim Order, the DIP Note and the other DIP Documents and in accordance with the Budget.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts and to execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements) and to pay all reasonable fees and expenses that the DIP Lender incurs in connection with the preparation, execution and delivery of the DIP Documents (not to exceed $35,000 in the aggregate), or the Debtors' performance of their obligations under the DIP Documents and the DIP Financing, including without limitation:

(i)     the execution, delivery and performance of the DIP Documents;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the Debtors and the DIP Lender may agree, and no further approval of this Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees paid in connection therewith) unless such amendments, waivers, consents or other modifications are material; and

(iii)    the performance of all other acts required under or in connection with the DIP Documents.

(c)    Upon execution and delivery of the DIP Documents, the DIP Documents (other than the Guaranty) shall constitute valid, binding and non-avoidable obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Interim Order and the DIP Documents (other than the Guaranty).  The Guaranty shall constitute valid, binding and non-avoidable obligations of the Guarantors, enforceable against the Guarantors in accordance with the terms of this Interim Order and the Guaranty.  No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.    *Superpriority Claims*.  Subject to the Carve-Out (as defined in paragraph 10 below), pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall

constitute allowed senior administrative expense claims (the "Superpriority Claims") against each of the Debtors with priority over any and all administrative expenses and all other claims against each of the Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof.

7.     *DIP Liens*.  As security for the DIP Obligations, and subject to the Carve-Out (as defined in paragraph 10 below), effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agent of any Collateral (as defined in this paragraph 7), the following security interests and liens are hereby granted by the Debtors to DIP Lender (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "Collateral", and all such liens and security interests granted to the DIP Lender, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a)     First Lien On Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Lender is hereby granted a valid, binding, continuing, enforceable,

8

fully-perfected first priority senior lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on or as of the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid, perfected, enforceable and unavoidable liens or are not subject to valid, enforceable and unavoidable liens perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property"), including without limitation, any and all unencumbered cash, accounts receivable, other rights to payment, inventory, general intangibles, contracts, documents, instruments, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, wherever located, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, of all of the foregoing.

(b)    Liens Junior To Certain Existing Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Lender is hereby granted a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property of the Debtors (other than the property described in clauses (a) and (c) of this paragraph 7, as to which the DIP Liens will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected, enforceable and unavoidable liens in existence immediately prior to the Petition Date (including, for avoidance of doubt, the liens of BTB Refining, LLC and PDVSA Petroleo, S.A. to the extent such liens are valid, perfected, enforceable and unavoidable) or to valid, enforceable and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in

9

favor of the DIP Lender are immediately junior only to such valid, perfected and unavoidable liens.

    (c) <u>Liens Senior To Certain Other Liens</u>.  The DIP Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (B) any liens or security interests arising after the Petition Date, including without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors, or (C) any intercompany or affiliate liens or security interests of the Debtors, or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code or otherwise.

    8. *Remedies after Event of Default*.  Immediately upon the occurrence of an Event of Default or the Maturity Date (as defined in the DIP Note), the DIP Lender's commitment to lend shall terminate and the DIP Lender shall be under no further obligation to advance additional funds under the DIP Note. Upon the occurrence and during the continuance of an Event of Default, and the giving of five (5) business days' prior written notice to the Debtors (with a copy to counsel to the United States Trustee), the DIP Lender may seek relief from the automatic stay on an emergency basis and obtain authority to exercise all other rights and remedies against the Collateral provided for in the DIP Documents and this Interim Order.  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default or Maturity Date has occurred and is continuing.  Subject only to and effective upon entry of the Final Order, each of the Debtors shall waive any right to seek relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the

5936259-11

DIP Lender set forth in this Interim Order or the DIP Documents.  In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.  The DIP Lender's delay or failure to exercise rights and remedies under the DIP Documents or this Interim Order shall not constitute a waiver of the DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Note.

9.      *Limitation on Charging Expenses Against Collateral*.  Subject only to and effective upon entry of the Final Order, notwithstanding anything to the contrary contained herein, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Lender to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

10.      *Carve-Out*. The Superpriority Claims and DIP Liens granted to the DIP Lender pursuant to this Interim Order shall be junior and subordinate to (a) all fees required to paid by the Debtors to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (b) all fees due the Clerk of the Court, (c) with respect to the Debtors' professionals, the allowed fees and disbursements as may be awarded to such professionals from time to time pursuant to Bankruptcy Code § 330, in the aggregate amount set forth in the Budget and only to the extent such fees were incurred prior to an Event of Default but not yet paid, and (d) up to $25,000 in

11

fees and expenses incurred by the Debtors' professionals following an Event of Default (collectively, the "Carve-Out").

11.     *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Lender pursuant to the provisions of this Interim Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code.

12.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     The DIP Lender is hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Lender shall, in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, unavoidable and not subject to challenge, dispute or subordination at the time and on the date of entry of this Interim Order.  The Debtors shall execute and deliver to the DIP Lender, as the case may be, all such agreements, financing statements, instruments and other documents as the DIP Lender may reasonably request to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

12

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)     Any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more landlords or other parties, or requires the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign or otherwise transfer any such interest or the proceeds thereof or other Collateral, is hereby and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the transactions granting the DIP Lender a security interest in and lien on such interest or the proceeds of any assignment and/or sale thereof by the Borrower or any Guarantor in favor of the DIP Lender in accordance with the terms of the DIP Documents and this Interim Order.

13.     *Preservation of Rights Granted Under the Order.*

(a)     Subject to the Carve-Out (as defined in paragraph 10 above), no claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order or the DIP Documents to the DIP Lender shall be granted or allowed while any portion of the DIP Obligations (or any refinancing thereof) remain outstanding and the Commitment (as defined in the DIP Note) has not been terminated, and the DIP Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

5936259-11

(b)     Unless all DIP Obligations shall have been indefeasibly paid in full in cash and the Commitment shall have been terminated (i) the Debtors shall not seek, and it shall constitute an immediate Event of Default under the DIP Note if any of the Debtors seeks, or if there is entered, any modification of this Interim Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lender or (ii) it shall constitute an immediate Event of Default under the DIP Note if any order is entered converting or dismissing any of the Cases.  If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (w) the Superpriority Claims and the DIP Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been indefeasibly paid in full in cash, and the Commitment shall have been terminated, (x) such Superpriority Claims and DIP Liens shall, notwithstanding such dismissal, remain binding on all parties in interest, (y) the other rights granted by this Interim Order shall not be affected and (z) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity, priority or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation, as applicable, or (ii) the validity, priority or enforceability of the DIP Liens. Notwithstanding any such reversal, stay, modification or vacation, any DIP Obligations incurred

14

incurred by the Debtors to the DIP Lender prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Documents with respect to all DIP Obligations.

(d)    Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, and all other rights and remedies of the DIP Lender granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases, terminating the joint administration of these cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in the Cases, in any successor cases if the Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Obligations, the Superpriority Claims, and all other rights and remedies of the DIP Lender granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash, and the Commitment has been terminated.

14.    *Limitation on Use of DIP Financing Proceeds and Collateral*.  The Debtors shall use the proceeds of the DIP Financing solely as provided in this Interim Order and in the DIP Documents (including, but not limited to, the Budget).  Notwithstanding anything herein or in

any other order of this Court to the contrary, no Loans under the DIP Note may be used (a) for professional fees and expenses incurred for any litigation or threatened litigation (whether by contested matter, adversary proceeding or otherwise) against the DIP Lender or for the purpose of objecting to or challenging the validity, perfection, enforceability, extent or priority of any claim, lien or security interest held or asserted by the DIP Lender or asserting any defense, claim, cause of action, counterclaim, or offset with respect to the DIP Obligations or the security interests in or liens on the Collateral or against the DIP Lender or its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (b) to prevent, hinder or otherwise delay the DIP Lender's assertion, enforcement or realization on the Collateral in accordance with the DIP Documents or this Interim Order (c) to seek to modify any of the rights granted to the DIP Lender under this Interim Order or under the DIP Documents, in each of the foregoing cases without the DIP Lender's prior written consent, which may be given or withheld by the DIP Lender in the exercise of its respective sole discretion, or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents (including, but not limited to, the Budget).

15.    *Exculpation.*  Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business or maintenance of assets, or in connection with their restructuring and sale efforts.  So long as the DIP Lender complies with its obligations under the DIP Documents and its obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Lender shall not, in any way

16

or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

16.     *Order Governs.*  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

17.     *Retention of Jurisdiction.*  The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

18.     *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Cases, including without limitation, the DIP Lender, the Debtors and the Guarantors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estates of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Lender and the Debtors and their respective successors and assigns, *provided* that the DIP Lender shall have no obligation to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

19.    *Limitation of Liability*.  The Debtors shall seek in the Final Order, in addition to the protections offered to the DIP Lender in this Interim Order, the following provision:  "In determining to make any loan or other extension of credit under the DIP Note, or in exercising any rights or remedies as and when permitted pursuant to the Interim Order, this Final Order or the DIP Documents, the DIP Lender shall not (i) be deemed to be in "control" of the operations of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute)."

20.    *Credit Bid.*  Subject to and effective upon entry of the Final Order, the DIP Lender shall have the unqualified right to credit bid all or any portion of the outstanding DIP Obligations in any sale of the Collateral under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

21.    *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

18

22.    *Headings.*  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

23.    *Final Hearing*. The Final Hearing will be held by this Court on _____ at _____ (prevailing Eastern time).   The Debtors shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Committee.  Any party in interest objecting to the relief sought at the Final Hearing shall file a written objection, which shall be served upon (a) Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn: Jordi Guso and Isaac M. Marcushamer, attorneys for the Debtors; (b) Kaye Scholer LLP, 425 Park Avenue, New York NY 10022, Attn: Benjamin Mintz and Neal Hampton, and Salazar Jackson, 201 Alhambra Circle, Suite 1205, Coral Gables, FL 33134, Attn: Luis Salazar, attorneys to the DIP Lender; (c) Thompson & Knight LLP, One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, TX  75201, Attn: David Bennett, attorneys to Encap Flatrock Midstream Fund II, L.P.; (d) Furr & Cohen, P.A., One Boca Place, Suite 337W, 2255 Glades Road, Boca Raton FL 33431, counsel to Dan Sargeant, Harry Sargeant, Jr. and Janet Sargeant; and (e) the Office of the United States Trustee, 51 SW First Avenue, Room 1204 Miami, FL 33130, and shall be filed with the Clerk of the United States Bankruptcy Court, Southern District of Florida, in each case to allow actual receipt by the foregoing no later than **[Insert Date]** at **[Insert Time]** (prevailing Eastern time).

Dated:  **West Palm Beach, Florida**
         **September [__], 2014**

_____
United States Bankruptcy Judge

19

<u>Schedule 1 - Guarantors</u>

Harry Sargeant, II
Janet Sargeant
Daniel Sargeant

# EXHIBIT "A"

DEBTOR-IN-POSSESSION
PROMISSORY NOTE

September [___], 2014                                                    $1,200,000.00

        For value received, (i) Trigeant, Ltd. (the "**Lead Borrower**"), a Florida limited partnership and a debtor-in-possession under Title 11 of the United States Code (as now or hereafter in effect, or any successor thereof, the "**Bankruptcy Code**"), which related petition for relief under the Bankruptcy Code was filed on September 16, 2014 pending before the United States Bankruptcy Court for the Southern District of Florida, Case Number 14-30727 (EPK) (the "**Lead Borrower Bankruptcy Case**"), and (ii) Trigeant Holdings, Ltd. ("**Holdings**"), a Florida, limited partnership, and Trigeant, LLC (collectively with Holdings and the Lead Borrower, the "**Borrowers**", and each a "**Borrower**"), a Florida, limited liability company, each a debtor-in-possession under the Bankruptcy Code, which related petitions for relief under the Bankruptcy Code were filed on August 25, 2014 pending before the United States Bankruptcy Court for the Southern District of Florida, Case Numbers 14-29027 and 14-29030 (EPK), respectively (such bankruptcy cases, as jointly administered with the Lead Borrower Bankruptcy Case, the "**Bankruptcy Cases**"), hereby promise, jointly and severally, to pay to Gulf Coast Asphalt Company, L.L.C. (together with any of its designee or its successors and assigns, the "**Lender**"), a principal amount not to exceed $1,200,000.00 (plus interest capitalized and added to principal pursuant to Section 5 below), together with interest thereon in accordance with the provisions of this Note (this "**Note**").    Capitalized terms used in this Note shall have the meanings assigned to such terms in Section 11 of this Note below.

        1.    <u>Payment of Interest</u>.    Except as otherwise expressly provided in Section 4(b), interest shall accrue at the rate of 8.5% per annum on the unpaid principal amount of each Term Advance owing to the Lender outstanding from time to time, or (if less) at the highest rate then permitted under applicable law.  Subject to Section 4(b), the Borrowers shall, jointly and severally, pay to the Lender all accrued and unpaid interest in arrears for each calendar month on the last Business Day of each calendar month, beginning September 30, 2014, and on the Maturity Date.

        2.    <u>The Term Advances</u>.

        (a)    The Lender agrees, on the terms and conditions set forth herein, to make term loans (each a "**Term Advance**") to the Borrowers, to the account designated in each notice of borrowing delivered pursuant to Section 2(b), on the later of (i) September 22, 2014 and (ii) three (3) Business Days after the Closing Date (such later date, the "**Initial Funding Date**") and, thereafter, on the first Business Day of each calendar week after the Initial Funding Date until the Maturity Date, in amounts not to exceed (x) $250,000.00 on the Initial Funding Date, (y) $100,000.00 on each first Business Day of each calendar week during the period beginning on September 29, 2014 and ending on November 30, 2014, and (z) $50,000.00 on December 1, 2014.

(b)    Each borrowing of a Term Advance shall be made on written notice signed by an authorized officer of the Lead Borrower (a copy of which notice may be delivered by email to the Lender at such email address as the Lender may designate from time to time in writing to the Lead Borrower), given not later than 2:00 P.M. (New York City time) on the third (3rd) Business Day prior to the date of the proposed borrowing.  Each notice of a borrowing of a Term Advance shall be by telephone, confirmed immediately in writing, or by facsimile or electronic communication, specifying therein the requested (i) date of such borrowing, (ii) aggregate amount of such borrowing, and (iii) the account to which each Term Advance should be made available with corresponding wiring instructions.  Each such notice shall be irrevocable and binding on the Borrowers.

(c)    The proceeds of the Term Advances shall be available to fund working capital to the Borrowers, pay professional fees and expenses that are payable by the Borrowers pursuant to the Budget, and for other corporate purposes, in each case, in accordance with the Budget.

(d)    The Lender's Commitment shall terminate immediately and without further action on the earlier of the funding in full of the Commitment and the Maturity Date (or on such earlier date on which the Term Advances become due and payable pursuant to the terms of this Note).

3.    Payment of Principal on Note; Commitment Termination.

(a)    Maturity.  The Borrowers, jointly and severally, shall pay the principal amount of this Note then outstanding to the Lender on the Maturity Date (or on such earlier date on which the Term Advances become due and payable pursuant to the terms of this Note).

(b)    Optional Prepayment.  The Borrowers may, upon at least one (1) Business Day's written notice delivered by 2:00 p.m. (New York City time) by the Lead Borrower to the Lender, prepay in whole or part of the outstanding principal balance of this Note at any time prior to its maturity; provided, however, that all accrued and unpaid interest must be paid prior to any prepayments of principal; provided further that each partial prepayment shall be in an aggregate principal amount of $100,000.00 or an integral multiple thereof.  Any prepayment made in accordance with this Section shall be made without premium or penalty.   Any amount borrowed under this Note and repaid or prepaid may not be reborrowed.

(c)    Guarantor Prepayments.  Each Guarantor shall have the right to make any prepayment pursuant to, and subject to the terms of, clause (b) above, as if it were a Borrower.

(d)    Commitment Termination.  The Lead Borrower may, upon at least one (1) Business Day's written notice to the Lender, terminate in whole the unused portions of the Commitment.

4.    Events of Default.

(a)    Definition.  For purposes of this Note, an "***Event of Default***" shall be deemed to have occurred if:

2

(i)       the Borrowers fail to pay when due and payable (whether at maturity or otherwise) any principal of, or any interest on or other amount on or in respect of, this Note;

(ii)       any of the Borrowers or Guarantors fail to perform or observe any provision (other as provided in Section 4(a)(i) above) contained in this Note or any other Loan Document, and such failure continues unremedied for a period of three consecutive days after written notice thereof is given to the Lead Borrower;

(iii)       any warranty or representation made by any of the Borrowers or Guarantors in this Note or any other Loan Document shall be discovered to be untrue or incomplete in any material respect;

(iv)       any Guarantor commences any case or proceeding under any bankruptcy, insolvency or other similar law now or hereafter in effect seeking to have an order for relief entered on its behalf as debtor or to adjudicate it as bankrupt or insolvent,

(v)       any involuntary case or other proceeding is commenced against any Guarantor with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or similar official of it or any substantial part of its property;

(vi)       any Guarantor fails to perform any of its respective obligations under the Guaranty, or repudiates or revokes or purports to repudiate or revoke any of its respective obligations under the Guaranty;

(vii)       any provision of the Interim Order, the Final Order, this Note or any other Loan Document shall for any reason cease to be valid or binding or in full force and effect against any of the Borrowers or the Guarantors (other than, in the case of the Interim Order, by virtue of the Final Order superseding it), or any of the Borrowers (or their respective Representatives or Affiliates) or the Guarantors (or their respective Representatives or Affiliates) shall state so in writing; or any of the Borrowers (or their respective Representatives or Affiliates) or the Guarantors (or their respective Representatives or Affiliates) shall commence or join in any legal proceeding to contest in any manner that the Interim Order, the Final Order, this Note or any other Loan Document constitutes a valid and enforceable agreement or any of the Borrowers (or their respective Representatives or Affiliates) or the Guarantors (or their respective Representatives or Affiliates) shall commence or join in any legal proceeding to assert that it has no further obligation or liability under the Interim Order, the Final Order, this Note or any other Loan Document;

(viii)       after the date hereof, and except for the Carve-Out (as defined in the Interim Order and the Final Order), any Borrower incurs, creates, assumes, suffers to exit or permits any administrative expense, unsecured claim or other Super-Priority Claim or lien which is *pari passu* with or senior to the claims or liens, as the case may be, of the Lender against the Borrowers hereunder or under the Interim Order or the Final Order (as applicable) or applies to the Bankruptcy Court for authority to do so;

(ix)       any of the Borrowers or the Guarantors fail or neglect to comply with any provisions of the Interim Order or Final Order; or

(x)    (i) an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the Lender of any amounts received in respect of the obligations hereunder, (ii) any Borrower shall file a motion or other request with the Bankruptcy Court seeking any financing under Section 364(d) of the Bankruptcy Code secured by any of the Collateral that does not provide for the payment in full of the outstanding principal amount of this Note (together with all such other amounts then due and payable, including any amounts payable pursuant to Section 9), or (iii) a material provision of the Plan Support Agreement shall cease to be in full force and effect.

The foregoing shall constitute Events of Default whatever the reason or cause for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any applicable law, judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

(b)    <u>Consequences of Events of Default</u>.

(i)    The Lead Borrower shall give prompt written notice to the Lender of the occurrence of any Default or Event of Default.

(ii)    Upon the occurrence of an Event of Default the interest rate payable on this Note shall increase immediately by an increment of two percentage point(s) *per annum*.  Any increase of the interest rate resulting from the operation of this subsection shall terminate as of the close of business on the date on which no Events of Default exist (subject to subsequent increases pursuant to this subsection).

(iii)    If any Event of Default has occurred and is continuing, the Lender may declare all or any portion of the outstanding principal amount of this Note (together with all accrued interest thereon and all other amounts due and payable with respect thereto) to be immediately due and payable and may demand immediate payment of all or any portion of the outstanding principal amount of this Note (together with all such other amounts then due and payable, including any amounts payable pursuant to Section 9).  If the Lender demands immediate payment of all or any portion of this Note, the Borrowers, jointly and severally, shall immediately pay to the Lender all amounts due and payable with respect to this Note.

(iv)    If any Event of Default has occurred and is continuing, the Lender may exercise all rights and remedies available to it under this Note, the Interim Order, the Final Order and the other Loan Documents and all rights and remedies under applicable law.

(v)    If any Event of Default has occurred and is continuing, the Lender may set off against amounts owing to the Lender under or in respect of this Note any amounts owing by the Lender to any Borrower or any Guarantor.

5.    <u>Payments</u>.  All amounts payable under or pursuant to this Note to the Lender shall be paid in lawful money of the United States of America, to the account designated by the Lender, in immediately available funds, without setoff or counterclaim, and in the event that any payments submitted hereunder are in funds not available until collected, said payments shall continue to bear interest in accordance with the terms hereof until collected; <u>provided</u> that any interest due and payable pursuant to Section 1 (as such interest may be increased by Section 4(b)) shall be paid by adding an amount equal to such unpaid interest due and payable to the principal amount of the Term Advances.

4

6.      Representations and Warranties.  Each Borrower, jointly and severally, represents and warrants to the Lender that:

(a)      Subject to the entry of the Interim Order and the Final Order, (i) it has full power and authority to enter into and perform its obligations under this Note, (ii) the execution and delivery of this Note was duly authorized and each Borrower has taken all necessary action to do so, (iii) no consent, authorization, filing, notice to or act by any third party (including any governmental authority, regulatory authority or judiciary) is required in connection with the execution and delivery of this Note except for those consents, authorizations, filings, notices or actions already obtained or made, and (iv) this Note constitutes a legal, valid and binding obligation of each Borrower, enforceable against each Borrower in accordance with its terms.

(b)      As of the date of this Note, no Event of Default has occurred and is continuing.

(c)      The 90-day budget delineating the expenses of the Bankruptcy Cases during such period attached hereto as Exhibit A (the "**Budget**") has been prepared by the Lead Borrower in light of the past maintenance of the assets of the Borrowers, and reflects the reasonable, projected expenses of the Bankruptcy Cases for the 90-day period contained therein.  The Budget is based upon estimates and assumptions stated therein, all of which are reasonable and fair in light of current conditions and current facts known to each Borrower as of the date hereof and reflects each Borrower's good faith and reasonable estimates of the future expenses of the Borrowers as of the date hereof and of the other information projected therein for the periods set forth therein.

(d)      (i)  Each Borrower is in compliance in all material respects with the terms and conditions of the Interim Order or the Final Order, as applicable, and (ii) the Interim Order or the Final Order, as applicable, is in full force and effect and has not been vacated, reversed, or rescinded or, without the prior written consent of the Lender, in its sole discretion, amended or modified, and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

(e)      Each Borrower's obligations hereunder shall (i) constitute allowed Super-Priority Claims, the establishment of which superpriority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code, other than to the extent provided in any of the Interim Order or Final Order (as applicable), and shall not be subject to claims against the Collateral pursuant to Section 506(c) of the Bankruptcy Code.

(f)      The Lender's liens granted pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code on the Collateral shall be deemed valid and perfected by entry of the Interim Order and the Final Order, as the case may be.  The Lender shall not be required to file, register or publish any financing statements, mortgages, hypothecs, notices of lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the liens on Collateral granted by or pursuant to this Note, the Interim Order, the Final Order or any other Loan Document.  If the Lender shall, in its sole discretion, from time to time elect to file, register or publish any such financing statements, mortgages, hypothecs, notices of lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Lender's liens on the Collateral, all such

5

documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date the Interim Order is entered.

(g)     The liens, lien priorities, superpriority administrative expense claims and other rights and remedies granted to the Lender pursuant to this Note, the Interim Order, the Final Order or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the liens provided for herein and therein, and the Super-Priority Claim provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by any Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of any of the Bankruptcy Cases, or by any other act or omission whatsoever.  Without limiting the generality of the foregoing, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:  (i) no costs or expenses of administration which have been or may be incurred in the Bankruptcy Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lender against any Borrower in respect to any obligation hereunder, (ii) the Lender's liens on the Collateral shall constitute valid, enforceable and perfected liens, and (iii) the Lender's liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Lender to file, register or publish any financing statements, mortgages, hypotheses, notices of lien or similar instruments or to otherwise perfect the Lender's liens under applicable non-bankruptcy law.

(h)     None of the Borrowers nor the Guarantors is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States).  No part of the proceeds of the Term Advances made to any Borrower will be used to purchase or carry any such margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States) or to extend credit to others for the purpose of purchasing or carrying any such margin stock or for any purpose, in each instance, that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System of the United States.

(i)     None of the Borrowers nor the Guarantors is in violation of any of the country or list based economic and trade sanctions administered and enforced by OFAC.  None of the Borrowers nor the Guarantors, (b) has its assets located in Sanctioned Entities, or (c) derive revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  No proceeds of any Term Advance will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

As used in this subsection 6(h):

"OFAC" means Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, (d) a Person resident in or determined to be resident in a country, in each case, that is subject to a country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means a person named on the list of Specially Designated Nationals maintained by OFAC.

       7.    Conditions Precedent.

       (a)    *Conditions Precedent for the Closing Date.*  This Note shall become effective on and as of the first date (the "***Closing Date***") on or after the following conditions precedent have been satisfied or waived by the Lender:

       (i)    The Lender shall have received:

       (A)    Counterparts of this Note, duly executed by the Lender and each Borrower;

       (B)    The Guaranty, duly executed by Dan Sargeant, Harry Sargeant, Jr. and Janet Sargeant;

       (C)    Opinion of Furr & Cohen, P.A. in respect to the Guaranty, in form and substance reasonably satisfactory to the Lender;

       (D)    A certificate of an authorized officer of the Lead Borrower, dated as of the Closing Date (the statements made in which certificate shall be true on and as of the Closing Date), certifying as to the absence of any event occurring and continuing that constitutes a Default or an Event of Default, and that no such Default or Event of Default will occur as a result of any borrowings of Term Advances on the Closing Date.

       (E)    A certificate of good standing for each Borrower from Florida; and

       (F)    The Budget, in form and substance satisfactory to the Lender and certified by an officer of the Lead Borrower.

       (ii)    The Interim Order Entry Date shall have occurred no later than September 26, 2014, and the Interim Order shall have been entered with prior notice in accordance with Bankruptcy Rule 4001 (as reasonably determined by the Lender), and the Lender shall have received a copy of the Interim Order, which shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal, in each case, without the consent of the Lender.

       (iii)    No material provision of the Plan Support Agreement shall cease to be in full force and effect.

       (b)    *Conditions Precedent for All Term Advances.*  The obligation of the Lender to make any Term Advance on the occasion of each borrowing, including on the Closing Date, shall be subject to the satisfaction or the waiver in writing by the Lender of the following conditions precedent:

       (i)    The Lender shall have received a notice of borrowing of Term Advances in accordance with Section 2(a);

(ii)    The representations and warranties contained in each Loan Document are true and correct in all material respects (provided that any representation or warranty qualified by materiality shall be true and correct in all respects) on and as of such date, before and after giving effect to such borrowing of Term Advances and to the application of the proceeds therefrom, as though made on and as of such date, other than any such representation or warranties that, by their terms, refer to a specific date other than the date of such borrowing, in which case as of such specific date;

(iii)    No Default or Event of Default has occurred and is continuing or would result from such borrowing or from the application of the proceeds therefrom;

(iv)    The making of such Term Advance shall not be prohibited by applicable law, judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body;

(v)    The Interim Order (prior to the Final Order Entry Date) or the Final Order, as applicable, shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal, in each case, without the consent of the Lender; and

(vi)    (A) No material breach by the Lead Borrower or any Consenting Owner (as defined in the Plan Support Agreement) of any of the undertakings, representations, warranties or covenants of such party or parties set forth in the Plan Support Agreement, the Asset Purchase Agreement (as defined in the Plan Support Agreement) or the Plan (as defined in the Plan Support Agreement) (including any event which, with the passage of time or provision of notice, would constitute any of the above) shall have occurred and continue; and (B) no event that would constitute a Buyer Termination Event (under, and as defined in, Section 5.02 of the Plan Support Agreement) upon delivery of a termination notice to the Lead Borrower after the occurrence thereof, in accordance with Section 5.02 of the Plan Support Agreement, shall have occurred and continue.

8.    <u>Waivers of Notice, etc</u>.  Each Borrower waives presentment, demand, protest, notice of dishonor, notice of demand or intent to demand, notice of acceleration or intent to accelerate, and all other notices, and agrees that no extension or indulgence to any Borrower, or release, substitution or nonenforcement of any security, or release or substitution of any guarantor or any other party, whether with or without notice, shall affect the obligations of any Borrower.  Each Borrower waives all defenses or rights to discharge available under Section 3-605 of the Uniform Commercial Code as in effect in the State of New York, and waives all other suretyship defenses or rights to discharge.  Each Borrower agrees that the Lender has the right to freely sell, assign, or grant participations, or any interest, in any or all of the indebtedness and other obligations arising under or in connection with this Note, and that, in connection with such right, but without limiting its ability to make other disclosures to the full extent allowable, the Lender may disclose all documents and information which the Lender now or later has relating to the Borrowers or this Note, provided that such prospective assignees and participants agree to comply with confidentiality provisions in form and substance substantially similar to the provisions set forth in the Mutual Confidentiality Agreement, dated as of April 30, 2014, among certain of affiliates of the Borrowers and the Lender.

9.    <u>Fees and Expenses; Indemnity</u>.

(a)    Each Borrower, jointly and severally, agrees to reimburse the Lender for any and all reasonable fees and expenses that the Lender incurs in connection with the preparation, execution and delivery of the Loan Documents (not to exceed $35,000 in the aggregate) and the costs and expenses (including, without limitation, court costs, legal expenses and reasonable attorneys' fees, whether or not suit is instituted, and, if suit is instituted, whether at the trial court level, appellate level, in a bankruptcy, probate or administrative proceeding or otherwise) incurred in collecting or attempting to collect this Note or any other Loan Document, or any indebtedness and other obligations arising under or in connection with this Note or any other Loan Document, or incurred in any other matter or proceeding relating to this Note or any other Loan Document or such indebtedness or obligations.  All expenses reimbursement obligations provided for hereunder shall survive the payment in full of all indebtedness hereunder.

(b)    Each Borrower, jointly and severally, hereby indemnifies the Lender, its Affiliates and its Representatives, on demand, and agrees to hold the Lender, its Affiliates and its Representatives harmless from any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees and expenses, incurred by or asserted against the Lender arising out of, in any way connected with, or as a result of this Note or any other Loan Document, including, but not limited to, the use of the funds evidenced by this Note; provided, however, that such indemnity shall not apply to the extent such losses, claims, damages, liabilities and related expenses result directly from the gross negligence or willful misconduct of the Lender, its Affiliates and its Representatives, as applicable, as determined by the final order of a court of competent jurisdiction.  All indemnities provided for hereunder shall survive the payment in full of all indebtedness hereunder.

10.    _Amendment and Waiver_.  The terms and conditions of this Note may not be amended, waived or modified except in a writing signed by the Lender and the Borrowers (and, in respect to any increase in principal amount of obligations permitted to be incurred hereunder or any amendment to Section 2(c), consented to in writing by the Guarantors) expressly stating that the writing constitutes an amendment, waiver or modification of the terms of this Note; provided that any material amendment shall require the approval of the Bankruptcy Court in accordance with the Interim Order or the Final Order, as applicable.

11.    _Definitions_.  For purposes of this Note, the following terms have the respective meaning set forth in this Section 11:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by, or under direct or indirect common Control with, such Person, and shall include each past and present Affiliate of a Person and the members of such Affiliate's immediate family and any trust, the beneficiaries of which are such individuals or relatives; provided that the term Affiliate with respect to each of the Borrowers and the Guarantors shall, for all purposes, exclude the HIII Parties.  For purposes of this definition, a Person shall be deemed to Control another Person if such Person owns or Controls, directly or indirectly, more than ten percent (10%) of the voting equity interests or other securities of the other Person.

"**Bankruptcy Cases**" has the meaning set forth in the introductory paragraph hereof.

"**Bankruptcy Code**" has the meaning set forth in the introductory paragraph hereof.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Florida (together with any other court with jurisdiction over the Bankruptcy Cases).

"**Borrowers**" has the meaning set forth in the introductory paragraph hereof.

"**Budget**" has the meaning set forth in Section 6(b) hereof.

"**Business Day**" means any day other than Saturday or Sunday or other day on which the banks in Miami, Florida are permitted or required by law to close.

"**Collateral**" has the meaning set forth in paragraph 7 of the Interim Order.

"**Commitment**" means the principal amount of $1,200,000.00.

"**Closing Date**" has the meaning set forth in Section 7(a) hereof.

"**Default**" means any Event of Default or any event that, with the passing of time or the giving of notice or both, would become an Event of Default.

"**Event of Default**" has the meaning set forth in Section 4(a) hereof.

"**Final Order**" means the final order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Bankruptcy Cases approving this Note and the other Loan Documents, in form and substance reasonably satisfactory to the Lender.

"**Final Order Entry Date**" means the date the Final Order is entered in the Bankruptcy Cases.

"**Guaranty**" means the Guaranty Agreement, substantially in the form attached hereto as Exhibit B.

"**Guarantor**" means Dan Sargeant, Harry Sargeant, Jr., Janet Sargeant and any other guarantor party to the Guaranty.

"**HIII Parties**" has the meaning set forth in the Plan Support Agreement.

"**Interim Order**" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Bankruptcy Cases substantially in the form of Exhibit C hereto, in form and substance satisfactory to the Lender, approving, *inter alia*, this Note and the other Loan Documents and authorizing the incurrence by the Borrowers of the post-petition indebtedness in accordance with this Note.

"**Interim Order Entry Date**" means the date the Interim Order is entered in the Bankruptcy Cases.

10

"*Lead Borrower*" has the meaning set forth in the introductory paragraph hereof.

"*Lender*" has the meaning set forth in the introductory paragraph hereof.

"*Loan Documents*" means this Note, the Guaranty and any other instrument or agreement entered into, or delivered, now or in the future, by any of the Borrower or the Guarantor in connection with this Note

"*Maturity Date*" means the earlier of (i) December 12, 2014, (ii) the termination of the Plan Support Agreement, (iii) 30 days after the Interim Order Entry Date, if the Final Order Entry Date has not occurred prior to the expiration of such period, or (iv) the effective date of a confirmed Chapter 11 plan of reorganization for any one or more of the Borrowers.

"*Maximum Rate*" has the meaning set forth in Section 18 hereof.

"*Note*" has the meaning set forth in the introductory paragraph hereof.

"*Person*" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"*Plan Support Agreement*" means the Plan Support Agreement, dated as of September 16, 2014, among Trigeant, Ltd, the parties signatory thereto that are the indirect owners of the Lead Borrower, and Gravity Midstream Corpus Christi, LLC.

"*Representative*" shall mean, as to any Person, such Person's (and such Person's Affiliates') managers, directors, officers, direct or indirect membership unit, partners (limited or general) or other equity interest holders, employees, agents, consultants and other advisors and representatives; provided that the "Representatives" of each of the Borrowers and the Guarantors shall exclude the HIII Parties.

"*Super-Priority Claim*" means, in relation to the Borrowers, a claim against any Borrower in the Bankruptcy Cases that is an administrative expense claim authorized and established by the Bankruptcy Court pursuant to Sections 364(c) and 507(b) of the Bankruptcy Code and having priority over any or all administrative expenses of the kind specified in Sections 105, 326, 328, 330, 331, 365,  503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code.

"*Term Advance*" has the meaning set forth in Section 2(a) hereof.

12.    Successors and Assigns.  This Note shall be binding upon the successors and assigns of the Borrowers and shall inure to the benefit of Lender and its successors and assigns, except that no Borrower shall have the right to assign any its rights or obligations hereunder or any interest herein without the prior written consent of Lender, in its sole

discretion.  This Note and Lender's rights and obligations herein shall be freely assignable by Lender and its successors and assigns, either in whole or in part.

13.    Integration.    Other than the Plan Support Agreement, each Borrower acknowledges and agrees that there are no contrary agreements, oral or written, establishing any term of this Note or any other Loan Document.  In the event of any consistency, between any Loan Document and the Interim Order or the Final Order, the Interim Order or the Final Order, as applicable, shall control.

14.    Rights of Lender Cumulative.    No delay or failure of the Lender in exercising any right, power or privilege hereunder shall affect such right, power or privilege, nor shall any single or partial exercise thereof preclude any further exercise thereof, or the exercise of any other power, right or privilege.  The rights of the Lender hereunder are cumulative and not exclusive of any right or remedy which the Lender would otherwise have, whether by other instruments or by law.

15.    Notices.    All notices and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand; (b) when delivered to the addressee if sent by a nationally recognized overnight courier, next Business Day delivery guaranteed; (c) on the date sent by facsimile or e-mail (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address, facsimile number or e-mail address as shall be specified by like notice):

If to the Lender:

Gulf Coast Asphalt Company, L.L.C.
11 Greenway Plaza, Suite 2950
29th Floor
Houston, TX 77046
Attention: J. David Hubenak, Vice President and General Counsel
Email: dhubenak@gcachouston.com
Fax: (832) 426 3320

with a copy to:

Kaye Scholer LLP
250 West 55th Street
New York, NY 10019

Attention:  Steven Canner and Benjamin Mintz
Email: steven.canner@kayescholer.com; benjamin.mintz@kayescholer.com
Fax: (212) 836-6636

If to any Borrower:

Trigeant, Ltd.
3020 North Military Trail
Suite 100

Boca Raton, FL  33431
Attention:  Stephen Roos, Chief Financial Officer
Email: sroos@sargeant.net
Fax:  (561) 999-9506

with a copy to:

Berger Singerman LLP
1450 Brickell Avenue
Suite 1900
Miami, FL  33131
Attentions:  Daniel Lampert and Jordi Guso
Email: dlampert@bergersingerman.com;  jguso@bergersingerman.com
Fax: (305) 714-4340

16.    **GOVERNING LAW; JURISDICTION, ETC.**

(a)    THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)    EXCEPT FOR MATTERS WITHIN THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, EACH BORROWER IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST LENDER IN ANY WAY RELATING TO THIS NOTE OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THE STATE OR FEDERAL COURTS LOCATED WITHIN WILMINGTON, DELAWARE, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH BORROWER HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE BORROWERS AND THE LENDER (BY ITS ACCEPTANCE HEREOF) AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS NOTE SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS NOTE AGAINST ANY BORROWER OR ANY OF ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    EXCEPT FOR MATTERS WITHIN THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, EACH BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN *PARAGRAPH (b)* OF THIS *SECTION*.  EACH BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     **EACH BORROWER HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN *SECTION 15*. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF THE LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.**

17.     **WAIVER OF JURY TRIAL.    EACH BORROWER (AND BY ITS ACCEPTANCE HEREOF, THE LENDER) HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS NOTE AND FOR ANY COUNTERCLAIM THEREIN.**

18.     Maximum Permitted Interest.    Notwithstanding anything to the contrary contained in this Note, the interest paid or agreed to be paid under this Note shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "***Maximum Rate***"). If Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of this Note or, if it exceeds such unpaid principal, refunded to the Lead Borrower.  In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, Lender may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of this Note.

19.     Recovery.    If after the receipt of any payment of all or part of the obligations hereunder, Lender is for any reason compelled to surrender such payment to any Person or entity because such payment is determined to be void or voidable as a preference, an impermissible setoff, a diversion of trust funds or any other reason, the indebtedness and obligations hereunder shall continue in full force, and each Borrower, jointly and severally, shall indemnify and hold Lender harmless for the amount of such payment surrendered until Lender shall have been finally and irrevocably paid in full.

14

IN WITNESS WHEREOF, the Borrower and the Lender has caused this Note to be executed on the day and year first above written.


THE BORROWERS:

**TRIGEANT, LTD.**
By its general partner, Trigeant, LLC


By:_____
Name: Stephen Roos
Title: Manager

**TRIGEANT HOLDINGS, LTD.**


By:_____
Name:
Title:

**TRIGEANT, LLC**


By:_____
Name:
Title:


[Signature page to DIP Promissory Note]

THE LENDER:

**GULF COAST ASPHALT COMPANY, L.L.C.**


By:_____
Name:
Title:

# **EXHIBIT A**

## **BUDGET**

[See Attached]

# **EXHIBIT B**

## **GUARANTY**

[See Attached]

# **EXHIBIT C**

## **INTERIM ORDER**

[See Attached]

# EXHIBIT "B"

137889-1

| | Trigeant Ltd 13 week budget | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Weeks beginning: | | | | | | | | | | | | |
| | | Sep 15, 2014 | Sep 22, 2014 | Sep 29, 2014 | Oct 6, 2014 | Oct 13, 2014 | Oct 20, 2014 | Oct 27, 2014 | Nov 3, 2014 | Nov 10, 2014 | Nov 17, 2014 | Nov 24, 2014 | Dec 1, 2014 | Dec 8, 2014 | Totals |
| | | | | | | | | | | | | | | |
| | **Operating costs** | | | | | | | | | | | | | |
| | Insurance | 125,000 | | 100,000 | | 100,000 | | 100,000 | | 100,000 | | 57,000 | | | 582,000 |
| | Payroll and payroll taxes | | 15,000 | | 15,000 | | 15,000 | | 15,000 | | 15,000 | | 15,000 | | 90,000 |
| | Benefits and wrkrs comp | | 8,000 | | | | 8,000 | | | | 8,000 | | | | 24,000 |
| | Electricity | | 18,270 | 18,583 | | 18,583 | | 18,583 | | 17,327 | | 17,327 | | 17,327 | 126,000 |
| | Natural gas | | | | | | | | | | | | | | 0 |
| | Maintenance and repairs | | 10,000 | | | | 10,000 | | | | 10,000 | | | | 30,000 |
| | DIP interest | | | | 1,417 | | | | 4,250 | | | | 7,083 | | 12,750 |
| | Professional fees | | | | 100,000 | | | | 100,000 | | | 100,000 | | | 300,000 |
| | Total operating costs | -125,000 | -51,270 | -118,583 | -116,417 | -118,583 | -33,000 | -118,583 | -119,250 | -117,327 | -33,000 | -74,327 | -122,083 | -17,327 | -1,164,750 |
| | | | | | | | | | | | | | | |
| | **DIP Financing** | 200,000 | | 400,000 | | | | 400,000 | | | | 200,000 | | | 1,200,000 |
| | | | | | | | | | | | | | | |
| | **Weekly cash flow** | **75,000** | **-51,270** | **281,417** | **-116,417** | **-118,583** | **-33,000** | **281,417** | **-119,250** | **-117,327** | **-33,000** | **125,673** | **-122,083** | **-17,327** | **35,250** |
| | **Cumulative cash flow** | **75,000** | **23,730** | **305,147** | **188,730** | **70,147** | **37,147** | **318,564** | **199,314** | **81,987** | **48,987** | **174,660** | **52,577** | **35,250** | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | Budget assumes ad valorem taxes, interest to note holders, and amounts due to creditors such as Bay/Berry will be paid from sale proceeds. | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

1

# EXHIBIT "C"

137889-1

# GUARANTY

FOR VALUE RECEIVED, and in consideration of any loan or other financial accommodation heretofore or hereafter at any time made or granted to Trigeant, Ltd., a Florida limited partnership, Trigeant Holdings, Ltd., a Florida limited partnership, and Trigeant, LLC, a Florida, limited liability company (collectively, the "Borrowers"), by Gulf Coast Asphalt Company, L.L.C. (together with any of its designee or its successors and assigns, the "Lender"), under that certain Debtor-In-Possession Promissory Note, dated as of September [__], 2014, made by the Borrowers in favor of Lender in an original principal amount equal to approximately $1,200,000.00 (as amended, restated, supplemented or otherwise modified from time to time, the "DIP Note"), the undersigned, Dan Sargeant, Harry Sargeant, Jr. and Janet Sargeant (collectively, the "Guarantors" and each a "Guarantor"), hereby agree as follows:

1. **Definitions**. Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the DIP Note.

2. **Guaranty of Obligations.** (a) Each Guarantor hereby unconditionally, absolutely and irrevocably guarantees the full and prompt payment and performance when due, whether by acceleration or otherwise, and at all times thereafter, of all indebtedness and other obligations of the Borrowers to the Lender, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or now or hereafter existing or due or to become due under or in connection with the DIP Note, and each of the documents, instruments and agreements executed and delivered in connection therewith, as each may be modified, amended, supplemented or replaced from time to time (all such indebtedness and obligations are herein referred to collectively as the "Liabilities", and all documents evidencing or securing any of the Liabilities are herein referred to, collectively, as the "Loan Documents"). The Liabilities shall include, without limitation, (i) the principal of, and interest on, the Term Advances made to the Borrowers by the Lender under the DIP Note, (ii) all renewals, extensions, amendments, refinancings and other modifications thereof and (iii) all reasonable out-of-pocket expenses incurred by Lender (including the fees, charges and disbursements of any counsel for the Lender) in connection with the collection or enforcement thereof, and all other amounts payable by the Borrowers pursuant to Section 9 of the DIP Note, and whether recovery upon such Liabilities may be or hereafter become unenforceable or shall be an allowed or disallowed claim, whether an administrative expense claim or otherwise, under any proceeding or case commenced by or against any Borrower, including the Bankruptcy Cases, or any Guarantor under any bankruptcy, insolvency or similar laws and including interest that accrues after the commencement by or against any Borrower or any Guarantor of any proceeding under any bankruptcy, insolvency or similar laws, including the Bankruptcy Cases. This Guaranty (as amended, restated, supplemented or otherwise modified from time to time, this "Guaranty") is a guaranty of payment and performance when due and not of collection.

(b) In the event of any default by any Borrower in making payment (on the Maturity Date or otherwise) of, or failure to perform by the Borrower during the occurrence and continuation of any Event of Default, any of the Liabilities, each Guarantor, jointly and severally, agrees on demand by the Lender to pay and perform all of the Liabilities as are then or

thereafter become due and owing or are to be performed under the terms of the Loan Documents, without resort by the Lender to any other party (including any Borrower).  Each Guarantor further agrees, jointly and severally, to pay all expenses (including attorneys' fees and expenses and other amounts payable pursuant to Section 9 of the DIP Note) paid or incurred by Lender in endeavoring to collect the Liabilities, or any part thereof, and in enforcing this Guaranty (herein, the "Collection Costs").

3.  **Continuing Nature of Guaranty and Liabilities.** This Guaranty shall be continuing and shall not be discharged, impaired or affected by:

(a)  the insolvency of any Borrower, including the Bankruptcy Cases, the dismissal or conversion of the Bankruptcy Cases, the appointment of a trustee or an examiner in the Bankruptcy Cases, or the entry of any other order by the Bankruptcy Court in the Bankruptcy Cases;

(b)  the power or authority or lack thereof of any Borrower to incur the Liabilities;

(c)  the validity or invalidity of any of the Loan Documents or the documents securing the same, including the Interim Order or the Final Order;

(d)  the existence or non-existence of any Borrower as a legal entity;

(e)  any statute of limitations affecting the liability of any Guarantor under this Guaranty or the Loan Documents or the ability of the Lender to enforce this Guaranty or any provision of the Loan Documents; or

(f)  any right of offset, counterclaim or defense of any Guarantor (other than payment in full in cash of the Liabilities), including, without limitation, those which have been waived by such Guarantor pursuant to Section 7 hereof.

4.  **Payment of the Liabilities.**  Any amounts received by the Lender from whatever source on account of the Liabilities may be applied by the Lender toward the payment of such of the Liabilities, and in such order of application, as the Lender may from time to time elect, and notwithstanding any payments made by or for the account of any Guarantor pursuant to this Guaranty.

5.  **Reinstatement.**  Each Guarantor agrees that, if at any time all or any part of any payment theretofore applied by the Lender to any of the Liabilities is or must be rescinded or returned by the Lender for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of Borrower, including by any action of the Bankruptcy Court), such Liabilities shall, for the purposes of this Guaranty and to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence notwithstanding such application by the Lender, and this Guaranty shall continue to be effective or be reinstated, as the case may be, as to such Liabilities, all as though such application by the Lender had not been made.

Trigeant DIP Guaranty.DOC

6.    **Permitted Actions of Lender.**  The Lender may from time to time, in its sole discretion and without notice to any Guarantor, take any or all of the following actions:

(a)    retain or obtain a security interest in any assets of any Borrower, any other Guarantor or any third party to secure any of the Liabilities or any obligations of any Guarantor hereunder;

(b)    retain or obtain the primary or secondary obligation of any obligor or obligors, in addition to the Guarantors, with respect to any of the Liabilities;

(c)    extend or renew for one or more periods (whether or not longer than the original period), alter or exchange any of the guaranteed Liabilities, provided that the Lender may not increase the principal amount of the Liabilities to an amount in excess of $1,200,000.00 (plus interest capitalized and added to principal pursuant to Section 5 of the DIP Note) with respect to any Guarantor, without the consent of such Guarantor, or amend Section 2(c) of the DIP Note, without the consent of the Guarantors;

(d)    waive, ignore or forbear from taking action or otherwise exercising any of its default rights or remedies with respect to any default by any Borrower under the Loan Documents;

(e)    release, waive or compromise any obligation of any Guarantor hereunder or any obligation of any nature of any other obligor primarily or secondarily obligated with respect to any of the Liabilities;

(f)    release its security interest in, or surrender, release or permit any substitution or exchange for, all or any part of any collateral now or hereafter securing any of the Liabilities or any obligation hereunder, or extend or renew for one or more periods (whether or not longer than the original period) or release, waive, compromise, alter or exchange any obligations of any nature of any obligor with respect to any such property; and

(g)    demand payment or performance of any of the Liabilities from any Guarantor in accordance with the terms of this Guaranty at any time or from time to time, whether or not the Lender shall have exercised any of its rights or remedies with respect to any property securing any of the Liabilities or any obligation hereunder or proceeded against any other obligor primarily or secondarily liable for payment or performance of any of the Liabilities.

7.    **Specific Waivers.**  Without limiting the generality of any other provision of this Guaranty, each Guarantor hereby expressly waives:

(a)    notice of the acceptance by the Lender of this Guaranty;

(b)    notice of the existence, creation, payment, nonpayment, performance or nonperformance of all or any of the Liabilities;

(c)    presentment, demand, notice of dishonor, protest, notice of protest and all other notices whatsoever with respect to the payment or performance of the Liabilities or the amount thereof or any payment or performance by such Guarantor hereunder;

(d)    all diligence in collection or protection of or realization upon the Liabilities or any thereof, any obligation hereunder or any security for or guaranty of any of the foregoing;

(e)    any right to direct or affect the manner or timing of the Lender's enforcement of its rights or remedies;

(f)    any and all defenses which would otherwise arise upon the occurrence of any event or contingency described in Section 2 hereof or upon the taking of any action by the Lender permitted hereunder;

(g)    any defense, right of set-off, claim or counterclaim whatsoever and any and all other rights, benefits, protections and other defenses available to such Guarantor now or at any time hereafter (other than payment in full in cash of the Liabilities); and

(h)    all other principles or provisions of law, if any, that conflict with the terms of this Guaranty, including, without limitation, the effect of any circumstances that may or might constitute a legal or equitable discharge of a guarantor or surety (other than payment in full in cash of the Liabilities).

8.    **Irrevocability.**  Each Guarantor hereby further waives all rights to revoke this Guaranty at any time, and all rights to revoke any agreement executed by such Guarantor at any time to secure the payment and performance of such Guarantor's obligations under this Guaranty.

9.    **Statutory Waiver of Rights and Defenses Regarding Election of Remedies.**  Each Guarantor waives all rights and defenses arising out of an election of remedies by the Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed such Guarantor's rights of subrogation and reimbursement against any Borrower by the operation of any applicable law or otherwise.

10.    **Subordination.**    Each Guarantor hereby subordinates any and all indebtedness of any Borrower to such Guarantor to the full and prompt payment and performance of all of the Liabilities.  Each Guarantor agrees that the Lender shall be entitled to receive payment of all Liabilities prior to such Guarantor's receipt of payment of any amount of any indebtedness of any Borrower to such Guarantor.  Any payments on such indebtedness to a Guarantor prior to the full and prompt payment and performance of all Liabilities, if the Lender so requests, shall be collected, enforced and received by such Guarantor, in trust, as trustee for the Lender and shall be paid over to the Lender on account of the Liabilities, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.  The Lender is

4

authorized and empowered, but not obligated, in its discretion, (a) in the name of each Guarantor, to collect and enforce, and to submit claims in respect of, any indebtedness of any Borrower to such Guarantor and to apply any amounts received thereon to the Liabilities, and (b) to require each Guarantor (i) to collect and enforce, and to submit claims in respect of, any indebtedness of any Borrower to such Guarantor, and (ii) to pay any amounts received on such indebtedness to the Lender for application to the Liabilities.

11.     **Subrogation.**  No Guarantor will exercise any rights that it may acquire by way of subrogation under this Guaranty, by any payment hereunder or otherwise, until all of the Liabilities have been paid in full in cash, and the Lender shall have no further obligations to any Borrower under the Loan Documents. If any amount shall be paid to a Guarantor on account of such subrogation rights at any time prior to the payment in full in cash of the Liabilities, such amount shall be held in trust for the benefit of the Lender and shall be forthwith paid to the Lender to be credited and applied to the Liabilities, whether matured or unmatured, in such manner as Lender shall determine in its sole discretion.  For the avoidance of doubt, each Guarantor's rights of subrogation under applicable law shall be restored after all of the Liabilities have been paid in full in cash, and the Lender shall have no further obligations to any Borrower under the Loan Documents.

12.     **Indulgences Not Waivers.**   No delay in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the Lender of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy; nor shall any modification or waiver of any of the provisions of this Guaranty be binding upon the Lender, except as expressly set forth in a writing duly signed and delivered by the Lender. No action of the Lender permitted hereunder shall in any way affect or impair the rights of the Lender or the obligations of Guarantors under this Guaranty.

13.     **Financial Condition of Borrower.**   (a) Each Guarantor represents and warrants that it is fully aware of the financial condition of each Borrower, and such Guarantor delivers this Guaranty based solely upon its own independent investigation of each Borrower's financial condition and in no part upon any representation or statement of the Lender with respect thereto. Each Guarantor further represents and warrants that it is in a position to and hereby does assume full responsibility for obtaining such additional information concerning each Borrower's financial condition as such Guarantor may deem material to its obligations hereunder, and no Guarantor is relying upon, nor expecting the Lender to furnish it any information in the Lender's possession concerning any Borrower's financial condition or concerning any circumstances bearing on the existence or creation, or the risk of nonpayment or nonperformance of the Liabilities.

(b)     Without limiting the generality of Section 13(a) above, each Guarantor hereby expressly waives any duty on the part of the Lender to disclose to such Guarantor any facts it may now or hereafter know about any Borrower, regardless of whether the Lender has reason to believe that any such facts materially increase the risk beyond that which such Guarantor intends to assume or has reason to believe that such facts are unknown to such Guarantor. In addition,

5

each Guarantor hereby knowingly accepts the full range of risk encompassed within a contract of "Guaranty" which includes, without limitation, the possibility that the Borrowers will contract for additional indebtedness for which such Guarantor may be liable hereunder after any Borrower's financial condition or ability to pay its lawful debts when they fall due has deteriorated.

14. **Representations and Warranties.**  Each Guarantor represents and warrants to the Lender that each of the following statements is accurate and complete as of the date of this Guaranty:

(a)    this Guaranty has been duly executed and delivered by such Guarantor and constitutes a legal, valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally;

(b)    the execution, delivery and performance of this Guaranty do not (i) violate any applicable provisions of law or any order of any court or other agency of government (each, a "Requirement of Law"), except for such violations that could not reasonably be expect to have a material adverse effect on such Guarantor's ability to perform its obligations hereunder (a "Material Adverse Effect"), (ii) contravene any provision of any material contract or agreement to which such Guarantor is a party or by which such Guarantor or such Guarantor's assets are bound (each, a "Contractual Obligation"), or (iii) result in the creation or imposition of any lien, charge or encumbrance of any nature upon any property, asset or revenue of such Guarantor;

(c)    all consents, approvals, orders and authorizations of, and registrations, declarations and filings with, any governmental agency or authority or other person or entity (including, without limitation, the shareholders or partners of any entity), if any, which are required to be obtained in connection with the execution and delivery of this Guaranty or the performance of such Guarantor's obligations hereunder have been obtained, and each is in full force and effect;

(d)    such Guarantor has paid all material taxes and other charges imposed by any governmental agency or authority due and payable by such Guarantor other than those which are being challenged in good faith by appropriate proceedings;

(e)    such Guarantor is not in violation of any Requirement of Law or Contractual Obligation other than any violation the consequences of which could not have a Material Adverse Effect; and

(f)    no action, proceeding, investigation or litigation is pending or, to the knowledge of such Guarantor, overtly threatened against such Guarantor by any person or entity which, if adversely determined, could have a Material Adverse Effect.

Trigeant DIP Guaranty.DOC

15.     **Binding Upon Successors; Death of a Guarantor.**     To the extent permitted by applicable law, this Guaranty shall be binding upon each Guarantor and such Guarantor's successors and assigns and shall inure to the benefit of the Lender and its successors and permitted assigns. This Guaranty shall not terminate or be revoked upon the death of a Guarantor, notwithstanding any knowledge by the Lender of such Guarantor's death. All references herein to a Borrower shall be deemed to include such Borrower' successors and assigns, and all references herein to a Guarantor shall be deemed to include such Guarantor and such Guarantor's successors and assigns or, upon the death of such Guarantor, the duly appointed representative, executor or administrator of such Guarantor's estate.

16.     **Obligations Joint and Several.**  In addition and notwithstanding anything to the contrary contained in this Guaranty or in any other document, instrument or agreement between or among any of the Lender, any Borrower, any Guarantor or any third party, the obligations of Guarantors with respect to the Liabilities shall be joint and several, and shall be joint and several with any other person or entity that now or hereafter executes a guaranty of any of the Liabilities separate from this Guaranty.  The obligations of each Guarantor hereunder are those of primary obligor, and not merely as surety, and are independent of the Liabilities and the obligations of any other guarantor of the Liabilities or any part thereof, and a separate action may be brought against any Guarantor to enforce this Guaranty whether or not Borrower or any other Guarantor is joined as a party.

17.     **Notices.**   All notices and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand; (b) when delivered to the addressee if sent by a nationally recognized overnight courier, next Business Day delivery guaranteed; (c) on the date sent by facsimile or e-mail (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.   Such communications must be sent to the respective parties at the following addresses (or at such other address, facsimile number or e-mail address as shall be specified by like notice):

If to the Lender:

Gulf Coast Asphalt Company, L.L.C.
11 Greenway Plaza, Suite 2950
29th Floor
Houston, TX 77046
Attention: J. David Hubenak, Vice President and General Counsel
Email: dhubenak@gcachouston.com
Fax: (832) 426 3320

with a copy to:

Kaye Scholer LLP
250 West 55th Street
New York, NY 10019

Attention:  Steven Canner and Benjamin Mintz
Email: steven.canner@kayescholer.com; benjamin.mintz@kayescholer.com
Fax: (212) 836-6636

If to any Guarantor:

Furr & Cohen, P.A.
2255 Glades Road
Suite 337 West
Boca Raton, FL  33431
Attention:  Alan R. Crane
Email: acrane@furrcohen.com
Fax:  (561) 338-7532

18.    **Governing Law; Additional Waivers.**

(a)    This Guaranty has been delivered and shall be governed by and construed in accordance with the internal laws (as opposed to the conflicts of law provisions) of the State of New York.

(b)    **EXCEPT FOR MATTERS WITHIN THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, EACH GUARANTOR IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE LENDER IN ANY WAY RELATING TO THIS GUARANTY OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THE STATE OR FEDERAL COURTS LOCATED WITHIN WILMINGTON, DELAWARE, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH GUARANTOR HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE GUARANTORS AND THE LENDER (BY ITS ACCEPTANCE HEREOF) AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS GUARANTY SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING**

8

**TO THIS GUARANTY AGAINST ANY GUARANTOR OR ANY OF ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.**

(c)     **EXCEPT FOR MATTERS WITHIN THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, EACH GUARANTOR IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN SUBSECTION (b) ABOVE.  EACH GUARANTOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.**

(d)     Nothing herein shall affect or impair the Lender's right to serve legal process in any manner permitted by law or the Lender's right to bring any action or proceeding against a Guarantor or its property in the courts of any other jurisdiction. Wherever possible each provision of this Guaranty shall be interpreted as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

(e)     **EACH GUARANTOR HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 17.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF THE LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.**

(f)     **EACH GUARANTOR (AND BY ITS ACCEPTANCE HEREOF, THE LENDER) HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS GUARANTY AND FOR ANY COUNTERCLAIM THEREIN.**

19.     **Advice of Counsel.**  EACH GUARANTOR ACKNOWLEDGES THAT SUCH GUARANTOR HAS EITHER OBTAINED THE ADVICE OF COUNSEL OR HAS HAD THE OPPORTUNITY TO OBTAIN SUCH ADVICE IN CONNECTION WITH THE TERMS AND PROVISIONS OF THIS GUARANTY.

20.     **Information to the Guarantors.**  Upon any Guarantor's request, promptly (and in no event later than three (3) Business Days' thereafter), the Lender shall deliver a written summary of the principal amount outstanding under the DIP Note as of the date of such request and the per diem amount accruing thereon to the extent calculable.

9

21.    **Entire Agreement.**  This Guaranty contains the complete understanding of the parties hereto with respect to the subject matter herein.   Each Guarantor acknowledges that such Guarantor is not relying upon any statements or representations of the Lender not contained in this Guaranty and that such statements or representations, if any, are of no force or effect and are fully superseded by this Guaranty. This Guaranty may only be modified by a writing executed by a Guarantor, in respect to any amendment or modifications of the rights and obligations thereof, and the Lender.

10

IN WITNESS WHEREOF, each Guarantor has executed this Guaranty this _____ day of September, 2014.

GUARANTORS:

_____
Dan Sargeant

_____
Harry Sargeant, Jr.

_____
Janet Sargeant

ACKNOWLEDGED AND AGREED:

LENDER:

**GULF COAST ASPHALT COMPANY, L.L.C.**


By: _____,
Name:
Title: