## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| TRIGEANT HOLDINGS, LTD., *et al.*,[1] | Case No. 14-29027-EPK |
| Debtors. | (Jointly Administered) |

### LIMITED OBJECTION TO AMENDED CLAIM OF BTB REFINING, LLC

Trigeant Holdings, Ltd. ("**Holdings**"), Trigeant, LLC ("**LLC**"), and Trigeant, Ltd. ("**Trigeant**"), debtors and debtors in possession (collectively, the "**Debtors**") in these chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to Federal Rule of Bankruptcy Procedure 3007 and Local Rule 3007-1, files this limited objection to the Amended Proof of Claim of BTB Refining, LLC (the "**BTB Claim**"),[2] and state:

### Jurisdiction

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).   Venue is proper under 28 U.S.C. §§ 1408 and 1409.   The statutory predicate for the relief requested herein is 11 U.S.C. § 502.

### Factual Background[3]

2.     Trigeant owns a crude processing unit and storage facility located at 6600 Up River Road, Corpus Christi, Texas (the "**CPU Facility**").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Trigeant Holdings, Ltd., (5375); Trigeant, LLC (2035); and Trigeant, Ltd. (2037).   The Debtors' business address is 3020 North Military Trail, Ste 100, Boca Raton, FL 33431.

[2] Case No. 14-30727; Claim No. 13-2 – this claim amended and replaced Claim No. 13-1.   For consistency and ease, this Objection cites and refers to only the proof of claim filed in Trigeant's bankruptcy case where identical copies of proofs of claim filed against Trigeant have been filed in LLC's or Holdings' bankruptcy cases.   Because the holders of such claims are entitled to only a single satisfaction, the relief requested in this Objection applies to such identical claims.

[3] Additional factual background is set forth in the Court's Orders at ECF Nos. 289, 477 and 492.

3.      On March 4, 2008, BTB conducted a non-judicial foreclosure sale of the CPU Facility and other property purportedly under Texas law (the "**March Foreclosure**"), which foreclosure included the CPU Facility.

4.      In 2009, PDVSA Petróleo, S.A ("**PDVSA**"), as a creditor of Trigeant, brought suit against BTB seeking, *inter alia*, to set aside the March Foreclosure sale as a fraudulent transfer under Texas law.  On January 14, 2013, the United States District Court for the Southern District of Texas (the "**District Court**") in *PDVSA Petróleo, S.A. v. Trigeant, LTD et al.*, Case No. 09-cv-00038 (S.D. Tex. Jan. 14, 2013) entered final judgment in favor of PDVSA and against BTB determining that the March Foreclosure effected by BTB constituted an actual and constructive fraudulent transfer (the "**Fraudulent Transfer Judgment**").

5.      The Fraudulent Transfer Judgment avoided the March Foreclosure, divested BTB of title to the CPU Facility, and returned title and ownership to Trigeant.

6.      On August 25, 2014, Holdings and LLC, and on September 16, 2014, Trigeant, each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing these Chapter 11 Cases.

7.      On January 16, 2015, BTB Refining, LLC ("**BTB**") filed the BTB Claim, which, in addition to other amounts, includes "an unsecured claim in the amount of $2,520,331.67 which represents payments made by [BTB] on behalf of Trigeant, including insurance, capital expenditures, and payment of creditors of the Debtor" (the "**Unsecured Claim**").  *See* BTB Claim, Ex. A, ¶3.  More specifically, the Unsecured Claim is compromised of the following amounts:

|       |             |              |
| ----- | ----------- | ------------ |
| (i)   | Unsecured   | $974,936.95  |
| (ii)  | Insurance 1 | $625,574.35  |
| (iii) | Insurance 2 | $771,545.80  |
| (iv)  | Cap Ex.     | $148,274.58  |

*See* BTB Claim, Ex. 4.

8.      The BTB Claim does not include or attach detailed invoices or any meaningful breakdown that might support the amounts set forth in the Unsecured Claim.  Instead, in connection with confirmation discovery, BTB produced to Trigeant documents purporting to support the Unsecured Claim (the "**Supporting Documents**").  A copy of the Supporting Documents is attached hereto as **Composite Exhibit A**.

9.      The Supporting Documents provide that BTB made a series of payments between March 4, 2008 and April 30, 2008 totaling $974,936.95 and for which it now seeks to hold the Debtors liable.  BTB fails to articulate how or why these purported payments by BTB entitle it to a claim against the Debtors in these cases.

10.     The Supporting Documents also include the following breakdown of the supposed capital expenditures:

| | |
|---|---|
| POWER REPAIR | $28,138.91 |
| CLEAN HARBORS | $6,160.55 |
| ENVIRONMENTAL | $4,979.60 |
| HOLMAN BOILER | $3,548.22 |
| SCOTT AIR | $27,818.78 |
| THERMON HEAT | $59,734.14 |
| US ECOLOGY | $17,894.38 |
| TOTAL | $148,274.58 |

*See* Supporting Documents, BTB 06650.  Again, BTB provides no further explanation or information about these purported payments or why BTB's purported payment of these amounts entitles it to a claim in these Chapter 11 Cases.

11.     Finally, BTB produced to the Debtors a chart labeled "Bill Payment to First Insurance Funding," which purports to set forth payments made to an insurance company (or, possibly, multiple insurance companies) by BTB in 2013 totaling $1,397,120.15.  BTB provides no reason why these payments, even if accurate, are chargeable to the Debtors.

3

## Legal Argument

12.     In accordance with Fed. Bankr. R. 3001(f), a proof of claim shall constitute prima facie evidence of the validity and amount of the claim.  "The debtor, however, need only present evidence supporting its objection ... to shift the burden of proving the claim back to the claimant."  *In re Rasbury*, 141 B.R. 752, 757 (N.D. Ala. 1992).  In other words, once the debtor satisfies its obligation of providing evidence to support its claim objection, the burden shifts back to the creditor to prove the validity of the claim by the preponderance of the evidence.  *In re Baggett Brothers Farm, Inc.*, 2009 WL 454923 (11th Cir. Feb. 25, 2009).  The ultimate burden of persuasion with regard to disputed claims generally rests with the claimant.  *In re Arndt*, 201 B.R. 853, 857 (Bankr. M.D. Fla. 2001).  BTB fails to satisfy that burden.

13.     Other than an unsubstantiated allegation that it made certain payments on behalf of Trigeant and to Trigeant's creditors, BTB offers little more to explain how or why these purported payments are chargeable to the Debtors.  For this reason alone, the Unsecured Claim fails and should be disallowed in its entirety.

a.      Accounts Payable

14.     BTB purports to have made a series of payments to trade creditors of Trigeant between March 4, 2008 and April 30, 2008 totaling $974,936.95.[4]  BTB, however, had already foreclosed on the CPU Facility as of March 4, 2008 and paid those amounts not for the benefit of Trigeant, but for its own benefit in its operation of the CPU Facility.  Moreover, as the then-owner of the CPU Facility, BTB had the financial upside associated with ownership of the facility and cannot pass along to the Debtors the costs associated with that ownership.  BTB

---

[4] The lack of specificity and explanation regarding the debts incurred and paid by BTB on account of these "Account Payables" impairs the Debtors ability to determine whether the amounts paid were legitimate, for whose benefit they were incurred and paid and whether Trigeant incurred and paid certain expenses of BTB for which it is entitled to a setoff.

would be unjustly enriched, and would profit from its actual fraud, if permitted to benefit not only from its fraudulent ownership of the CPU Facility, but also by passing on to the Debtors some of the costs associated with that ownership.  Accordingly, these amounts are not chargeable to Trigeant.

    b.  <u>Capital Expenditures</u>

   15.  While BTB provides a list of those payments purportedly made as capital expenditures, BTB fails to set forth when these purported payments were made or why the Debtors should be liable for these payments.  To the extent that BTB incurred and paid these amounts while it owned and controlled the CPU Facility, then these amounts should not be chargeable to the Debtors.

   16.  BTB had the ability to obtain the economic benefit associated with the CPU Facility during its period of ownership and control and any amounts incurred or paid during that period should not be passed on to the Debtors.  Moreover, BTB is seeking to recover monies expended in furtherance of its actual fraudulent transfer of the CPU Facility.  *See PDVSA Petroleo S.A. v. Trigeant, Ltd.*, 2012 WL 3249531, at *13 (S.D. Tex. Aug. 7, 2012) (holding that BTB engaged in actual fraud in connection with its foreclosure of the CPU facility).  BTB should not be permitted to recover from the labors of its fraudulent conduct.  *Cf.* ECF No. 492 ("It is not reasonable for BTB to now seek to recover fees and expenses in connection with a foreclosure that was found to be, incontrovertibly, an intentionally fraudulent act involving BTB and its principal insider.").  BTB's attempt to recoup these alleged capital expenditures should, therefore, be rejected.

c.    Insurance

17.    BTB's inclusion of insurance payments made in late 2012 and in 2013 as part of the Unsecured Claim is also puzzling.

18.    BTB and Freepoint Commodities Trading and Marketing LLC ("**Freepoint**") entered into a Tank Lease Agreement dated December 1, 2012 in which Trigeant joined (the "**TLA**").  A copy of the TLA is attached hereto as **Exhibit B**.  Pursuant to the TLA, the "Lessor" – BTB – was required to maintain certain minimum levels of insurance.  *See* TLA, at §§ 20.2 and 20.3.  While title to the CPU Facility was re-vested in Trigeant under the Fraudulent Transfer Judgment entered on January 14, 2013, the District Court permitted BTB to continue to operate under the TLA.  *See Order Denying BTB Refining, LLC's Emergency Motion for Stay and Modifying Order on Trigeant, Ltd.'s Motion to Enforce Judgment* [ECF No. 352; Case No. 2:09-cv-00038 (S.D. Tex.)] (the "**Modified Order**"), a copy of which is attached hereto as **Exhibit C**.

19.    The Modified Order also provided, among other things, that BTB shall immediately deposit into the "Escrow Account" (as defined therein) any and all funds received from Freepoint under the TLA.  *See* Modified Order, at ¶2.  Those funds were then to be available for Trigeant to pay certain necessary and reasonable costs, including, for example, to maintain the insurance required under the TLA.  *Id.* at ¶4.  In fact, Trigeant's records reflect that it made monthly payments from the Escrow Account directly to First Insurance Funding from and after the entry of the Modified Order in 2013.

20.    To the extent BTB made any insurance payments prior to the entry of the Modified Order, those payments were in accordance with BTB's obligations under the TLA, were made for the benefit of BTB and are not chargeable to Trigeant.  Without more information from BTB supporting its entitlement to reimbursement for certain alleged insurance payments,

Trigeant cannot even determine what insurance payments BTB is alleging to have made and under what basis BTB would be entitled to reimbursement for any such payments.

21.    Moreover, on multiple occasions, BTB failed to deposit into the Escrow Account all of the funds received from Freepoint, as required by the Modified Order.  Instead, BTB diverted those funds away from Trigeant and yet now seeks to hold Trigeant responsible for certain insurance payments that, if made by BTB at all, were likely made with those same diverted funds.  Again here, if in fact BTB opted to make these insurance payments directly rather than through the Escrow Account as required by the Modified Order, it cannot be heard to seek reimbursement from Trigeant.

22.    For these reasons, this portion of the Unsecured Claim should also be denied.

## RIGHTS OF SETOFF

23.    In addition to all of the foregoing, Trigeant asserts as part of this objection both general and specific rights of setoff against the Unsecured Claim.  The bases for these setoffs are set forth in greater detail in the *Amended Complaint* [ECF No. 13; Adv. Proc. No. 15-01079-EPK] and also exist as a result of other independent claims of Trigeant against BTB.  These setoffs, which can be more clearly articulated once BTB provides the requisite specificity in support of the Unsecured Claim, form yet another basis to deny the Unsecured Claim in full.[5]

## REQUEST TO SHORTEN NOTICE PERIOD

24.    Pursuant to Federal Rule of Bankruptcy Procedure 3007(a), the notice period for a hearing on an objection to claim is 30 days.  In accordance with Federal Rule of Bankruptcy Procedure 9006(c)(1), the Court "for cause shown may in its discretion with or without motion or

---

[5] In particular, and without limitation, these specific rights of setoff (or even recoupment) arise in respect of unpaid obligations incurred by BTB during the term of the TLA which have been lodged against Trigeant, such as permit fees incurred to TCEQ, the Bay/Berry claims (in event that Court determines that Dock Use Agreement is owned by BTB and not Trigeant), and others too numerous to mention until such time as BTB provides additional information regarding the basis for the BTB Claim.

notice order the period reduced." "Cause" exists here for the Court to reduce the notice period from 30 days to 27 days to enable this Limited Objection to be heard in connection with the confirmation hearing on the Debtors' Plan of Reorganization, which is scheduled to begin on May 4, 2015. No party in interest will be materially or unfairly prejudiced by a short, three-day reduction in the notice period. Accordingly, the Debtors request the Court to reduce the notice period for this Limited Objection to the BTB Claim from 30 days to 27 days.

WHEREFORE, the Debtors respectfully request that the Court (i) reduce the notice period for this Limited Objection; (ii) sustain this Limited Objection and disallow the Unsecured Claim in its entirety; and (iii) grant further relief as is just and proper.

Dated April 7, 2015.                                    Respectfully submitted,

GREENBERG TRAURIG, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

By:    /s/ *Mark D. Bloom*
      MARK D. BLOOM
      Fla. Bar. No. 303836
      bloomm@gtlaw.com
      JOHN R. DODD
      Fla. Bar No. 38091
      doddj@gtlaw.com
      ARI NEWMAN
      Fla. Bar No. 56575
      newmanar@gtlaw.com

-and-

SCOTT M. GROSSMAN
Fla. Bar No. 176702
grossmansm@gtlaw.com
401 East Las Olas Blvd., Suite 2000
Fort Lauderdale, FL 33301
Telephone: (954) 765-0500
Facsimile: (954) 765-1477

*Counsel to the Debtors*

9

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List below, either via transmission of Notices of Electronic Filing generated by CM/ECF or by first class U.S. mail for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

 /s/ <i>Mark D. Bloom</i>        
Mark D. Bloom

### <u>Electronic Mail Notice List</u>

The following is the list of parties who are currently on the list to receive e-mail notice/service for this case:

- David M Bennett    david.bennett@tklaw.com
- Mark D. Bloom    bloomm@gtlaw.com, MiaLitDock@gtlaw.com;miaecfbky@gtlaw.com
- Mark Bonacquisti    mark@mbpa-law.com, atty_ellison@trustesolutions.com,allusers@mbpa-law.com,annmarie@mbpa-law.com
- Alan R Crane    acrane@furrcohen.com, pmouton@furrcohen.com;atty_furrcohen@bluestylus.com
- John R. Dodd    doddj@gtlaw.com, miaecfbky@gtlaw.com;mialitdock@gtlaw.com
- Heidi A Feinman    Heidi.A.Feinman@usdoj.gov
- Gregory S Grossman    ggrossman@astidavis.com, ngonzalez@astidavis.com
- Scott M. Grossman    grossmansm@gtlaw.com, smithl@gtlaw.com; MiaLitDock@gtlaw.com;FTLLitDock@GTLaw.com;miaecfbky@gtlaw.com
- Jordi Guso    jguso@bergersingerman.com, fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com
- Charles H Lichtman    clichtman@bergersingerman.com, lwebster@bergersingerman.com;efile@bergersingerman.com
- Demetra L Liggins    demetra.liggins@tklaw.com
- Isaac M Marcushamer    imarcushamer@bergersingerman.com, fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com
- Michael C Markham    mikem@jpfirm.com, minervag@jpfirm.com
- Paul J McMahon    pjm@pjmlawmiami.com
- Ari Newman    newmanar@gtlaw.com, crossmann@gtlaw.com;mialitdock@gtlaw.com;miaecfbky@gtlaw.com
- Office of the US Trustee    USTPRegion21.MM.ECF@usdoj.gov
- Jodi Ann Pandolfi    jodi.pandolfi@bakermckenzie.com
- David L Rosendorf    dlr@kttlaw.com, rcp@kttlaw.com;CWT@kttlaw.com;ycc@kttlaw.com
- Deirdre B. Ruckman    druckman@gardere.com, koliver@gardere.com
- Jay Sakalo    jsakalo@bilzin.com, eservice@bilzin.com;lflores@bilzin.com

- Luis Salazar    salazar@salazarjackson.com,
  jackson@salazarjackson.com;dagley@salazarjackson.com;aguilar@salazarjackson.com;
  Lee-Sin@SalazarJackson.com;pacetti@salazarjackson.com;cloyd@salazarjackson.com
- Diane W Sanders    austin.bankruptcy@lgbs.com
- Paul Steven Singerman    singerman@bergersingerman.com,
  mdiaz@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com
- Cristina M Suarez    csuarez@astidavis.com
- Charles W Throckmorton    cwt@kttlaw.com, lf@kttlaw.com;ycc@kttlaw.com

## Manual Notice List

Steven J Reisman
Jonathan J. Walsh
Theresa A. Foudy
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178

Robert L. Klawetter
Eastham, Watson, Dale & Forney, LLP
808 Travis St., Suite 1300
Houston, TX 77002

Benjamin Mintz
Neal Hampton Kaye Scholer
250 West 55th Street
New York, NY 10019-9710

Mark T. Mitchell
Gardere Wynne Sewell LLP
600 Congress Ave., #3000
Austin, TX 78701

David Parham
Rosa A Shirley
Baker & McKenzie LLP
2300 Tammell Crow Center
2001 Ross Ave #2300
Dallas, TX 75201

Christina K. Schovajsa
Eastham, Watson,
Dale & Forney, L.L.P.
808 Travis St., Suite 1300
Houston, TX 77002

Union Pacific Railroad Company
1400 Douglas Street Stop 1580
Omaha, NE 96817

Isaias Medina
Coordinator of Litigation and Claims
Management of International Matters
General Counsel's Office
Petroleos de Venezuela, S.A.
Av. Libertador, Toree Este Piso 1
Oficina 10-30
Consultoria Juridica, La Campina
Caracas, Venezuela 1050

Ronald A. Simank
Schauer & Simank, PC
615 North Upper Broadway
Suite 700
Corpus Christi, TX 78401

**BTB Refining, LLC**
**Bill Payments for FIRST INSURANCE FUNDING**
**All Transactions**

| Type | Num | Date | Amount | Base Finance Payment | Ratio | Property Coverage |
|------|-----|------|--------|----------------------|-------|-------------------|
| Future Wire Transfer | | 06/25/2013 | $           - | $    158,143.43 | 8.14% | $    116,770.89 |
| Future Wire Transfer | | 05/25/2013 | 0.00 | 158,143.43 | 8.14% | 116,770.89 |
| Future Wire Transfer | | 04/25/2013 | 0.00 | 158,143.43 | 8.14% | 116,770.89 |
| Bill Pmt -Check | Wire Transf | 04/04/2013 | 212,742.64 | 158,143.43 | 8.14% | 116,770.89 |
| Bill Pmt -Check | Wire Trsf | 02/28/2013 | 186,214.07 | 158,143.43 | 8.14% | 116,770.89 |
| Bill Pmt -Check | Wire | 01/29/2013 | 15,814.34 | | | |
| Bill Pmt -Check | Wire | 01/28/2013 | 158,143.43 | 158,143.43 | 8.14% | 116,770.89 |
| Bill Pmt -Check | Wire Trans | 12/28/2012 | 158,143.43 | 158,143.43 | 8.14% | 116,770.89 |
| Bill Pmt -Check | Wire Trans | 12/06/2012 | 158,143.43 | 158,143.43 | 8.14% | 116,770.89 |
| Total First Insurance | | | 889,201.34 | | | |
| Bill Pmt -Check | Wire | 02/01/2013 | 45,000.00 | | | |
| Bill Pmt -Check | Wire Transf | 10/29/2012 | 10,043.43 | 158,143.43 | 8.14% | 116,770.89 |
| Bill Pmt -Check | Wire Transf | 10/16/2012 | 6,974.96 | | | |
| Bill Pmt -Check | Wire Transf | 10/11/2012 | 158,143.43 | 158,143.43 | 8.14% | 116,770.89 |
| Bill Pmt -Check | Wire Transf | 10/11/2012 | 354,257.65 | 361,232.61 | 18.59% | 266,729.09 |
| Total Tequesta Agency | | | 574,419.47 | | | |
| **TOTAL INSURANCE** | | | **$   1,463,620.81** | **$   1,942,666.91** | **100.00%** | **$    1,434,438** |

| | | |
|---|---|---|
| **INSURANCE DAYS** | | 360 |
| **INSURANCE PER DAY** | | 3,984.55 |
| **JAN** | 7 | 27,891.85 |
| **FEB** | 30 | 119,536.50 |
| **MAR** | 30 | 119,536.50 |
| **APR** | 30 | 119,536.50 |
| **MAY** | 30 | 119,536.50 |
| **JUN** | 30 | 119,536.50 |
| **TOTAL JUNE 2013 POLICY** | | **625,574.35** |

**COMPOSITE**
**EXHIBIT A**

2:20 PM
04/12/13

**BTB Refining, LLC**
Case 14-29027-EPK    Doc 504    Filed 04/07/15    Page 13 of 46
**Bill Payments for FIRST INSURANCE FUNDING**
**All Transactions**

**Post Order**

**Payments**

$ 116,770.89

116,770.89

116,770.89

116,770.89

73.84%

Check

BTB 06648

**BTB Refining, LLC**
# Bill Payments for FIRST INSURANCE FUNDING
### All Transactions

| Type | Num | Date | Base Finance Payment | Ratio | Property Coverage |
|------|-----|------|---------------------:|:-----:|------------------:|
| First Insurance Funding | | 12/07/2013 | $ 629,346.91 | 73.84% | $ 464,700.93 |
| Tequesta | | 06/08/2013 | 155,482.72 | 73.84% | 114,806.26 |
| Tequesta | | 06/08/2013 | 260,078.89 | 73.84% | 192,038.60 |
| **TOTAL INSURANCE** | | | **$ 1,044,908.52** | **221.52%** | **771,545.80** |

BTB 06649

| NAME | Num | Date | Amount |
|------|-----|------|--------|
| POWER REPAIR | | | 28,138.91 |
| CLEAN HARBORS | | | 6,160.55 |
| ENVIRONMENTAL EVOLUTIONS | | | 4,979.60 |
| HOLMAN BOILER | | | 3,548.22 |
| SCOTT AIR | | | 27,818.78 |
| THERMON HEAT TRACING | | | 59,734.14 |
| US ECOLOGY | | | 17,894.38 |
| **TOTAL INSURANCE** | | | **148,274.58** |

| Date | Name | Amount | Balance |
|------|------|-------:|--------:|
| **20000-1 · Accounts Payable** | | | 0.00 |
| 03/04/2008 | UNION PACIFIC RAILROAD COMPANY | 21,554.70 | 21,554.70 |
| 03/05/2008 | A & W OFFICE SUPPLY | 87.65 | 21,642.35 |
| 03/06/2008 | T-MOBILE | 104.55 | 21,746.90 |
| 03/06/2008 | TRACTOR SUPPLY COMPANY | 224.09 | 21,970.99 |
| 03/06/2008 | AT&T WIRELESS | 873.39 | 22,844.38 |
| 03/06/2008 | AMERICAN INSULATION/ABATEMENT | 25,128.07 | 47,972.45 |
| 03/10/2008 | LOCKHEED MARTIN | 132.50 | 48,104.95 |
| 03/11/2008 | LOCKHEED MARTIN | 132.50 | 48,237.45 |
| 03/12/2008 | LOCKHEED MARTIN | 132.50 | 48,369.95 |
| 03/12/2008 | BAY LTD. | 126.07 | 48,496.02 |
| 03/12/2008 | TEXAS STEEL COMPANY | 29.20 | 48,525.22 |
| 03/13/2008 | ORANGE GROVE CO-OP | 293.99 | 48,819.21 |
| 03/14/2008 | LYNNIE GANTZ | 200.78 | 49,019.99 |
| 03/14/2008 | LOCKHEED MARTIN | 132.50 | 49,152.49 |
| 03/14/2008 | CITY OF CORPUS CHRISTI-001 | 600.00 | 49,752.49 |
| 03/14/2008 | FERGUSON ENTERPRISES INC. | 60.96 | 49,813.45 |
| 03/14/2008 | NetSolutions | 867.81 | 50,681.26 |
| 03/18/2008 | AT & T-001 | 685.67 | 51,366.93 |
| 03/19/2008 | JOHN DELUNA | 300.00 | 51,666.93 |
| 03/20/2008 | FIDELITY H R ACCESS | 15,655.50 | 67,322.43 |
| 03/20/2008 | LOCKHEED MARTIN | 132.50 | 67,454.93 |
| 03/26/2008 | ANTONIO MARTINEZ | 3,000.00 | 70,454.93 |
| 03/27/2008 | LOCKHEED MARTIN | 132.50 | 70,587.43 |
| 03/31/2008 | J M SUPPLY | 64,487.90 | 135,075.33 |
| 03/31/2008 | BAY LTD. | 135,695.78 | 270,771.11 |
| 03/31/2008 | CORPUS CHRISTI GASKET & FASTENER LTD. | 517.49 | 271,288.60 |
| 03/31/2008 | TRIPLEX INC. | 938.52 | 272,227.12 |
| 03/31/2008 | SOUTH TEXAS PAINTING & SANDBLASTING | 62,000.00 | 334,227.12 |
| 03/31/2008 | KENNEDY WIRE ROPE & SLING COMPANY | 76.87 | 334,303.99 |
| 03/31/2008 | ECKEL & ASSOCIATES INC. | 2,059.72 | 336,363.71 |
| 04/01/2008 | INTER-TEL LEASING INC. | 1,184.68 | 337,548.39 |
| 04/01/2008 | RAY WEST WAREHOUSES INC. | 120.00 | 337,668.39 |
| 04/01/2008 | BAY LTD. | 180.00 | 337,848.39 |
| 04/01/2008 | ALLIED WASTE SERVICES #847 | 394.48 | 338,242.87 |
| 04/01/2008 | T. ROBERTS OPTICAL | 94.00 | 338,336.87 |
| 04/01/2008 | KEVIN KIESCHNICK | 61.50 | 338,398.37 |
| 04/01/2008 | TX DEPT OF STATE HEALTH SERVICES | 272.00 | 338,670.37 |
| 04/01/2008 | AASHTO | 350.00 | 339,020.37 |
| 04/01/2008 | AASHTO | 675.00 | 339,695.37 |
| 04/01/2008 | LOCKHEED MARTIN | 132.50 | 339,827.87 |
| 04/01/2008 | BEST COMMERCIAL SERVICES | 1,244.88 | 341,072.75 |
| 04/01/2008 | GULF COAST EXPRESS | 425.00 | 341,497.75 |
| 04/01/2008 | JOHN CRANE INC. | 239.54 | 341,737.29 |
| 04/01/2008 | ALLIED WASTE SERVICES #847 | 5.82 | 341,743.11 |
| 04/01/2008 | DISTRIBUTION INTERNATIONAL | 56.00 | 341,799.11 |

BTB 06651

| | | | |
|---|---|---|---|
| 04/01/2008 | WILSON-MOHR INC. | 464.28 | 342,263.39 |
| 04/01/2008 | JOHNSTONE SUPPLY | 41.00 | 342,304.39 |
| 04/01/2008 | SAFETY-KLEEN SYSTEMS INC. | 191.67 | 342,496.06 |
| 04/01/2008 | JOHNSTONE SUPPLY | 564.92 | 343,060.98 |
| 04/01/2008 | DISTRIBUTION INTERNATIONAL | 112.00 | 343,172.98 |
| 04/01/2008 | DISTRIBUTION INTERNATIONAL | 9.75 | 343,182.73 |
| 04/01/2008 | DISTRIBUTION INTERNATIONAL | 369.40 | 343,552.13 |
| 04/01/2008 | DISTRIBUTION INTERNATIONAL | 83.55 | 343,635.68 |
| 04/01/2008 | DISTRIBUTION INTERNATIONAL | 245.17 | 343,880.85 |
| 04/02/2008 | BAY LTD. | 183.52 | 344,064.37 |
| 04/02/2008 | SIGN XPRESS | 105.00 | 344,169.37 |
| 04/02/2008 | SIGN XPRESS | 8.66 | 344,178.03 |
| 04/02/2008 | TERMINIX INTERNATIONAL | 117.99 | 344,296.02 |
| 04/02/2008 | TRADE TECHNOLOGY SYSTEMS INC.-001 | 108.25 | 344,404.27 |
| 04/03/2008 | ACE HARDWARE/WESTERN AUTO | 40.04 | 344,444.31 |
| 04/03/2008 | JOHN CRANE INC. | 4,607.85 | 349,052.16 |
| 04/03/2008 | JOHN CRANE INC. | 14.85 | 349,067.01 |
| 04/03/2008 | JOHN CRANE INC. | 4,333.60 | 353,400.61 |
| 04/03/2008 | FOCUS1 HR GROUP | 287.64 | 353,688.25 |
| 04/03/2008 | U.S. SECURITY ASSOCIATES INC. | 4,157.35 | 357,845.60 |
| 04/03/2008 | CORPUS CHRISTI ELECTRIC CO. | 76.86 | 357,922.46 |
| 04/03/2008 | ACE HARDWARE/WESTERN AUTO | 40.04 | 357,962.50 |
| 04/04/2008 | AT & T-001 | 1,395.49 | 359,357.99 |
| 04/04/2008 | G & K SERVICES | 67.51 | 359,425.50 |
| 04/04/2008 | G & K SERVICES | 102.26 | 359,527.76 |
| 04/04/2008 | G & K SERVICES | 171.76 | 359,699.52 |
| 04/04/2008 | G & K SERVICES | 55.14 | 359,754.66 |
| 04/04/2008 | G & K SERVICES | 84.40 | 359,839.06 |
| 04/04/2008 | G & K SERVICES | 14.94 | 359,854.00 |
| 04/04/2008 | LYNNIE GANTZ | 27.34 | 359,881.34 |
| 04/04/2008 | LYNNIE GANTZ | 4.32 | 359,885.66 |
| 04/04/2008 | LYNNIE GANTZ | 11.27 | 359,896.93 |
| 04/04/2008 | LYNNIE GANTZ | 98.48 | 359,995.41 |
| 04/04/2008 | LYNNIE GANTZ | 32.22 | 360,027.63 |
| 04/04/2008 | BAY COFFEE SERVICE | 49.85 | 360,077.48 |
| 04/04/2008 | TOSHIBA BUSINESS SOLUTIONS | 268.20 | 360,345.68 |
| 04/04/2008 | LYNNIE GANTZ | 22.47 | 360,368.15 |
| 04/04/2008 | BAY COFFEE SERVICE | 73.21 | 360,441.36 |
| 04/04/2008 | LYNNIE GANTZ | 22.46 | 360,463.82 |
| 04/04/2008 | BAY COFFEE SERVICE | 52.21 | 360,516.03 |
| 04/04/2008 | LYNNIE GANTZ | 14.87 | 360,530.90 |
| 04/04/2008 | BAY COFFEE SERVICE | 19.00 | 360,549.90 |
| 04/04/2008 | LYNNIE GANTZ | 47.91 | 360,597.81 |
| 04/04/2008 | LYNNIE GANTZ | 137.93 | 360,735.74 |
| 04/04/2008 | LYNNIE GANTZ | 28.19 | 360,763.93 |
| 04/05/2008 | AT & T-001 | 1,494.08 | 362,258.01 |
| 04/05/2008 | SCOTT AIR CONDITIONING & HEATING | 662.49 | 362,920.50 |

| 04/05/2008 | PERKIN ELMER LIFE AND ANALYTICAL SCIENCES | 5,400.00 | 368,320.50 |
|---|---|---|---|
| 04/06/2008 | AT & T-001 | 800.62 | 369,121.12 |
| 04/06/2008 | T-MOBILE | 225.00 | 369,346.12 |
| 04/06/2008 | TOSHIBA FINANCIAL SERVICES | 855.09 | 370,201.21 |
| 04/06/2008 | MARK LYONS | 90.00 | 370,291.21 |
| 04/07/2008 | SAM'S CLUB | 210.00 | 370,501.21 |
| 04/07/2008 | JOSE RAMOS SR. | 455.00 | 370,956.21 |
| 04/07/2008 | CITGO ASPHALT REFINING CO. | 15.00 | 370,971.21 |
| 04/07/2008 | JOSE RAMOS SR. | 455.00 | 371,426.21 |
| 04/07/2008 | SAM'S CLUB | 210.00 | 371,636.21 |
| 04/07/2008 | CITGO REFINING & CHEMICALS CO. | 15.00 | 371,651.21 |
| 04/07/2008 | GULF COAST PAPER CO. INC. | 30.63 | 371,681.84 |
| 04/07/2008 | RONALD RENZ | 2,918.65 | 374,600.49 |
| 04/07/2008 | RONALD RENZ | 56.24 | 374,656.73 |
| 04/07/2008 | RONALD RENZ | 151.55 | 374,808.28 |
| 04/08/2008 | CITGO ASPHALT REFINING CO. | 15.00 | 374,823.28 |
| 04/08/2008 | ENVIRONMENTAL RESOURCES MGMT | 205.00 | 375,028.28 |
| 04/08/2008 | SHEINBERG TOOL CO. INC. | 45.49 | 375,073.77 |
| 04/08/2008 | CITGO REFINING & CHEMICALS CO. | 15.00 | 375,088.77 |
| 04/09/2008 | ANTONIO DOMINGUEZ | 90.00 | 375,178.77 |
| 04/09/2008 | KIRBY LOGISTICS MANAGEMENT | 1,614.88 | 376,793.65 |
| 04/09/2008 | AMERICAN FIRST AID OF TEXAS | 403.80 | 377,197.45 |
| 04/09/2008 | J.J. KELLER & ASSOCIATES INC. | 63.97 | 377,261.42 |
| 04/09/2008 | CARL'S FLOWERS | 55.75 | 377,317.17 |
| 04/10/2008 | INTER-TEL NETSOLUTIONS-001 | 2,351.10 | 379,668.27 |
| 04/10/2008 | JOE RAMOS JR. | 90.00 | 379,758.27 |
| 04/10/2008 | KIRBY LOGISTICS MANAGEMENT | 4,105.88 | 383,864.15 |
| 04/10/2008 | HUMBOLDT MFG. CO. | 7,552.67 | 391,416.82 |
| 04/10/2008 | TOTAL SAFETY U.S. INC. | 119.09 | 391,535.91 |
| 04/10/2008 | BAY LTD. | 126.23 | 391,662.14 |
| 04/10/2008 | BAY LTD. | 317.05 | 391,979.19 |
| 04/10/2008 | BAY LTD. | 868.56 | 392,847.75 |
| 04/10/2008 | CORPUS CHRISTI ELECTRIC CO. | 15,535.98 | 408,383.73 |
| 04/10/2008 | CORPUS CHRISTI ELECTRIC CO. | 2,532.92 | 410,916.65 |
| 04/10/2008 | C.C. BOLT & SCREW CO. | 5.42 | 410,922.07 |
| 04/10/2008 | TRIPLEX INC. | 327.51 | 411,249.58 |
| 04/11/2008 | G & K SERVICES | 67.51 | 411,317.09 |
| 04/11/2008 | G & K SERVICES | 221.70 | 411,538.79 |
| 04/11/2008 | G & K SERVICES | 102.26 | 411,641.05 |
| 04/11/2008 | G & K SERVICES | 161.54 | 411,802.59 |
| 04/11/2008 | ALDINGER COMPANY | 411.00 | 412,213.59 |
| 04/11/2008 | ALDINGER COMPANY | 31.37 | 412,244.96 |
| 04/11/2008 | ALDINGER COMPANY | 53.72 | 412,298.68 |
| 04/11/2008 | G & K SERVICES | 55.14 | 412,353.82 |
| 04/11/2008 | G & K SERVICES | 14.94 | 412,368.76 |
| 04/11/2008 | SEVERN TRENT LABORATORIES INC | 222.60 | 412,591.36 |
| 04/11/2008 | JONES & COOK STATIONERS | 141.46 | 412,732.82 |

BTB 06653

| | | | |
|---|---|---:|---:|
| 04/11/2008 | BAY COFFEE SERVICE | 96.21 | 412,829.03 |
| 04/11/2008 | BAY COFFEE SERVICE | 110.11 | 412,939.14 |
| 04/11/2008 | BAY COFFEE SERVICE | 66.41 | 413,005.55 |
| 04/11/2008 | BAY COFFEE SERVICE | 64.35 | 413,069.90 |
| 04/11/2008 | BAY LTD. | 11,782.55 | 424,852.45 |
| 04/11/2008 | J M SUPPLY | 490.96 | 425,343.41 |
| 04/11/2008 | JOHN CRANE INC. | 362.24 | 425,705.65 |
| 04/11/2008 | CORPUS CHRISTI ELECTRIC CO. | 445.31 | 426,150.96 |
| 04/11/2008 | SCOTT ELECTRIC COMPANY | 6,157.94 | 432,308.90 |
| 04/13/2008 | SHAFER PROJECT RESOURCES INC. | 1,875.00 | 434,183.90 |
| 04/14/2008 | CORPUS CHRISTI CALLER TIMES | 870.81 | 435,054.71 |
| 04/14/2008 | NetSolutions | 1,346.46 | 436,401.17 |
| 04/14/2008 | THOMAS CHODOSH D.O. P.A. | 75.00 | 436,476.17 |
| 04/14/2008 | CORPUS CHRISTI CALLER TIMES | 870.81 | 437,346.98 |
| 04/14/2008 | HAZMATPAC | 123.66 | 437,470.64 |
| 04/14/2008 | GULF COAST PAPER CO. INC. | 44.71 | 437,515.35 |
| 04/14/2008 | TEXAS STEEL COMPANY | 717.60 | 438,232.95 |
| 04/14/2008 | JM TEST SYSTEMS INC. | 140.64 | 438,373.59 |
| 04/14/2008 | C.C. BOLT & SCREW CO. | 10.83 | 438,384.42 |
| 04/14/2008 | CORPUS CHRISTI ELECTRIC CO. | 87.06 | 438,471.48 |
| 04/14/2008 | BAY LTD. | 165.52 | 438,637.00 |
| 04/14/2008 | BAY LTD. | 53.20 | 438,690.20 |
| 04/14/2008 | J M SUPPLY | 36.81 | 438,727.01 |
| 04/14/2008 | CORPUS CHRISTI ELECTRIC CO. | 26,755.40 | 465,482.41 |
| 04/14/2008 | CORPUS CHRISTI ELECTRIC CO. | 342.07 | 465,824.48 |
| 04/15/2008 | KEVIN KIESCHNICK | 61.50 | 465,885.98 |
| 04/15/2008 | LOCKHEED MARTIN | 132.50 | 466,018.48 |
| 04/15/2008 | THE EADS COMPANY | 131.84 | 466,150.32 |
| 04/15/2008 | JOHNSTONE SUPPLY | 128.17 | 466,278.49 |
| 04/15/2008 | PORT OF CORPUS CHRISTI AUTHORITY | 100.00 | 466,378.49 |
| 04/16/2008 | GULF COAST EXPRESS | 192.00 | 466,570.49 |
| 04/16/2008 | KIRBY LOGISTICS MANAGEMENT | 626.75 | 467,197.24 |
| 04/16/2008 | GOLDEN WEST OIL COMPANY | 2,146.85 | 469,344.09 |
| 04/16/2008 | THE EADS COMPANY | 1,794.04 | 471,138.13 |
| 04/16/2008 | GRAINGER | 4.70 | 471,142.83 |
| 04/16/2008 | CORPUS CHRISTI GOLF CARS | 60.49 | 471,203.32 |
| 04/16/2008 | GRAINGER | 29.95 | 471,233.27 |
| 04/16/2008 | GRAINGER | 63.63 | 471,296.90 |
| 04/16/2008 | JONES & COOK STATIONERS | 35.71 | 471,332.61 |
| 04/16/2008 | BAY LTD. | 41,270.33 | 512,602.94 |
| 04/16/2008 | BAY LTD. | 6,173.25 | 518,776.19 |
| 04/16/2008 | BAY LTD. | 756.00 | 519,532.19 |
| 04/16/2008 | CORPUS CHRISTI ELECTRIC CO. | 915.56 | 520,447.75 |
| 04/17/2008 | THOMAS CHODOSH D.O. P.A. | 110.00 | 520,557.75 |
| 04/17/2008 | POWER REPAIR SERVICE INC. | 7,080.00 | 527,637.75 |
| 04/17/2008 | U.S. SECURITY ASSOCIATES INC. | 4,157.31 | 531,795.06 |
| 04/17/2008 | POWER REPAIR SERVICE INC. | 707.84 | 532,502.90 |

| Date | Payee | Amount | Balance |
|------|-------|--------|---------|
| 04/17/2008 | GRAINGER | 7.04 | 532,509.94 |
| 04/17/2008 | GRAINGER | 305.80 | 532,815.74 |
| 04/17/2008 | CHANNEL SAFETY & MARINE SUPPLY INC. | 181.08 | 532,996.82 |
| 04/17/2008 | POWER REPAIR SERVICE INC. | 227.33 | 533,224.15 |
| 04/17/2008 | TRIPLEX INC. | 115.30 | 533,339.45 |
| 04/18/2008 | TRACTOR SUPPLY COMPANY | 51.90 | 533,391.35 |
| 04/18/2008 | G & K SERVICES | 67.51 | 533,458.86 |
| 04/18/2008 | G & K SERVICES | 114.66 | 533,573.52 |
| 04/18/2008 | G & K SERVICES | 134.70 | 533,708.22 |
| 04/18/2008 | G & K SERVICES | 161.54 | 533,869.76 |
| 04/18/2008 | G & K SERVICES | 80.12 | 533,949.88 |
| 04/18/2008 | G & K SERVICES | 14.94 | 533,964.82 |
| 04/18/2008 | TRACTOR SUPPLY COMPANY | 51.90 | 534,016.72 |
| 04/18/2008 | BAY COFFEE SERVICE | 128.91 | 534,145.63 |
| 04/18/2008 | BAY COFFEE SERVICE | 145.28 | 534,290.91 |
| 04/18/2008 | BAY COFFEE SERVICE | 73.85 | 534,364.76 |
| 04/18/2008 | BAY COFFEE SERVICE | 30.85 | 534,395.61 |
| 04/18/2008 | BAY COFFEE SERVICE | 51.85 | 534,447.46 |
| 04/18/2008 | CORPUS CHRISTI ELECTRIC CO. | 547.56 | 534,995.02 |
| 04/19/2008 | AT & T-002 | 1,288.13 | 536,283.15 |
| 04/20/2008 | SHAFER PROJECT RESOURCES INC. | 320.00 | 536,603.15 |
| 04/21/2008 | HACH COMPANY | 61.75 | 536,664.90 |
| 04/21/2008 | BAY LTD. | 2,316.00 | 538,980.90 |
| 04/21/2008 | CHEMETRICS INC. | 43.30 | 539,024.20 |
| 04/21/2008 | CITY OF CORPUS CHRISTI-001 | 142.71 | 539,166.91 |
| 04/21/2008 | J M SUPPLY | 4,305.23 | 543,472.14 |
| 04/21/2008 | J M SUPPLY | 475.11 | 543,947.25 |
| 04/21/2008 | J M SUPPLY | 1,238.61 | 545,185.86 |
| 04/21/2008 | BAY LTD. | 180.81 | 545,366.67 |
| 04/21/2008 | SCOTT ELECTRIC COMPANY | 5,410.41 | 550,777.08 |
| 04/22/2008 | RAWSON LP | 308.51 | 551,085.59 |
| 04/22/2008 | JOSE RAMOS SR. | 234.78 | 551,320.37 |
| 04/22/2008 | J M SUPPLY | 24.36 | 551,344.73 |
| 04/22/2008 | BAY LTD. | 46,001.40 | 597,346.13 |
| 04/22/2008 | BAY LTD. | 369.69 | 597,715.82 |
| 04/22/2008 | BAY LTD. | 33.44 | 597,749.26 |
| 04/22/2008 | CORPUS CHRISTI ELECTRIC CO. | 1,393.21 | 599,142.47 |
| 04/22/2008 | CORPUS CHRISTI ELECTRIC CO. | 527.21 | 599,669.68 |
| 04/22/2008 | SCOTT ELECTRIC COMPANY | 3,581.39 | 603,251.07 |
| 04/23/2008 | BAY LTD. | 81.68 | 603,332.75 |
| 04/23/2008 | BAY LTD. | 55.00 | 603,387.75 |
| 04/23/2008 | BAY LTD. | 502.71 | 603,890.46 |
| 04/24/2008 | SEVERN TRENT LABORATORIES INC | 222.60 | 604,113.06 |
| 04/24/2008 | CHANNEL SAFETY & MARINE SUPPLY INC. | 81.19 | 604,194.25 |
| 04/24/2008 | GDF SUEZ ENERGY RESOURCES NA, INC. | 590.19 | 604,784.44 |
| 04/24/2008 | CORPUS CHRISTI GASKET & FASTENER LTD. | 233.13 | 605,017.57 |
| 04/24/2008 | CORPUS CHRISTI ELECTRIC CO. | 254.36 | 605,271.93 |

| Date | Payee | Amount | Balance |
|------|-------|-------:|--------:|
| 04/24/2008 | BAY LTD. | 750.00 | 606,021.93 |
| 04/25/2008 | G & K SERVICES | 114.66 | 606,136.59 |
| 04/25/2008 | G & K SERVICES | 67.51 | 606,204.10 |
| 04/25/2008 | G & K SERVICES | 102.26 | 606,306.36 |
| 04/25/2008 | G & K SERVICES | 158.13 | 606,464.49 |
| 04/25/2008 | G & K SERVICES | 55.14 | 606,519.63 |
| 04/25/2008 | G & K SERVICES | 14.94 | 606,534.57 |
| 04/25/2008 | FISHER SCIENTIFIC | 95.24 | 606,629.81 |
| 04/25/2008 | BAY COFFEE SERVICE | 139.31 | 606,769.12 |
| 04/25/2008 | BAY COFFEE SERVICE | 104.86 | 606,873.98 |
| 04/25/2008 | BAY COFFEE SERVICE | 23.71 | 606,897.69 |
| 04/25/2008 | BAY COFFEE SERVICE | 21.35 | 606,919.04 |
| 04/25/2008 | BAY COFFEE SERVICE | 61.71 | 606,980.75 |
| 04/25/2008 | J M SUPPLY | 1,781.98 | 608,762.73 |
| 04/25/2008 | J M SUPPLY | 1,092.39 | 609,855.12 |
| 04/25/2008 | BAY LTD. | 6,674.01 | 616,529.13 |
| 04/26/2008 | ANTONIO MARTINEZ | 3,000.00 | 619,529.13 |
| 04/27/2008 | PETROCHEM INSPECTION SERVICES INC. | 132.00 | 619,661.13 |
| 04/27/2008 | PETROCHEM INSPECTION SERVICES INC. | 2,129.20 | 621,790.33 |
| 04/27/2008 | SHAFER PROJECT RESOURCES INC. | 1,600.00 | 623,390.33 |
| 04/28/2008 | LARSON PLUMBING | 105.00 | 623,495.33 |
| 04/28/2008 | LARSON PLUMBING | 8.66 | 623,503.99 |
| 04/28/2008 | LARSON PLUMBING | 8.58 | 623,512.57 |
| 04/28/2008 | LARSON PLUMBING | 30.40 | 623,542.97 |
| 04/28/2008 | LARSON PLUMBING | 105.00 | 623,647.97 |
| 04/28/2008 | LARSON PLUMBING | 11.88 | 623,659.85 |
| 04/28/2008 | INDUSTRIAL COMMUNICATIONS | 714.45 | 624,374.30 |
| 04/28/2008 | HOLMAN BOILER WORKS INC. | 513.50 | 624,887.80 |
| 04/28/2008 | FREUND CONTAINER | 227.38 | 625,115.18 |
| 04/28/2008 | FISHER SCIENTIFIC | 71.32 | 625,186.50 |
| 04/28/2008 | TEXAS STEEL COMPANY | 160.87 | 625,347.37 |
| 04/28/2008 | TEXAS STEEL COMPANY | 148.92 | 625,496.29 |
| 04/29/2008 | SKID-O-KAN CO. | 550.00 | 626,046.29 |
| 04/29/2008 | TEJAS ENVIRONMENTAL HEALTH & SAFETY | 661.44 | 626,707.73 |
| 04/29/2008 | GRAINGER | 285.91 | 626,993.64 |
| 04/29/2008 | GRAINGER | 258.78 | 627,252.42 |
| 04/29/2008 | SHEINBERG TOOL CO. INC. | 254.34 | 627,506.76 |
| 04/29/2008 | CORPUS CHRISTI ELECTRIC CO. | 263.84 | 627,770.60 |
| 04/29/2008 | MECHANICAL SALES CO. | 3,750.00 | 631,520.60 |
| 04/29/2008 | SCOTT ELECTRIC COMPANY | 5,034.34 | 636,554.94 |
| 04/30/2008 | LOCKHEED MARTIN | 132.50 | 636,687.44 |
| 04/30/2008 | BANK OF AMERICA - CORPUS | 20.46 | 636,707.90 |
| 04/30/2008 | AIRGAS-SOUTHWEST | 11.50 | 636,719.40 |
| 04/30/2008 | AIRGAS-SOUTHWEST | 112.00 | 636,831.40 |
| 04/30/2008 | AIRGAS-SOUTHWEST | 121.20 | 636,952.60 |
| 04/30/2008 | CORPUS CHRISTI ELECTRIC CO. | 14,242.21 | 651,194.81 |
| 04/30/2008 | J M SUPPLY | 78,995.63 | 730,190.44 |

BTB 06656

| | | | |
|---|---|---:|---:|
| 04/30/2008 | SCOTT ELECTRIC COMPANY | 4,841.30 | 735,031.74 |
| 04/30/2008 | BAY LTD. | 166,658.92 | 901,690.66 |
| 04/30/2008 | TEXAS STEEL COMPANY | 2,103.44 | 903,794.10 |
| 04/30/2008 | JOHN CRANE INC. | 1,502.70 | 905,296.80 |
| 04/30/2008 | U-RENT-IT | 1,625.07 | 906,921.87 |
| 04/30/2008 | TRIPLEX INC. | 1,004.66 | 907,926.53 |
| 04/30/2008 | POWER REPAIR SERVICE INC. | 162.38 | 908,088.91 |
| 04/30/2008 | SHAFER PROJECT RESOURCES INC. | 1,060.00 | 909,148.91 |
| 04/30/2008 | CORPUS CHRISTI GASKET & FASTENER LTD. | 1,550.14 | 910,699.05 |
| 04/30/2008 | SOUTH TEXAS PAINTING & SANDBLASTING | 25,290.68 | 935,989.73 |
| 04/30/2008 | HR HOUSTON | 1,080.00 | 937,069.73 |
| 04/30/2008 | C.C. BOLT & SCREW CO. | 35.72 | 937,105.45 |
| 04/30/2008 | ECKEL & ASSOCIATES INC. | 1,003.75 | 938,109.20 |
| 04/30/2008 | MECHANICAL SALES CO. | 12,560.00 | 950,669.20 |
| 04/30/2008 | LOCKHEED MARTIN | 132.50 | 950,801.70 |
| 04/30/2008 | ANALYSYS INC. | 1,959.15 | 952,760.85 |
| 04/30/2008 | BFI - TESSMAN ROAD LANDFILL-001 | 2,815.46 | 955,576.31 |
| 04/30/2008 | J M SUPPLY | 168.44 | 955,744.75 |
| 04/30/2008 | GRAINGER | 54.29 | 955,799.04 |
| 04/30/2008 | GRAINGER | 60.15 | 955,859.19 |
| 04/30/2008 | VALLEY SOLVENTS & CHEMICALS | 651.66 | 956,510.85 |
| 04/30/2008 | HACH COMPANY | 174.78 | 956,685.63 |
| 04/30/2008 | OFFICE DEPOT | 120.04 | 956,805.67 |
| 04/30/2008 | GULF COAST PAPER CO. INC. | 103.54 | 956,909.21 |
| 04/30/2008 | OFFICE DEPOT | 39.04 | 956,948.25 |
| 04/30/2008 | J M SUPPLY | 2,712.40 | 959,660.65 |
| 04/30/2008 | J M SUPPLY | 247.20 | 959,907.85 |
| 04/30/2008 | BRADLEY'S INC. | 14,782.62 | 974,690.47 |
| 04/30/2008 | J M SUPPLY | 4.99 | 974,695.46 |
| 04/30/2008 | CORPUS CHRISTI GASKET & FASTENER LTD. | 65.49 | 974,760.95 |
| 04/30/2008 | BAY LTD. | 176.00 | 974,936.95 |
| Total 20000-1 · Accounts Payable | | 974,936.95 | |

BTB 06657

# TANK LEASE AGREEMENT

## BTB REFINING, LLC

AND

## FREEPOINT COMMODITIES TRADING AND MARKETING LLC

Dated as of December 1, 2012

4163085v.12

**EXHIBIT B**

BTB 06954

1.    Definitions and Interpretation.................................................................................................1

2.    Joinder of Trigeant Ltd...........................................................................................................3

3.    Storage Space ..........................................................................................................................4

4.    Storage Fee All Tanks .............................................................................................................4

5.    Term of Storage Period ...........................................................................................................5

6.    Services ....................................................................................................................................5

7.    Delivery ...................................................................................................................................6

8.    Quantity Determinations .........................................................................................................7

9.    Inspection ................................................................................................................................7

10.   Payment ...................................................................................................................................7

11.   Reporting and Holding Certificates........................................................................................8

12.   Representations and Warranties ..............................................................................................8

13.   Required Notifications.............................................................................................................9

14.   Default and Determination ...................................................................................................10

15.   Suspension and Termination .................................................................................................11

16.   Contacts.................................................................................................................................12

17.   Tank Heels.............................................................................................................................12

18.   Volume Differential; Losses..................................................................................................12

19.   Dock Throughput and Dockage Fees and Rail Car Fees......................................................13

20.   Insurance ...............................................................................................................................13

21.   Foreign Trade Zone ..............................................................................................................14

22.   Indemnification; Limitation on Damages..............................................................................14

23.   General Terms and Conditions..............................................................................................15

24.   Assignment............................................................................................................................17

25.   Other Terms...........................................................................................................................17

(i)

BTB 06955

# BTB REFINING, LLC

## TANK LEASE AGREEMENT

December 1, 2012

This TANK LEASE AGREEMENT (this "**Agreement**"), dated December 1, 2012, is entered into among Freepoint Commodities Trading and Marketing LLC, a Delaware limited liability company ("**Lessee**") and BTB Refining, LLC, a Delaware limited liability company ("**BTB**" or "**Lessor**"). Each of BTB and Lessee are referred to individually as a "**Party**" and collectively as the "**Parties**" and use of the term "Party" in the singular refers to BTB or to Lessee.

**WHEREAS**, Lessor operates a refinery, located at 6600 Up River Road, Corpus Christi, Texas devoted for use as a terminaling facility (the "**Terminal**"); and

**WHEREAS**, Lessor desires to provide Lessee with storage in the tanks on the Terminal premises for crude oil, light crude oil, condensate, straight run fuel oil, fuel oil, vacuum tower bottoms, asphalt, fuel oil/asphalt blending components, or any other refined petroleum product (the "**Products**") and certain throughput services related thereto, and Lessee desires to utilize such storage and obtain such services from Lessor for the fees described herein.

**NOW, THEREFORE**, in consideration of the premises and the respective promises, conditions, terms and agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Lessor and Lessee hereby agree as follows:

## 1. DEFINITIONS AND INTERPRETATION

1.1    <u>Definitions</u>.  The following terms used in this Agreement have the meanings ascribed to them below:

"**Affiliate**" means, in relation to either Party, any entity controlled, directly or indirectly, by such Party, any entity that controls, directly or indirectly, such Party, or any entity directly or indirectly under common control with such Party.  For this purpose and for purposes of the definition of the term Change of Control, "**control**" of any entity or Party means ownership of a majority of the issued shares, or voting power or control in fact, of the entity or Party.

"**Agreement**" or "**this Agreement**" means this Tank Lease Agreement, all Schedules hereto, which are incorporated herein, as may be amended, modified, supplemented, extended, renewed or restated from time to time in accordance with the terms hereof, and the General Terms.

"**Applicable Law**" means (i) any law, statute, regulation, code, ordinance, license, decision, order, writ, injunction, directive, judgment, policy, decree and any judicial or administrative interpretations thereof, (ii) any agreement, concession or arrangement with any Governmental Authority or (iii) any license, permit or compliance requirement, including under any Environmental Law, in each case as may be applicable to either Party or either Party's performance under this Agreement.

"**Bankrupt**" means that a person: (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, which proceeding or petition, if not instituted by it, is not controverted within thirty (30) days from the service of the summons thereon, or is not dismissed or stayed within ninety (90) days, after commencement of the case; (v) has a resolution passed for its winding-up, official management or liquidation, other than pursuant to a consolidation, amalgamation or merger; (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for all or substantially all of its assets; (vii) has a secured party take possession

4163085v.12

BTB 06956

of all or substantially all of its assets, or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all of its assets; (viii) files an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any proceeding of the foregoing nature; (ix) causes or is subject to any event with respect to it which, under Applicable Law, has an analogous effect to any of the events specified in clauses (i) to (viii) (inclusive); or (x) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

"**Barrel**" means 42 net U.S. gallons, measured at 60°F at atmospheric pressure.

"**Bottoms**" means the volumes of Products located in the Tanks below the low suction line.

"**Business Day**" means a day on which banks are open for general commercial business in New York, New York.

"**Change of Control**" means, as to any Party, the occurrence of, or the taking of any action to facilitate, any of the following: (i) the consolidation of a Party with another person, the merger of such Party into another person, the merger of another person into such Party, or any similar transactions involving an Affiliate of such Party which in any case results in, or any similar event pursuant to a transaction which results in, fifty percent (50%) or more of the voting shares of such person being changed into or exchanged for cash, securities or other property (other than any such transaction where the holders of the voting shares of such Party immediately prior to such transaction own, directly or indirectly, not less than a majority of the voting shares of the surviving or resulting person or persons immediately after such transaction); or (ii) the consummation of any transaction or series of related transactions (including any merger or consolidation) the result of which is that any person other than the current direct and indirect owners of such Party becomes the beneficial owner directly or indirectly of, or has the ability to control the voting of, more than fifty percent (50%) of the voting shares of such Party.  For purposes of this definition, any transfer of an equity interest in a person that was formed for the purpose of acquiring voting shares of a person shall be deemed to be a transfer of such portion of such voting shares as corresponds to the portion of the equity of such person that has been so transferred.

"**Confirmation**" means this Tank Lease Agreement, excluding the General Terms.

"**Defaulting Party**" has the meaning ascribed thereto in Section 15.1.

"**Environmental Law**" means any law, policy, judicial or administrative interpretation thereof or any legally binding requirement that governs or purports to govern the protection of persons, natural resources or the environment (including the protection of ambient air, surface water, groundwater, land surface or subsurface strata, endangered species or wetlands), occupational health and safety and the manufacture, processing, distribution, use, generation, handling, treatment, storage, disposal, transportation, release or management of solid waste, industrial waste or hazardous substances or materials.

"**General Terms**" has the meaning ascribed thereto in Section 23.1.

"**Good Industry Practice**" means the exercise of that degree of skill, diligence, prudence and foresight that would reasonably and ordinarily be expected from a skilled and experienced terminal operator under the same or similar circumstances and in the same or similar location; with the recognition that Good Industry Practice is not intended to be limited to the optimum method to the exclusion of all others, but rather to include a spectrum of reasonable and ordinary methods.

"**Governmental Authority**" means any federal, state or local governmental body, agency, instrumentality, authority or entity established or controlled by a government or subdivision thereof, including any legislative, administrative or judicial body or any person purporting to act therefor, port authority and any stock or commodity exchange or similar self-regulatory body or supervisory authority having appropriate jurisdiction.

"**Heels**" has the meaning specified in Article 12 of the General Terms.

"**Independent Inspector**" means a licensed person reasonably acceptable to Lessee that performs sampling, quality analysis and quantity determinations of the Products.

2

4163085v.12

BTB 06957

"**Liabilities**" means any and all claims, demands, suits, losses, expenses (including reasonable attorneys' fees), damages, charges, fines, penalties, deficiencies, assessments, interest, fines, costs and expenses of any kind (including reasonable attorneys' fees and other fees, court costs and other disbursements), causes of action and liabilities of every type and character, including personal injury or death to any person or loss or damage to any personal or real property; any liabilities arising out of or related to any suit, proceeding, judgment, settlement or judicial or administrative order; and any liabilities with respect to Environmental Laws.

"**Lien**" means any lien, pledge, mortgage, claim, charge, encumbrance or other security interest of any nature whatsoever that secures any obligation of any person or any other agreement or arrangement having a similar effect.

"**Material Adverse Effect**" means any material and adverse effect on (i) the Terminal or the operation or maintenance thereof, or (ii) the financial condition, business, operations, or circumstances of Lessor from and after the Effective Date, in each case that could reasonably be expected to impair or that impairs the ability of Lessor to meet its material obligations under this Agreement and that does not result from changes in the general economy, changes in the refining or terminaling industries generally, changes in the oil and gas industry generally, or changes in law or regulation or the interpretation thereof.

"**Performing Party**" has the meaning ascribed thereto in Section 15.1.

"**Services**" means the (i) receipt into the Tanks of Products owned by Lessee, (ii) storage and handling of the Stored Inventory, (iii) withdrawal of Lessee's Products from the Tanks for delivery out of the Terminal, (iv) transfer of Lessee's Products to any connecting pipelines at the Terminal, the Terminal truck loading rack, the Terminal rail loading and unloading facilities, the Terminal dock and Citgo Oil Dock #3; (v) gauging of Lessee's Products, (vi) accounting for and providing reports with respect to Lessee's Products and all customary record keeping, and (vii) all other ancillary services, as more fully described in Section 6.

"**Stored Inventory**" means all Products owned by Lessee and located at the Terminal.

"**Trigeant**" has the meaning ascribed thereto in Section 2.

## 2.    JOINDER OF TRIGEANT LTD.

Trigeant, Ltd., a Florida limited partnership ("**Trigeant**"), joins in the execution of this Agreement for the purposes of acknowledging, confirming and evidencing its acknowledgments and agreements as hereinafter set forth. By its execution of this Agreement, Trigeant acknowledges and agrees that (a) all of its right, title and interest in the Terminal, whether now owned or hereafter acquired, is, shall be and shall remain subjected and subject to the terms of this Agreement and to the rights of Lessee under this Agreement; (b) if (i) title to the Terminal becomes vested in Trigeant, whether by reason of voluntary conveyance, order of court, operation of law, or otherwise, or (ii) Trigeant succeeds to or otherwise acquires all or any portion of BTB's interest in the Terminal in any other manner, then, in any such event, so long as Lessee is not a Defaulting Party, none of Lessee's rights and privileges under this Agreement, or any extensions or renewals thereof, shall be in any manner diminished or interfered with by Trigeant; (c) notwithstanding the occurrence of any one or more of the events described or to which reference is made in Sections 2(b)(i) and 2(b)(ii), Trigeant agrees that all payments required to be made by Lessee to BTB pursuant to the terms of this Agreement shall continue to be payable by Lessee solely and exclusively to BTB, and Lessee agrees to that it will continue to make such payments to BTB upon any such eventuality; and (d) BTB, including its employees, contractors and agents, shall have, and is hereby granted by Trigeant, the right, at any and all times, and from time to time and without requirement of notice to Trigeant, to enter the Terminal to perform any and all of its obligations under this Agreement, notwithstanding the occurrence of any one or more of the events described or to which reference is made in Sections 2(b)(i) and 2(b)(ii). Trigeant further acknowledges and agrees (and, by its execution of this Agreement, BTB acknowledges and agrees) that if any of the events described or to which reference is made in Sections 2(b)(i) and 2(b)(ii) shall occur, (i) Trigeant and BTB shall thereafter, jointly and severally, continue to provide Services to Lessee without interruption and in full compliance with this Agreement, and without any further action on the part of either of them or Lessee by way of an assignment or transfer of the rights and obligations under this Agreement, and (ii) each reference under

3

4163085v.12

**BTB 06958**

this Agreement to "BTB" or to the "Lessor", or to BTB as a "Party", shall thereafter be construed as a joint and several reference to each of BTB and Trigeant. As used in this Section 2, the term "Terminal" means and includes, in addition to the Terminal, any portion thereof and any interest therein.

3. STORAGE SPACE

(a) **STORAGE SPACE:**   230,000 US barrels net working capacity as follows:
       Tank 301 (BBL):   115,000 working capacity
       Tank 302 (BBL):   115,000 working capacity

**PRODUCT:**   Crude oil and/or straight run fuel oil.

*AND*

(b) **STORAGE SPACE:**   71,000 US barrels net working capacity as follows:
       Tank 305:   35,500 bbl working capacity
       Tank 307:   35,500 bbl working capacity

**PRODUCT:**   Light crude oil and condensate, comingled with rundown pre-flash distillate (PFD) when the refinery is processing crude oil and other feedstocks.

*AND*

(c) **STORAGE SPACE:**   374,400 US barrels net working capacity as Follows:
       Tank 303:     73,000 bbl
       Tank 304      35,500 bbl
       Tank 306      56,900 bbl
       Tank 312:     52,000 bbl
       Tank 313:     51,000 bbl
       Tank 314;     22,500 bbl
       Tank 315;     22,500 bbl
       Tank 316:     61,000 bbl

**PRODUCT:**   Fuel oil, straight run fuel oil, vacuum tower bottoms, asphalt, fuel oil/asphalt blending components subject to system and tank restrictions

All tanks referenced in (a), (b) and (c) above, hereinafter referred to as the "**Tanks**".

Lessor shall provide Lessee with storage at the Terminal in each of the Tanks, which shall be for Lessee's exclusive use and which shall be reasonably suitable for the storage of each of the Products mutually agreed by the Parties to be stored in such Tanks. Lessee's storage shall be segregated and its use of the Tanks exclusive. Lessor agrees that it will not store any of its own Product, or allow any third party, excepting Lessee pursuant to the terms of this Agreement, to store any product in any of the Tanks.

4. STORAGE FEE ALL TANKS

4.1 <u>Monthly Storage Fee</u>: $0.8513/bbl on working capacity per calendar month ($575,000 for 675,400 bbls working storage in all above mentioned tanks per calendar month.)

4

4163085v.12

BTB 06959

4.2   Unavailability of Tanks. In the event a Tank will be put out of service or is unavailable due to an event of Force Majeure, Lessor shall inform Lessee as soon as possible and the storage fee shall be decreased proportionately for as long as the Tank is not available to Lessee.

4.3   Electricity and Natural Gas. Lessor shall be responsible for up to $55,000 per month for the cost of any electricity or natural gas required at the Terminal. Lessee shall reimburse Lessor for the cost of electricity and natural gas utilized solely in the provision of storage and services to Lessee under the terms of this Agreement to the extent such costs exceed $55,000 per calendar month upon delivery to Lessee of reasonable back-up documentation and an invoice.

## 5.   TERM OF STORAGE PERIOD

5.1   Term: December 1, 2012 thru November 30, 2013.

5.2   Termination Option. Lessee shall, after the passage of ninety (90) calendar days following the effective date hereof, have the option, with ninety (90) days' notice to Lessor, to terminate this Agreement. Upon such termination, and upon payment to Lessor of any fees owed for the period prior to such termination, Lessee shall have no further obligation to Lessor pursuant to this Agreement.

5.3   Removal of Product at Termination. If fifteen (15) days prior to expiration of the term period the Parties have not agreed on extending this contract, Lessee shall vacate the Tank(s) by 24:00 hours November 30, 2013.

5.4   If Lessee has not removed its Products from Lessor's premises by such date and time, Lessee shall pay, except where Lessor is a Defaulting Party, in which case, the daily storage fee shall remain unchanged, Lessor a daily storage fee of 2.5 times the contractual monthly fee as per above schedule divided by 30 per barrel on the total working capacity of Tanks not yet returned to Lessor until the date the Tanks are emptied and the Product is removed from the facilities. Notwithstanding the above, no daily storage fee shall be payable if (i) Lessee has requested Lessor to deliver Product out of the Terminal in accordance with the normal operating procedures at the Terminal but Lessor has failed to do so other than as a result of Force Majeure or (ii) Lessor or its affiliates, representatives or agents has impeded Lessee's reasonable access to its Product.

## 6.   SERVICES

6.1   Lessor hereby undertakes the following obligations in respect of the Services to be provided Lessee:

6.1.1   Lessor agrees, in accordance with the terms and conditions of this Agreement, to provide to Lessee the Services at the Terminal.

6.1.2   Lessor shall be responsible for and have ultimate care, control and supervision over the Terminal, including with respect to maintenance and operation of the Tanks, the docks, the rack and the rail loading and unloading facilities, and shall comply in all material respects with all Applicable Laws and any applicable safety guidelines, procedures or policies in connection with operations at the Terminal.

6.1.3   It shall render the Services in compliance in all material respects with all Applicable Laws and in accordance with Good Industry Practice.

6.1.4   Neither Lessor nor Lessee shall store third party oil or make the tanks available to any third party without the prior written consent of the other Party. Should the Parties agree to sublease storage space to a third party, the third party shall sign a contract with Lessor for the term of the sublease.

4163085v.12

BTB 06960

Lessor and Lessee shall equally share the excess monthly storage Fee, if any, after deduction of any related cost.

7.    **DELIVERY**

7.1    Delivery of Crude, Condensate, Straight Run Fuel Oil, VGO, Fuel Oil and/or Fuel oil blending components to the Terminal is to be made by Lessee's nominated and approved marine tanker, marine barge, rail cars or road trucks / common carrier.

7.2    Receipts and Deliveries of Product.  Lessor shall use its reasonable efforts to ensure that all receipts and deliveries of Lessee's Products may occur in accordance with the Terminal's normal operating procedures and Lessor agrees to keep Lessee reasonably informed of all such procedures.

　　　7.2.1    *Terminal Truck Loading Rack.*  To the extent available on Lessor's premises, Lessor shall make available to Lessee the Terminal truck rack for delivery of Products into Lessee's or its designee's tank trucks.  Lessor shall provide all hoses and connections necessary for the transfer of Products to tank trucks from the Terminal's flange free of charge as long as such flanges and/or hoses are then available at the Terminal.  If any such flanges and/or hoses are not available at the Terminal then they shall be provided at Lessee's cost.

　　　7.2.2    *Terminal Rail Facility.*  To the extent available on Lessor's premises, Lessor shall make available to Lessee the rail loading/unloading facility for receipt from, or delivery of Products into, Lessee's or its designee's rail cars.  Lessor shall provide all hoses and connections necessary for the transfer of Products to or from rail cars  to or from the Terminal's flange free of charge as long as such flanges and/or hoses are then available at the Terminal.  If any such flanges and/or hoses are not available at the Terminal then they shall be provided at Lessee's cost.

　　　7.2.3    *Into/Out of Connecting Pipelines.*  To the extent the Terminal is able to accept pipeline deliveries, Lessee shall notify Lessor of pipeline nominations at least one Business Day prior to the applicable pipeline's scheduling nomination deadline.  As long as the proposed nomination schedule is operationally possible at such time at the Terminal, Lessor shall deliver Lessee's Products into and out of connecting pipelines in accordance with the nomination schedule.  Lessee will notify Lessor as soon as reasonably practicable upon any change to the nomination schedule.

7.3    Excess Handling Fee:  In any given month Lessee shall make an additional payment to Lessor for excess handling as per the following schedule, with such excess handling volume being based on the volume of Product delivered into the Terminal by Lessee pursuant to this Agreement:

Excess Handling Schedule:

$0.00/bbl on 0 – 50,000 bbls per month
$0.75/bbl on 50,001 – 100,000 bbls per month
$0.50/bbl on above 100,000 bbls per month

7.4    Product may be delivered to Lessor's Terminal tanks at Corpus Christi, TX across Citgo Oil Dock #3, or Bay Dock (Barge Dock) connected to Lessor's tanks, via Lessee's mutually scheduled, nominated and accepted vessels and/or barges.  Unless agreed in writing by the Parties, Title and Risk on the Product shall remain with Lessee at all times, except that Risk shall pass to Lessor as the Product passes the first permanent inlet flange to the terminal facility, and shall cease when the Product passes the last permanent outlet flange of the terminal.

6

4163085v.12

BTB 06961

7.5 Under no circumstances will Lessor be liable for any demurrage claimed from Lessee on delivery or loading out of Product in storage, except to the extent that such demurrage is caused by the gross negligence or willful misconduct of Lessor.

7.6 Upon arrival at the Citgo dock, prior to commencement of discharge, the content of shore line from the dock to the shore tanks of approximately 8,300 barrels must be displaced towards either the vessel or a shore tank as per attached procedure. Laytime for this operation shall be for the charterer's account. Owners are requested to cooperate with shore personnel in order to facilitate this operation.

7.7 Re-delivery of Product out of the Terminal shall be by pipeline delivery or loaded to barge(s) or loaded to trucks or rail cars per mutually scheduled with Lessor within the constraints of the Terminal and receiving facility.

7.8 In case access to Barges and Tankers is required, the Parties will discuss the installation of required VOC control equipment at the dock.

## 8. QUANTITY DETERMINATIONS

8.1 <u>Generally</u>. Except as otherwise provided below, the quantity and quality of Products received into and delivered from the Tanks and delivered into or from connecting pipelines, vessels, tank trucks or rail tank cars, as well the quantity and quality of Stored Inventory in the Tanks at any given time, shall be determined in accordance with established API/ASTM standards, or other mutually agreed to standards.

8.2 Truck quantities delivered shall be determined via receiving shoretank upgauges, with shoretanks in static state, as determined by a mutually agreeable independent inspector and or daily Lessor product control gauges, as mutually determined by the parties.

8.3 Quantity of deliveries by pipeline out of the refinery shall be via delivering shoretank downgauges, with tanks in static state, as determined by a mutually agreeable independent inspector.

8.4 Quantities from tankers and barges shall be based on Lessor's shoretank(s) upgauge(s), with tanks in static state, at discharge and downgauge(s) at reload as measured by a mutually agreeable independent inspector.

    8.4.1 Quantities from rail cars shall be based on Lessor's shoretank upgauges or downgauges, as the case may be, with tanks in static state, as determined by a mutually agreeable independent inspector.

## 9. INSPECTION

Inspection for quantity shall be by an Independent Inspector of Lessee's choice with charges 100% for Lessee's account. Lessee shall provide, or cause to be prov ided to Lessor, a copy of each inspection report for each movement under this Agreement.

## 10. PAYMENT

10.1 Payment for tank rental shall be due seven (7) calendar days prior to commencement of every monthly period, excepting that the final monthly tank rental payment will be netted against the amount due, or to become due in the then current month, to Lessee for any heels purchased by Lessor pursuant to Section 17.2 below.

4163085v.12

BTB 06962

10.2   Payment of the Excess Handling Fee shall be made by the 15th calendar day of the following calendar month.

10.3   Payment of amounts Lessee owes pursuant to Section 4.3 shall be due three (3) Business Days after Lessee receives an invoice therefor and back-up documentation substantiated such charges.

10.4   If a payment date falls on a US banking holiday, then payment shall be made on the previous Business Day.

10.5   Payment shall be made via wire transfer as per Lessor's instructions on its invoice.

## 11.   REPORTING AND HOLDING CERTIFICATES

11.1   On or prior to the fifth calendar day following each month or partial month during the Term, Lessor shall provide Lessee with reports reflecting, with respect to the preceding month or partial month:

11.1.1   all receipts and deliveries of Stored Inventory into and out of storage;

11.1.2   all transfers of Product to different Tanks, and the dates of each such transfer;

11.1.3   the beginning Stored Inventory and the ending Stored Inventory;

11.1.4   all Stored Inventory losses;

11.1.5   the Tanks in which the Stored Inventory is located; and

11.1.6   Stored Inventory test results by Tank.

11.2   At Lessee's reasonable request, Lessor shall provide such reports on a daily basis with copies of such reports being sent to Lessee and Lessee's bank. At such times, Lessor shall adjust the book inventory to the physical inventory. Lessor and Lessee shall negotiate in good faith to resolve any dispute over the volumes of Lessee's Stored Inventory received, stored or delivered within 30 days from the date that Lessee receives the monthly report described in this Section 11.2.

11.3   Upon Lessee's request, Lessor shall issue holding certificates to Lessee's designated financing banks in a format reasonably acceptable to Lessor, Lessee and Lessee's financing banks. If reasonably requested in writing by Lessee's designated financing banks, Lessor agrees that it will not move Lessee's product from the Terminal without receiving a signed certificate from such bank or banks or a designated agent acting on behalf thereof, with the further understanding that Lessor shall no liability for relying on, and Lessee agrees to indemnify Lessor against any claims relating to, the authenticity of any such certificate.

## 12.   REPRESENTATIONS AND WARRANTIES

12.1   <u>Mutual</u>. Lessor and Lessee each represent and warrant as of the Effective Date and shall be deemed to represent and warrant as of the Effective Date and on each day during the Term as follows:

12.1.1   It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and is in good standing under such laws.

12.1.2   It has the corporate, governmental and other legal capacity, authority and power to execute this Agreement, to deliver this Agreement and to perform its obligations under this Agreement, and has taken all necessary action to authorize the foregoing.

8

4163085v.12

BTB 06963

12.1.3  The execution, delivery and performance of this Agreement by it does not and shall not violate or conflict with any Applicable Law applicable to it or any of its assets, any provision of its constitutional documents or any contracts binding on or affecting it or any of its assets.

12.1.4  All governmental and other authorizations, approvals, consents, notices and filings that are required to have been obtained or submitted by it in respect of this Agreement and the Parties' performance of their respective obligations (including any internal authorizations, approvals and consents required by such Party under its organizational documents) have been obtained or submitted and are in full force and effect, and all conditions of any such authorizations, approvals, consents, notices and filings have been complied with.

12.1.5  This Agreement constitutes its legal, valid and binding obligation, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application regardless of whether enforcement is sought in a proceeding in equity or at law).

12.1.6  No Event of Default, or any event or circumstance with which notice or the passage of time would constitute an Event of Default, with respect to it has occurred and is continuing, and no such event or circumstance shall occur as a result of its entering into or performing its obligations under this Agreement.

12.2  Lessor.  Lessor to the best of its knowledge, after due inquiry, shall be deemed to represent and warrant to Lessee, as of the Effective Date and as of the date of each receipt or delivery by it of Lessee's Products, as follows:

12.2.1  The Tanks are in serviceable condition and will be maintained and operated in a manner which complies with Good Industry Practice; the facilities that shall be used for the Services provided by it under this Agreement are in material compliance with all Applicable Laws and such facilities are suitable for the purposes for which they are to be utilized under this Agreement; and, to the best of its knowledge, after due inquiry, it is not aware of any leak in any Tank, pipeline or facilities relevant to Lessor's performance under this Agreement which could cause material environmental danger, generate material environmental Liabilities or be detrimental to the environment in any material respect.

12.2.2  Other than Liens for ad valorem taxes or similar taxes, there are no Liens on any portion of the Terminal or other property the foreclosure of which could materially impair its ability to perform its obligations to Lessee under this Agreement.

12.2.3  There are no existing or threatened labor disputes at the Terminal that could interfere with its performance under this Agreement, and there is no litigation pending or, to its knowledge, threatened, that could have a material adverse effect upon its ability to perform its obligations under this Agreement.

13.  **REQUIRED NOTIFICATIONS**

13.1  Notice of Events Affecting Financial Condition.  Lessor shall notify Lessee within one Business Day of becoming aware of any of the following events:

13.1.1  Trigeant or BTB's binding agreement to sell, lease, sublease, transfer or otherwise dispose of, or grant any person (including an Affiliate) an option to acquire, to any person less creditworthy than BTB, in one transaction or a series of related transactions, all or a material portion of the

9

BTB 06964

Terminal assets or Lessor's execution of any letter of intent or memorandum of understanding or similar document to transfer all or any material portion of the Terminal assets;

13.1.2   Lessor consolidates or amalgamates with, merges with or into, or transfers all or substantially all of its assets to, another entity (including an Affiliate);

13.1.3   Any event that could reasonably be expected to have a Material Adverse Effect;

13.1.4   A final judicial or administrative judgment is rendered against Lessor in excess of $1,000,000; and

13.1.5   Lessor also shall notify Lessee no later than 30 days in advance of (or such date thereafter as is reasonable given the circumstances) any Change of Control.

## 14.    DEFAULT AND DETERMINATION

14.1    Default.  Notwithstanding any other provision of this Agreement, an "Event of Default" shall be deemed to occur in respect of this Agreement (and shall be deemed to continue thereafter for only so long as such matter has not been cured):

14.1.1   A Party fails to make payment when due under this Agreement within three Business Days of a written demand therefor (excluding any payment that is the subject of a good faith dispute but only to the extent of such disputed amount).

14.1.2   A Party fails to perform any material obligation under this Agreement, which is not cured to the satisfaction of the other Party (in its reasonable discretion) within twenty Business Days (or such longer period as reasonably required to effect a cure) from the earlier of (i) the date that such Party receives notice that corrective action is needed and (ii) the date such Party becomes aware of such failure.

14.1.3   A Party breaches any representation, warranty made or repeated or deemed to have been made or repeated by the Party in any material respect when made or repeated or deemed to have been made or repeated under this Agreement, or any warranty or representation proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated under this Agreement; provided, however, that if such breach is curable, such breach is not cured to the reasonable satisfaction of the other Party (in its sole discretion) within ten Business Days from the date that such Party receives notice that corrective action is needed.

14.1.4   A Party becomes or is Bankrupt.

14.1.5   Any person forecloses on or exercises its rights under any Lien on any portion of the Terminal and, as a result, Lessee reasonably believes that its rights and privileges under this Agreement could be materially interfered with or materially adversely affected; provided that, if following any such foreclosure BTB or an Affiliate of BTB or Trigeant, Ltd. assumes control of the Terminal, then an Event of Default shall not be deemed to have occurred in any event.

14.1.6   A Party consolidates or amalgamates with, merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer, (i) the resulting, surviving or transferee entity fails to assume all the obligations of such Party under this Agreement, either by operation of law or by an agreement reasonably satisfactory to the other Party or otherwise, or (ii) in the reasonable opinion of the other Party, the creditworthiness of the successor, surviving or transferee entity, taking into account any guaranty,

4163085v.12

BTB 06965

is materially weaker than the predecessor entity immediately prior to the consolidation, amalgamation, merger or transfer.

14.1.7 A Change of Control occurs and the creditworthiness of the successor, surviving or transferee entity, taking into account any guaranty, is, in the non-affected party's reasonable discretion, materially weaker than the predecessor entity immediately prior to the Change of Control.

14.2 <u>Additional Lessor Events of Default</u>. In addition to the Events of Default set forth above, the occurrence of any one or more of the following during the Term shall be deemed to constitute a Default or an Event of Default with respect to Lessor (and Lessor will be the Defaulting Party):

14.2.1 A transfer of all or substantially all of the Terminal assets occurs (other than a transfer to an Affiliate of Lessor or following which transfer an Affiliate of Lessor leases, operates or otherwise controls the Terminal), and in the reasonable opinion of Lessee, the creditworthiness of the transferee entity, taking into account any guaranty, is materially weaker than the predecessor entity immediately prior to the transfer.

14.2.2 Any Lien (other than a Lien granted by Lessee) is placed on any material portion of the Stored Inventory due to an act or omission of Lessor or any of its creditors which Lien is not removed or adequately bonded (or otherwise subject to a similar protective measure) for within reasonable notice thereof. Upon the occurrence of such event, Lessor shall be deemed to be the Defaulting Party (as defined below) and Lessee shall be deemed to be the Performing Party (as defined below).

15. **SUSPENSION AND TERMINATION**

15.1 <u>Suspension and Termination</u>. Notwithstanding any other provision of this Agreement, upon the occurrence of and during the continuation of an Event of Default with respect to a Party (the "**Defaulting Party**"), the other Party (the "**Performing Party**") shall be entitled to do either or both of the following: (i) suspend its performance under this Agreement, other than obligations to make undisputed payments under this Agreement, or (ii) terminate this Agreement upon notice to the Defaulting Party, effective upon the date specified in such notice (which date shall be no earlier than the later of: (x) if such Event of Default arises as a result of anything other than a failure to make a required payment, ten Business Days after the occurrence of the Event of Default, and (y) two Business Days after the date of receipt or deemed receipt of such notice).

15.2 <u>Indemnification</u>. The Defaulting Party shall indemnify and hold harmless the Performing Party for all liabilities incurred as a result of the Event of Default or in the exercise of any remedies under this Agreement.

15.3 <u>Cooperation after Termination Date</u>. Notwithstanding an early termination of this Agreement by Lessee due to a default by Lessor, Lessor shall remain obligated under this Agreement to continue to provide Services to Lessee in respect of safekeeping of Lessee's Products (and Lessee shall remain responsible for paying Lessor for such Services) and the removal and delivery of Products to Lessee in a timely and safe manner and Lessor shall ensure that Lessee and its representatives have full access to its Products for purposes of ensuring their safekeeping and removal from the Terminal.

15.4 <u>Specific Performance</u>. The Parties agree that the failure of the Defaulting Party to comply with the terms of this Agreement will cause irreparable injury to the Performing Party, which may not properly or adequately be compensated by the mere payment of money. The Parties agree, therefore, that upon the occurrence of an Event of Default, the Performing Party, in addition to any other remedies that may be available to the Performing Party, shall have the right to obtain from any competent court a decree

11

4163085v.12

BTB 06966

enjoining a breach of this Agreement by the Defaulting Party or providing that the terms of this Agreement be specifically enforced.

16.    **CONTACTS**

                        **BTB REFINING, LLC**

| | |
|---|---|
| Commercial: | Roberto Finocchi Tel # 561 999 9918, <br> Email: rfinocchi@btbrefining.com |
| Operations: | Linda Collins    Tel #: 713-900-1118, cell: 713-392-8089 <br> Email: lcollins@btbrefining.com |
| Financial: | Randy Collar, Tel #: 561-347-5509 <br> Email: rcollar@iotcgroup.com |

                        **FREEPOINT COMMODITIES TRADING AND MARKETING LLC**

                        **58 Commerce Rd.**
                        **Stamford, CT 06902**

| | |
|---|---|
| Commercial: | Jim Degnan  Tel# 203-542-6228 <br> Email:  jdegnan@freepoint.com |
| | Aaron Markley Tel# 203-542-6261 <br> Email: amarkley@freepoint.com |
| Operations: | Lou Santore Tel#  203-542-6405 <br> Email:  LSantore@freepoint.com |
| Financial: | Scott Nelson Tel# 203-542-6801 <br> Email:  SNelson@freepoint.com |

17.    **TANK HEELS**

17.1    Lessee acknowledges that the tank(s) used for storage may have tanks heels of a different quality crude than Lessee is bringing in.  Lessee hereby agrees to hold Lessor harmless from any and all claims arising as a result of any affect that the tanks heels may have on the crude Lessee brings in to store, provided that Lessor performs quality testing on the Heels prior to the Effective Date, provides a copy of the results to Lessee and Lessee does not object.

17.2    Lessee shall sell the Heels back to Lessor on the expiration or termination of the Agreement for the sum of $50 per barrel.

18.    **VOLUME DIFFERENTIAL; LOSSES**

18.1    For Products or Crude oil with a Reid Vapor Pressure equal to or below .5, any differential between discharge and reload net volumetric figures larger than 0.3 percent in volume, will be settled at the current market price for the grade in tanks (to be mutually agreed) at the end of the storage period.

12

4163085v.12

BTB 06967

18.2   For Products or Crude oil with a Reid Vapor Pressure of 9 or above, any differential between discharge and reload net volumetric figure larger than 4.5 percent (4.5%) in volume, will be settled at the current market price for the grade in tanks (to be mutually agreed) at the end of the storage period.

18.3   For Products or Crude oil with a Reid Vapor Pressure of greater than .5 but less than 9, the volume loss allowance will be the interpolated value, based on Sections 18.1 and 18.2.

## 19.   DOCK THROUGHPUT AND DOCKAGE FEES AND RAIL CAR FEES

Any fees charged to Lessor for use of Citgo Dock and/or Bay Dock, or any rail car fees charge by a third party including but not limited to throughput, dockage, wharfage, spill response, Texas Coastal Protection Fee and extra tankermen or labor for handling trucks, rail cars and pipelines will be rebilled to Lessee. Lessee shall pay such invoices upon receipt and without delay.

## 20.   INSURANCE

20.1   Insurance Required by Lessee.   Lessee shall insure the Products under its cargo and casualty insurance policy.

20.2   Insurance Required by Lessor.   Lessor, directly or through an Affiliate, shall procure and maintain in full force and effect throughout the Term insurance coverage of the following types and amounts and with insurance companies rated not less than A- by A.M. Best or otherwise reasonably acceptable to Lessee, in respect of Lessor's receipt, handling and storage of Product under this Agreement:

   20.2.1   workers Compensation coverage in compliance with Applicable Law;

   20.2.2   automobile liability coverage in a minimum amount of $1,000,000; and

   20.2.3   comprehensive or commercial general liability coverage and umbrella excess liability coverage, which includes bodily injury, broad form property damage and contractual liability coverages, in a minimum amount of $100,000,000, which includes losses for Product while in Lessor's care, custody and control, and "sudden and accidental and seepage pollution" liability coverages (excluding events that result in acidic deposition).

20.3   Additional Insurance Requirements.

   20.3.1   Each Party shall cause its insurance carriers to furnish insurance certificates to the other Party, in a form reasonably satisfactory to the other Party, evidencing the existence of the coverages required pursuant to Sections 20.1 and 20.2. Each Party shall provide renewal certificates within 30 days of expiration of the previous policy under which coverage is maintained or when any insurance coverage described above is materially changed.

   20.3.2   Further, each Party shall name the other Party as an additional insured under the foregoing policies to the extent of the indemnities required under this Agreement, excepting that Lessee shall only be obligated to list BTB and/or Trigent as additional insured under its general liability policy.

   20.3.3   The mere purchase and existence of insurance coverage shall not reduce or release either Party from any Liabilities incurred or assumed under this Agreement.

13

4163085v.12

BTB 06968

20.3.4  In the event of a Product loss for which Lessor is liable to Lessee, Lessor's insurance shall be the primary and exclusive coverage for such loss, notwithstanding the existence of other valid and collectible insurance.

## 21.  FOREIGN TRADE ZONE

Should customer chose to use Lessor's Foreign Trade Zone status for any Product or Crude oil that stores in the Terminal, any cost including but not limited to Customs Fees, Duties and Taxes, shall be for Lessee's account.

## 22.  INDEMNIFICATION; LIMITATION ON DAMAGES

22.1    Indemnity by Lessor.  To the fullest extent permitted by Applicable Law, Lessor shall defend, indemnify and hold harmless Lessee, its Affiliates and each of their directors, officers, employees, representatives, agents and contractors, for and against any Liabilities arising out of injury, disease or death of any person or damage to or loss of any property, fine or penalty, including as a result of any leak, spill, discharge or any environmental pollution, any of which (i) arises out of Lessor's material breach of this Agreement or its failure to comply with Applicable Laws that relate to its performance under this Agreement, (ii) is caused by Lessor, or its employees, representatives, agents or contractors in performing its obligations under this Agreement, except to the extent that such injury, disease, death, or damage to or loss of property was caused by the negligence or willful misconduct on the part of Lessee, its employees, representatives, agents or contractors, or (iii) is attributable to any of its representations, covenants or warranties having been proven to be materially incorrect or misleading when made.

22.2    Indemnity by Lessee.  To the fullest extent permitted by Applicable Law, Lessee shall defend, indemnify and hold harmless Lessor, its Affiliates and each of their directors, officers, employees, representatives, agents and contractors, for and against any Liabilities arising out of injury, disease, or death of any person or damage to or loss of any property, fine or penalty, including as a result of any leak, spill, discharge or any environmental pollution, any of which (i) arises out of Lessee's material breach of this Agreement or its failure to comply with Applicable Laws that relate to its performance under this Agreement, (ii) is caused by Lessee or its employees, representatives, agents or contractors in performing its obligations under this Agreement, except to the extent that such injury, disease, death, or damage to or loss of property was caused by the negligence or willful misconduct on the part of Lessor, or its employees, representatives, agents or contractors, or (iii) is attributable to any of its representations, covenants or warranties having been proven to be materially incorrect or misleading when made.

22.3    No Third Party Rights.  Each Party's obligation to defend, indemnify, and hold the other Party harmless under the terms of this Agreement shall not vest any rights in any third party (whether a Governmental Authority or private entity), nor shall they be considered an admission of liability or responsibility for any purposes other than those enumerated in this Agreement.

22.4    Notice of Claims.

22.4.1  Lessor.  Lessor shall notify Lessee as soon as reasonably practicable after receiving notice of claim, demand, suit or proceeding brought against it within the indemnities of this Agreement, shall furnish to Lessee the complete details within its knowledge and shall render all reasonable assistance requested by Lessee in the defense. Lessor has the right but not the duty to participate, at its own expense, with counsel of its own selection, in the defense and settlement thereof without relieving Lessee of any obligations hereunder.

22.4.2  Lessee.  Lessee shall notify Lessor, as soon as reasonably practicable after receiving notice of claim, demand, suit or proceeding brought against it within the indemnities of this Agreement,

14

BTB 06969

shall furnish to Lessor the complete details within its knowledge and shall render all reasonable assistance requested by Lessor in the defense. *Lessee* has the right but not the duty to participate, at its own expense, with counsel of its own selection, in the defense and settlement thereof without relieving Lessor of any obligations hereunder.

22.4.3 *Exclusion*. Notwithstanding the foregoing, an indemnifying Party shall not be entitled to assume responsibility for and control of any judicial or administrative proceeding if such proceeding involves an Event of Default by the indemnifying Party under this Agreement that has occurred and is continuing.

22.5 <u>Limitation on Damages</u>. Without prejudice to the express remedies set forth herein, the parties' liability for damages is limited to direct, actual damages only and neither party shall be liable for lost profits or other business interruption damages or special, consequential, incidental, punitive, exemplary or indirect damages, in tort, contract or otherwise, of any kind, arising out of or in any way connected with the performance, the suspension of performance, the failure to perform, or the termination of this agreement; provided, however, that, this limitation shall not apply with respect to any third-party claim for which indemnification is available under this agreement. Each party acknowledges the duty to mitigate damages hereunder. Each Party further acknowledges and agrees that this Section 22.5 is not intended to limit Lessee's obligation to pay Lessor fees as set forth in this Agreement.

## 23.    GENERAL TERMS AND CONDITIONS.

23.1 Except as specifically detailed below, Lessor's General Conditions for Tank Storage (the "**General Terms**") shall supplement this Confirmation. Each party hereby warrants to the other party that a copy of the General Terms is already in possession. To the extent that any matter is addressed in this Confirmation and in the General Terms, to the extent the terms of this Confirmation are inconsistent with or conflict with the General Terms, this Confirmation shall govern. No amendment to the General Terms shall amend the terms and conditions of this Agreement in any manner without the prior written consent of Lessee.

23.2 The General Terms shall be amended as follows:

23.2.1 Each of the following Articles shall be deleted in their entirety and shall not apply to this Agreement: 6, 8, 9, 29, 33, 35.1, 35.2, 36, 38, 39, 52.1, 52.3, 53, 54, 58 and 63;

23.2.2 The words "of all undisputed amounts" shall be added before the period at the end of Article 10;

23.2.3 The last sentence of Article 12 shall be deleted;

23.2.4 The words "if possible" shall be deleted from Article 14;

23.2.5 In Article 15, (i) the word "reasonable" shall be added before the word "costs", and (ii) the word "operations" shall be deleted and replaced with the clause "agreement between Principal and BTB".

23.2.6 The following sentence shall be added to the end of Article 17: "Communications provided by e-mail shall be deemed to have been given in writing.";

23.2.7 The words "reasonably be expected to" shall be added before the word "cause" in Article 18;

23.2.8 The words "knowledge of which would typically be important to a terminalling company or alternatively which are of such a nature that the agreement would not have been entered into or

15

BTB 06970

not on the same conditions if, BTB had known of those particulars" shall be deleted from the last sentence of Article 19.1

23.2.9 The words "and with Principal's consent, such consent not to be unreasonably withheld or delayed," shall be added after the words "account of the Principal" in Article 22.2;

23.2.10 The words "With the reasonable consent of Principal," are added to the beginning of Article 37.2;

23.2.11 The parenthetical "(including e-mail)" shall be added after the words "in writing" in Article 42.1.

23.2.12 The words ", which consent shall not be unreasonably withheld" shall be added before the period at the end of Article 43.1;

23.2.13 The words ", holding certificate" will be added after the words "store warrant" in Article 44.1;

23.2.14 The word "reasonable" shall be inserted before the word "grounds" in the last sentence of Article 44.2;

23.2.15 The words "/holding certificates" shall be added after the words "deliver-orders" in Article 44.3;

23.2.16 The words "on a reasonable basis" shall be added after the words "undesirable by BTB" in Article 48.3;

23.2.17 The words "related to services provided to Principal" shall be added to Article 49.3 after the words "All costs";

23.2.18 The words "the costs of labor, inflation, currency exchange rate variations, by" and the words "or by any other factor that is beyond the control of BTB, inclusive of measures in the interest of safety or environment," shall be deleted from Article 49.8;

23.2.19 Each instance of the word "BTB" shall be replaced by the words "a Party" in Aticle 55.1;

23.2.20 The words "Except to the extent any such condition or event is the result of a Party's negligence, " shall be added to the beginning or Article 55.1 and the words "as well as defects, whether or not latent, of the premises and/or the storage space, pipeline, pumps, jetties, foundations etc." shall be deleted from Article 55.1;

23.2.21 The words "delays in the delivery of goods held by BTB," shall be deleted from Article 55.1.3;

23.2.22 The word "BTB" shall be replaced by the words "a Party" in Article 55.1.4;

23.2.23 Article 55.2 shall be deleted in its entirety and replaced with the following:

"such Party shall not be required to fulfill its obligations under the Agreement to the extent that performance is hindered by the force majeure event or the consequences thereof; provided that the Party unable to perform shall use commercially reasonable efforts to avoid or remove the event of force majeure."

23.2.24 The following sentence shall be inserted as new Article 55.4: "Notwithstanding anything otherwise provided in this Agreement, a Party's obligation to pay any fees, reimburse costs and

16

BTB 06971

expenses incurred, or any other monetary obligations as they fall due, shall not in any event be suspended, reduced or altered as a result of any facts or circumstances that might constitute force majeure."

24.  **ASSIGNMENT**

24.1  Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon the Parties hereto, their respective successors and permitted assigns.

24.2  Assignment Prohibited. No Party shall (i) assign this Agreement or its rights or interests under this Agreement in whole or in part or (ii) delegate its obligations under this Agreement in whole or in part; in either case, without the express written consent of the other Party (which may be at its sole discretion); provided that if a Party requests assignment or transfer of this Agreement to an Affiliate, consent shall not be unreasonably withheld, delayed or conditioned and BTB's lease of the Terminal from Trigeant, Ltd. after a court-ordered reversal, voiding, set-aside, unwinding, invalidation or other judicial order or judicial decision that has a similar effect, of BTB's prior foreclosure of the Terminal, shall not require the consent of Lessee. If written consent is given for any assignment, the assignor shall remain jointly and severally liable with the assignee for the full performance of the assignor's obligations under this Agreement, unless the Parties otherwise agree in writing.

24.3  Void Assignment. Any assignment or attempted assignment by a Party in violation of Section 24.2 shall be null and void ab initio, and the non-assigning Party has the right, without prejudice to any other rights or remedies it may have under this Agreement or otherwise, to terminate this Agreement effective immediately upon giving notice to the assigning Party.

25.  **OTHER TERMS**

25.1  Interpretation. Section and sub-section headings are for convenience of reference only and will not affect the interpretation thereof. Except where the context otherwise requires, words denoting the singular include the plural and vice versa and words denoting any gender include all genders. The word "or" is not exclusive. The word "include" and its derivatives will not be construed as terms of limitation. Unless otherwise expressly stated, the words "hereof", "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement. The words "will" and "shall" are expressions of command, not merely expressions of future intent or expectation. References to any Party shall be construed as a reference to such Party's successors in interest and permitted assigns. References to a provision of Applicable Law or Applicable Laws generally are references to that provision or Applicable Laws generally, as may be amended, extended or re-enacted from time to time. Unless otherwise provided, references to "days," "months" and "years" mean calendar days, months and years, respectively, and a "day" consists of the 24-hour period commencing at 12:00:00 a.m. EPT and ending on 11:59:59 EPT on that day. References to any other agreement, or other document or to a provision contained in any of these, shall be construed, at the particular time, as a reference to it as it may then have been amended, supplemented, modified or assigned in accordance with its terms. References to any "person" include any natural person, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization, estate, association, partnership, statutory body, joint stock company or any other private entity or organization, Governmental Authority, court or any other legal entity, whether acting in an individual, fiduciary or other capacity. When any provision of this Agreement requires or prohibits a person from taking any particular action, the provision applies regardless of whether the action is taken directly or indirectly by the person.

25.2  Severability. If at any time any court of competent jurisdiction declares any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any Applicable Law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality,

17

4163085v.12

BTB 06972

validity or enforceability of such provision under the Applicable Law of any other jurisdiction will, in any way, be affected or impaired. The Parties will negotiate in good faith with a view to reform this Agreement in order to give effect to the original intention of the Parties and produce as nearly as is practicable in all the circumstances the appropriate balance of the commercial interests of the Parties. The failure to agree upon such provisions for any reason or no reason shall not be considered a breach of this Agreement.

25.3    Waiver. No failure to exercise, nor any delay in exercising, any right, power or remedy under this Agreement or provided by Applicable Law shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies (provided by Applicable Law or otherwise). Any waiver of any breach of this Agreement shall not be deemed to be a waiver of any subsequent breach.

25.4    Entire Agreement. This Agreement constitutes the entire agreement of the Parties regarding the matters contemplated herein, and no representations or warranties shall be implied or provisions added hereto in the absence of a written agreement to such effect among the Parties after the Effective Date. No promise, representation or inducement has been made by any Party that is not embodied in this Agreement, and no Party shall be bound by or liable for any alleged representation, promise or inducement not so set forth.

25.5    Amendment. This Agreement may not be altered, amended, modified or otherwise changed in any respect except in writing duly executed by an authorized representative of each Party and no representations or warranties shall be implied or terms added in the absence of a writing signed by all Parties.

25.6    Survival. Termination or expiration of this Agreement shall not affect any rights or obligations that may have accrued prior to termination, including any in respect of antecedent breaches. The obligations of each Party that expressly survive termination, are required to take effect on or give effect to termination or the consequences of termination or which by their very nature must survive termination, shall continue in full force and effect notwithstanding termination of this Agreement.

25.7    Counterparts. This Agreement may be executed by the Parties in separate counterparts and all such counterparts shall together constitute one and the same instrument. In the event that any signature is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the Party executing (or on whose behalf the signature is executed) the same with the same force and effect as if such facsimile signature page were an original thereof.

[Remainder of Page Intentionally Left Blank]

18

4163085v.12

BTB 06973

We are pleased to have concluded this business with you and we look forward to more business with you in the future. Kindly sign below and return a scanned pdf of this signature page by email to BTB with the understanding that this Agreement shall be effective as of the date first set forth above.

Very truly yours,

**BTB REFINING, LLC**

By: _____
Name: KEVIN KIRKEIDE
Title: MANAGER

**TRIGEANT, LTD.**

By: _____
Name: STEPHEN ROOS
Title: MANAGER

Accepted and Agreed:

**FREEPOINT COMMODITIES TRADING AND MARKETING LLC**

By: _____
Name: Brandon Dikit
Title: Ass. Gen. Counsel

19

BTB 06974

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| PDVSA PETROLEO, S.A., | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:09-CV-00038 |
| | § | |
| TRIGEANT, LTD., | § | |
| BTB REFINING, L.L.C., and | § | |
| HARRY SARGEANT, III, | § | |
| | § | |
| **Defendants.** | § | |

## ORDER DENYING BTB REFINING, LLC'S EMERGENCY MOTION FOR STAY AND MODIFYING ORDER ON TRIGEANT, LTD'S MOTION TO ENFORCE JUDGMENT

On the 2nd day of April, 2013, the Court considered BTB Refining, LLC's Emergency Motion for Stay. (D.E. 335.) After considering the motion and the arguments of counsel, the motion is DENIED, and the Court's Order Granting Trigeant, Ltd.'s Motion to Enforce Judgment (D.E. 308) is MODIFIED AS FOLLOWS:

It is ORDERED that:

1.  During the pendency of this cause on appeal, Trigeant, Ltd. ("Trigeant") shall remain in possession of all property foreclosed upon in the March 4, 2008 foreclosure sale. Notwithstanding, BTB shall have the non-exclusive right to use, occupy and have access to the foreclosed property for the sole purpose of fulfilling all of its rights and contractual obligations under the Tank Lease Agreement dated December 1, 2012 entered between BTB as Lessor and Freepoint Commodities Trading and Marketing, LLC ("Freepoint") as Lessee.

EXHIBIT C

2.      BTB shall immediately deposit any and all funds received from Freepoint which currently remain in its possession, as well as any and all future funds received from Freepoint immediately after their receipt into an operating account ("Escrow Account") established by and in the name of Trigeant.  This Escrow Account shall be used solely for refinery operating expenses arising out of the Tank Lease Agreement as specified below, without setoff or payment of any funds by BTB for any purpose, prior to the deposit of such funds into the Escrow Account.  The Escrow Account shall also be exempt from any state or federal garnishment, or levy or execution proceeding.

> Bank Name:          International Bank of Commerce
> Bank Address:       1200 San Bernardo Ave.
>                     Laredo, Texas 78042
> ABA #:              XXXXX2528
> SWIFT Code:         XXXXUS44
> Account #:          XXXXXX4535
> Account Name:       **Trigeant, Ltd.**

3.      All necessary and reasonable costs associated solely with fulfilling BTB's contractual rights and obligations under the Tank Lease Agreement shall be paid by Trigeant from the Escrow Account to any appropriate vendor or payee, which may include BTB.  Trigeant shall make all such payments from the Escrow Account within 5 business days of the presentation of an invoice and all supporting documents by BTB to Trigeant that details said costs and expenses.

4.      The funds held in the Escrow Account shall be paid only for employee salaries and related taxes and withholding obligations, and for operating expenses, safety, maintenance, insurance, utilities, regulatory compliance, and other applicable

local, state or federal taxes, and capital improvements at the facility, and solely as they pertain to or arise from the Tank Lease Agreement.

5.      Trigeant shall maintain a detailed accounting of the funds received from BTB and the operating expenses paid, including the supporting documentation provided to Trigeant by BTB, and provide such accounting to BTB and Freepoint by the 15th day of each month.

ORDERED this 4th day of April 2013.

*Nelva Gonzales Ramos*

**NELVA GONZALES RAMOS**
**UNITED STATES DISTRICT JUDGE**