**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| IN RE | Chapter 11 Cases |
| | Case No. 14-29027-EPK |
| TRIGEANT HOLDINGS, LTD., *et al.* [1], | (Jointly Administered) |
| Debtors. | |
| _____/ | |

**OBJECTION TO CONFIRMATION OF DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FILED BY BTB REFINING, LLC, HARRY SARGEANT III, AND INTERNATIONAL OIL TRADING COMPANY, LTD.**

*It is not possible to overstate the following. There is an ongoing war between Harry Sargeant the second, Daniel Sargeant, and James Sargeant on one side, and Harry [Sargeant] the third on the other. The war is hard fought, involving protracted litigation in various parts of the country. The war has so far resulted in several battles in this court as well, from the first Chapter 11 case of [Trigeant] Limited, to the involuntary petition against BTB, to these jointly administered cases.*

*\*\*\**

*The debtors have made it explicit that they intend to continue to pursue their overall goals, baldly stated as selling the asset that BTB claims a lien on, in a case in which BTB has an enormous claim, and in which BTB's owner is a significant equity interest holder, over BTB's objection, without requesting competitive bidding, and with the expectation that they will defeat completely all claims of BTB such that BTB will receive absolutely nothing in this case on account of its claims, even claims it might acquire from PDVSA.[2]*

BTB Refining, LLC ("BTB"), Harry Sargeant, III ("HSIII"), and International Oil Trading Company, Ltd. ("IOTC" and, with BTB and HSIII, the "Objectors") object to the Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy

---

[1] The Debtors in these jointly administered Chapter 11 cases are Trigeant Holdings, Ltd. ("Holdings"), Trigeant, LLC ("LLC"), and Trigeant, Ltd. ("Trigeant").

[2] (October 10, 2014 Hearing Transcript, ECF No. 176, p.17, ll.8-17; p.30, l.13-23)(remarks of the Court).

1

Code (the "Plan") (ECF No. 519). This Court should deny confirmation of the Plan, which fails to satisfy 11 U.S.C. § 1129(a). [3]

## THE OBJECTORS AND THEIR CLAIMS AND INTERESTS

The Objectors are, collectively, by far the largest stakeholders in this case.

### The AmCap Debt: $28,000,000 at Confirmation

BTB owns and holds the first-priority secured Class 2 Claim [4] on the assets of Trigeant, otherwise known as the AmCap Debt. BTB purchased the AmCap Debt at par in 2007. The AmCap Debt has been in default for more than seven years. As of February 11, 2015, BTB's Class 2 Claim is in the amount of $27,185,217.14,[5] with interest continuing to accrue at the rate of approximately 14% per annum, compounded monthly.

On the eve of the Confirmation Hearing, on May 1, 2015,[6] the BTB Class 2 Claim will, at a minimum, comprise principal and interest of $25,621,994.23, plus the Court-awarded costs and fees of $2,254,977.54, for a total of $27,826,971.77, plus attorneys' fees incurred after the cutoff date for BTB's original motion under 11 U.S.C. § 506(b). Prior to the Confirmation Hearing, as permitted by paragraph 3 of the 506(b) Order, BTB will file a motion for assessment

---

[3] The Debtors' deadline to file a Plan Supplement and other documents in support of confirmation is April 17, 2015, which is also the deadline for this objection. Objectors reserve the right to supplement this objection to address any matters presented by any Plan-related documents filed on or after April 17.

[4] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

[5] See *Amended Order on Amended Motion for Allowance of Claim for Interest, Fees, Costs and Expenses* (ECF No. 492)(the "506(b) Order"), noting principal balance of $22,565,193.55, and allowing interest, costs, and fees, through February 11, 2015, in the total amount of $4,620,023.59.

[6] For purposes of claims computations and feasibility analyses in this objection, Objectors are computing the various claims as of the commencement of the Confirmation Hearing. The amounts that the Debtors must pay or reserve under the Plan will actually be higher because Distributions will not be made until later, on the Effective Date, which is a date that will be "selected by the Plan Proponents" and is thus currently unknown to Objectors. *See* Plan, § 1.2(vv). Moreover, the claim numbers will be higher both for all allowed secured claims (all of which are oversecured under the Plan) *and* all allowed unsecured claims, which are required under the Plan to be paid in full with interest. *See* Plan, §§ 4.5 and 4.7.

2

of these additional fees. In round numbers, BTB conservatively estimates that the total amount of the AmCap Debt, as of the commencement of the confirmation hearing, will be **$28,000,000.00**.

### The PDVSA Claim:  $ 40,472,948.98 at Confirmation

BTB also has the option to acquire ---- and, in all events, the Debtors have the obligation to pay ---- the PDVSA Claim, which is the Class 3 Claim under the Plan and which is secured by a second lien on Trigeant's assets. All timely objections to the PDVSA Claim have been overruled by final orders of this Court.[7] On Trigeant's Petition Date, the amount of the PDVSA Claim, calculated pursuant to this Court's Interest Rate Order,[8] was at least $40,374,633.08,[9] with interest continuing to accrue at the rate of 0.39% per annum. [10]

At the commencement of the confirmation hearing, on May 4, 2015, using the rate prescribed in the Interest Rate Order, the amount of the PDVSA Claim will be **$40,472,948.98**.

### BTB's Unsecured Claim:  $ 2,522,039.42 at Confirmation

BTB also holds an unsecured claim in the amount of $2,520,331.67.  On April 7, 2015, the Debtors objected to this claim, and the objection is scheduled to be heard in conjunction with the Confirmation Hearing. If allowed in full, this claim will total **$2,522,039.42** as of the commencement of the Confirmation Hearing. [11]

---

[7] See *Order Overruling Objection to Claim No. 8* (ECF No. 435).

[8] *Order Sustaining Joint Objection to Claim of PDVSA Petroleo, S.A.* (ECF No. 289).

[9] If the pending appeal of the Interest Rate Order by BTB and PDVSA is successful, this amount will be more than $15 million higher.  BTB acknowledges that the Interest Rate Order is unstayed pending appeal.

[10] The interest calculation is set forth in the addendum to PDVSA's amended proof of claim, Claim No. 8-2 in Trigeant's case, at p. 174.

[11] This assumes, without conceding the propriety of, the application of the 0.11% Judgment Rate proposed in the Plan for General Unsecured Claims.  *See, e.g.*, Plan, § 4.5(b)(ii).

3

### IOTC: $6,865,123.30 at Confirmation

IOTC is an unsecured creditor of Holdings. Holdings' objection to IOTC's claim is set for evidentiary hearing commencing April 20, 2015. If allowed in full, this claim will total **$6,865,123.30** as of the commencement of the Confirmation Hearing.

### HSIII

HSIII owns 28.9575% of the equity interests in Holdings, which owns 99% of the equity interests in Trigeant.

Thus, at the commencement of the Confirmation Hearing, in a case where the total value of the Debtors' assets is fixed, by the APA, at $100 million, the Objectors hold claims that will range, approximately, between **$68,472,948.98** and **$77,860,111.70**. In the extraordinarily unlikely event that there are sufficient proceeds to fund Distributions to holders of Equity Interests, HSIII would be entitled to approximately 29% of such Distributions.

### ARGUMENT

**I.    The Debtors Bear the Burden to Demonstrate, by Clear and Convincing Evidence, that the Plan Satisfies § 1129 [12]**

The Debtors have the burden to demonstrate, by clear and convincing evidence, that the Plan satisfies §1129. *In re New Midland Plaza Assocs.*, 247 B.R. 877, 883 (Bankr. S.D. Fla. 2000)(Hyman, J.); In *re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937, 940 (Bankr. S.D. Fla. 1992)(Cristol, J.). *Contra*, *In re J.C. Householder Land Trust #1*, 501 B.R. 441, 447 (Bankr. M.D. Fla. 2013) (adopting preponderance of the evidence standard).

As detailed herein, the Debtors are incapable of meeting their burden under either standard.

---

[12] Unless otherwise noted, all statutory references are to the Bankruptcy Code, Title 11, U.S. Code.

**II.     The Plan Impairs BTB's Class 2 Claim**

The Plan's crucial premise is that holders of all allowed claims will be paid in full and are therefore unimpaired. *See, e.g.*, Plan at p.1; § 3.2; Article IV. The Debtors have deliberately crafted the Plan as a "full payment" plan in order to deprive creditors of the right to vote on the Plan and thereby subject the Plan to cramdown standards that it would surely fail. But this Plan *does* impair the Class 2 Claim. [13] The Plan's provisions concerning Disputed Claims Reserves do not "leave[] unaltered the legal, equitable, and contractual rights to which [such Claim] entitles the [holder of such Claim]." § 1124(1).

§8.2(c) of the Plan creates a "Disputed Claims Reserve," which is defined as:

> [A] reserve to be established, in accordance with Article IV hereof, by the Debtors or the Reorganized Debtors (or their respective agent(s)), as the case may be, to receive and hold, in a segregated account, Cash on account of Disputed Claims against the applicable Debtor.

Plan, Section 1.2(ss).

BTB's Class 2 Claim (based on the AmCap Debt) is a Disputed Claim.[14] The Plan does not provide for payment of BTB's Class 2 Claim on the Effective Date. Instead, the Debtors will "deposit in the Disputed Claims Reserve Cash in the amount of the Class 2 Claim, with interest for the Post-Effective Date Reserve Period at the rate applicable to the Class 2 Claim … ." Plan, § 4.2(b). The "Post-Effective Date Reserve Period" is defined as "the eighteen month period commencing the day after the Effective Date, or such period as fixed by the Bankruptcy Court."

---

[13] As discussed in Section III below, it also impairs the Class 3 PDVSA Claim.

[14] *See* Plan, §§4.2.

5

Plan, § 1.2(xxx). *Significantly, the reserve created in respect of the Claim also caps BTB's recovery on this Claim in perpetuity*. [15]

This treatment impairs BTB's Class 2 Claim in several ways.

### A. BTB is Entitled to Full, Unreserved Payment on the Class 2 Claim on the Effective Date

#### i. The Validity and Amount of the Secured Class 2 Claim Have Been Established

There is no permissible legal basis for the Debtors to reserve payment of the Class 2 Claim. The principal amount of the Claim is undisputed and the 506(b) Order, and any future supplements thereto, will liquidate interest, costs, and attorneys' fees.

Nor is there any remaining dispute that the Class 2 Claim is secured by a valid first lien on Trigeant's assets. At a hearing on May 6, 2012 in PDVSA's fraudulent transfer action ("TUFTA Action") against BTB in the U.S. District Court for the Southern District of Texas, BTB moved for a judgment on partial findings pursuant to Fed.R.Civ.P. 52(c) that the AmCap lien constitutes a valid lien, based on uncontroverted evidence establishing "that the lien was the result of an arm's length transaction between AmCap and Trigeant," that "there is no evidence that the lien that was granted in favor of AmCap was invalid or fraudulent in any respect," that "the sale to BTB of the lien and loan, the documents that are part of that sale, the assignment of that loan and lien have not been legally attacked in any manner in this case on their face," that "the borrower was promptly notified of the sale," that "the loan and lien assignment was filed in the public records of Nueces County," and that "there is no fraud by Trigeant in the creation of the loan transaction." Trigeant, which was represented by its own counsel, joined in that motion and the Texas District Court granted the motion.

---

[15] *See* Plan, § 8.1(d): "[The holder of a Disputed Claim] may not receive any Distribution on account of its formerly Disputed Claim that is greater than the amount that was allocated to such Disputed Claim in the Disputed Claims Reserve in accordance with the Plan."

6

On January 14, 2013, the Texas District Court entered a Final Judgment which (1) avoided BTB's March 2008 foreclosure sale of Trigeant's refinery; and (2) "ORDERED that each of the following documents … including all indebtedness and obligations evidenced and/or secured thereby and all rights and obligations of the parties thereto, are reinstated as of March 4, 2008, and declared to be in full force and effect as of the date of this Judgment" (and then proceeded to list all of the AmCap Loan documents, including the assignment to BTB), and further that "the amount of the debt evidenced by and payable under the Note as of the date of this Judgment is $22,565,193.55."

### ii. The Debtors are Not Permitted to Use Their Alter Ego Allegations to Stall Payment of the Claim

The Debtors' only basis for their proposed relegation of BTB's Class 2 Claim to a Disputed Claims Reserve are the pending objections to that Claim, consisting of (i) the "Consenting Owners' Objection to IOTC and BTB Claim Filed Against Trigeant Ltd." (ECF#401), which, in reliance on the allegations in the "Big Case," requests that the Claim be disallowed; and (ii) the objection to the Claim incorporated into the Amended Complaint in Adv. No. 15-1079 (which is itself a largely verbatim rehash of the operative complaint in the "Big Case").[16] Both of these objections are based on (i) contingent, unliquidated, and disputed claims by the Debtors against *HSIII* (not BTB), combined with (ii) a contingent and disputed claim that BTB is HSIII's alter ego.

The Plan is designed to delay payment to BTB and any entity associated with HSIII, by starving them of cash as a tactical tool in the "family dispute" between the Consenting Owners and HSIII. In substance, what the Consenting Owners and Debtors hope to accomplish through their objections is to set off against a valid, perfected, secured claim on account of their

---

[16] BTB and other defendants to that adversary proceeding have recently filed a motion requesting that this Court dismiss, or in the alternative, abstain from hearing, that proceeding. *See* ECF No. 24 in Adv. No. 15-1079.

7

unliquidated tort claims against HSIII. That is an inappropriate, bad faith abuse of the powers and privileges afforded a debtor by the Bankruptcy Code, and also an improper attempt to effectuate a setoff.

A debtor in possession has the same defenses available to it as are available outside of bankruptcy, but bankruptcy generally does not expand the substantive defenses available to the debtor. See §558, which does not create a debtor's right of setoff, but merely acknowledges the continued viability of any setoff claim to the extent one exists under state law.

Here, any analysis of the availability of setoff against the BTB Class 2 Claim must start with the AmCap Loan itself. Section 3.11 of the Credit Agreement expressly provides that "[e]ach Borrower unconditionally waives (a) any rights to presentment, demand, protest or (except as expressly required hereby) notice of any kind, and (b) any rights of rescission, setoff, counterclaim or defense to payment of the Term Loans or otherwise that the Borrowers may have or claim against any Lender, the Agent or any prior Lender or the Agent." The Credit Agreement also contains a successor and assigns provision making that waiver applicable to BTB as successor. (Section 10.1). Thus, the Debtors have waived any right to assert a setoff against the obligations represented by the AmCap Loan.

Even absent such waiver, under Maryland law (which applies pursuant to Section 10.8 of the Credit Agreement), setoff generally may only be exercised pursuant to statutory authority or as an incident to the court's equity jurisdiction. *See Cearfoss Constr. Corp. v. MMSG Ltd. Ptnrshp*, 904 F.Supp. 450, 453 (D. Md. 1995). Moreover, Maryland courts typically hold that any amounts to be exercised as a setoff must be liquidated and certain. *See iGambit, Inc. v. Digi-Data Corp.*, 2013 U.S. Dixt. LEXIS 174673, *9, 2013 WL 6579649 (D. Md. 2013); *Schlens v. Poe*, 128 Md. 352, 375-76, 97 A. 649 (Ct. App. Md. 1916) ("There must be mutuality in the

demands, and the amounts should be liquidated and certain. And while the practice in equity may be more liberal than at law, in respect to mutual credits, set-off can no more be allowed in equity than at law, in cases of demands for uncertain damages, as on breaches of covenant, or for torts.").

The law in Florida, to the extent applicable, is much the same. To establish a valid right to setoff, a movant must prove that the claims being setoff are mutual. *See In re First Foliage, L.C.*, 2014 Bankr. LEXIS 2605 at *41-43, 2014 WL 2616618 at *12, Adv. No. 10-03581-LMI (Bankr. S.D. Fla. June 11, 2014) (Isicoff, J.). Under Florida law, contingent or unmatured claims may not be used to effect a setoff. *See id*. at *42-43, citing *In re Tower Envtl., Inc.*, 217 B.R. 933, 937 (Bankr. M.D. Fla. 1997), *In re Aquasport*, 155 B.R. 245, 248 (M.D. Fla. 1992). In particular, the party asserting the right of setoff is barred from such defense if its claim is non-liquidated or contingent. *See In re First Foliage*, 2014 WL 2616618 at *43 ("[A]s RCIS points out in its response – RCIS would only be barred from asserting its setoff defense if its claim was non-liquidated or contingent – it is neither.").

Here, the Debtors' unliquidated tort claims against HSIII, which further depend on a determination that BTB is the alter ego of HSIII, are far from liquidated or certain. Under applicable law, they may not validly be asserted as a setoff against the valid, liquidated, undisputed obligations owed by the Debtors under the AmCap Loan. The Debtors cannot set off against the BTB Class 2 Claim on account of their purported claims against HSIII for at least two reasons.

First, the Debtors' and Consenting Owners' claims are contingent, unmatured and not liquidated. Any liability has yet to be determined, and depends not only on a determination of the various tort claims, but also on a finding that BTB is the alter ego of HSIII. To the extent

9

BTB is liable for damages on account of these purported claims, the amount of any such damages is uncertain. Accordingly, the Consenting Owners and Debtors lack an essential element of setoff under Florida law.

Second, there is no mutuality between the BTB Class 2 Claim and the Consenting Owners' claims against HSIII. Under applicable case law, the claimant must be liable to the exact same debtor that is obligated on the claimant's indebtedness.

Stated another way, what the Debtors hope to accomplish is in effect a pre-judgment attachment of any distribution to BTB by the Debtors on valid, undisputed, secured claims, in order to preserve a recovery on account of the Debtors' and Consenting Owners' disputed, contingent, unliquidated tort claims against HSIII. Such a pre-judgment attachment is directly contrary to applicable law. *See, e.g., Cohen Fin., LP v. KMC/EC II, LLC*, 967 So.2d 224, 227-28 (Fla. 3d DCA 2007):

> It is entirely settled by a long and unbroken line of Florida cases that in an action at law for money damages, there is simply no judicial authority for an order requiring the deposit of the amount in controversy into the registry of the court, or indeed for any restraint upon the use of a defendant's unrestricted assets prior to the entry of judgment.

(citing *Konover Realty Assocs., Ltd. v. Mladen*, 511 So.2d 705, 706 (Fla. 3d DCA 1987)).

The Court should not permit the Debtors and Consenting Owners to abuse the bankruptcy process and obtain an improper pre-judgment attachment under the guise of a "reserve." These parties are free to continue to pursue those claims in an appropriate forum. Meanwhile, the Debtors should be directed to pay, on the Effective Date, the full amount of the BTB Class 2 Claim. Anything less represents an impairment of the Claim.

### B. The Proposed Reserve for the Class 2 Claim is Inadequate.

Thus, the Debtors must pay the Class 2 Claim on the Effective Date. They have no right to reserve for it. Even if they did, the proposed eighteen-month reserve is grossly inadequate. As noted, any reserve established under the Plan would forever cap BTB's possible recovery on the Claim. Moreover, the Plan expressly conditions any distribution to BTB on this Claim upon resolution of the Debtors' "Causes of Action" (i.e., the "Big Case" claims) via an "Unstayed Order." Plan, § 4.2(b). An "Unstayed Order" requires, *inter alia*, full resolution of any appeals. Plan, § 1.2(rrrr).

It is ludicrous to suppose that the complex and attenuated "Big Case" allegations will necessarily be litigated to conclusion, including all appeals, in eighteen months. Indeed, this Court has already rejected the notion that the Debtors' contingent alter ego claims ---- which serve as the sole justification for their attempt to delay payment of a (now) $28 million claim that has been in default for more than seven years ---could be resolved in a year (as suggested by the Consenting Owners) or in eighteen months:

> So the idea that it will happen in a year, that is just a fiction. … It's not going to happen. … The idea that there would be a resolution in 18 months, really not realistic. It's got to be at least twice that long.

(Transcript of 3/30/15 hearing, ECF No. 506, at 176). Thus, even if the Debtors could reserve against the Class 2 Claim without impairing it, their proposed eighteen-month reserve period, especially when combined with the cap, operates to impair the claim.

The Plan purports to incorporate a "fix" to this objection by providing that the "Post-Effective Date Reserve Period" can be expanded beyond eighteen months to "such [other] period as fixed by the Bankruptcy Court." Plan, § 1.2(xxx). As demonstrated in Section IV.B. below, this solution fails because it is not remotely feasible: The Debtors will not have sufficient cash

11

to fund a thirty-six-month reserve (or, for that matter, even an eighteen-month reserve), at the rate of 14% compounded monthly, as required under the AmCap loan documents.

There is no legal justification for reserving all or any part of the Class 2 Claim. The Plan impairs the Class 2 Claim, and the Plan's premise that there is a deemed acceptance of the Plan by the holder of the Class 2 Claim under § 1126(f), is invalid. The Debtors have violated the Bankruptcy Code by failing to solicit acceptances from, and allowing voting by, the holder of the Class 2 Claim. For this reason, the Plan violates § 1129(a)(1),(2), and (3).

### III.    The Plan Impairs PDVSA's Class 3 Claim

Under the Plan, the Debtors will pay PDVSA the "PDVSA Initial Distribution" (*i.e.*, the "Strike Price" under BTB's settlement agreement with PDVSA) on the Effective Date. Plan, § 4.3(b)(1). The remaining Distribution of approximately $20 million on the claim --- denominated in the Plan as the "PDVSA/Sargeant III Distribution" ---- will be reserved in precisely the same manner as the BTB Class 2 Claim. Plan, § 4.3(b)(ii).

As discussed above, the Plan impairs BTB's Class 2 Claim because it calls for an impermissible reserve of that Claim, and the proposed reserve would be inadequate in any event. These same principles apply *a fortiori* to the Class 3 PDVSA Claim. As noted, all *timely* objections to the PDVSA Claim have been overruled. The Debtors did not object to the PDVSA Claim, when it was amended per the Court's directive in the Interest Rate Order. Their sole justification for holding the "PDVSA/Sargeant III Distribution" is, once again, the "Big Case"/alter ego quinela that the *Consenting Owners* had constructed in Adv. No. 15-1079, before they were replaced as plaintiffs in that proceeding by the Debtors following questions by the Court at the March 6 hearing in this case.

12

Delaying the PDVSA/Sargeant III Distribution is inappropriate for the same reasons discussed above with respect to the BTB Class 2 Claim: the proposed delay is based on an improper setoff of a contingent, unliquidated claim where mutuality is lacking. It is even more egregious because the Court established a deadline for objections to the PDVSA Claim and all timely objections have been overruled.

The allowance of the PDVSA Claim is res judicata, and the fact that BTB or its affiliates may acquire part of the Claim does not change that result. In fact, as discussed in Section V. below, it only serves to highlight the bad faith underlying the Plan. At the March 30 hearing in this case, the Court repeatedly, but unsuccessfully, sought an articulation of the legal basis for delaying payment of the PDVSA Claim at this point, and concluded by aptly observing that divining such a justification:

> [Is] a little bit like watching [Cirque] de Soleil, you wonder how they do it …, and how do you get to the end. … It's mysterious. … It's mysterious, because it sounds like a series of claims against someone who is not a debtor, which the debtor, even though the claims weren't initially brought by the debtor, is attempting to pursue against a creditor for a strategic purpose.

(Transcript of 3/30/15 hearing, ECF No. 506, at 175).

There is no legal justification for reserving all or any part of the Class 3 PDVSA Claim. The Plan impairs the Class 3 Claim, and the Plan's premise that there is a deemed acceptance of the Plan by the holder of the Class 3 Claim under § 1126(f), is invalid. The Debtors have violated the Bankruptcy Code by failing to solicit acceptances from, and allowing voting by, the holder of the Class 3 Claim. For this independent reason, the Plan again violates § 1129(a)(1),(2), and (3).

**IV.    The Plan is Not Feasible**

The Plan is unconfirmable for the independent reason that the Debtors cannot satisfy § 1129(a)(11), which requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  A plan proponent has the burden of demonstrating that it presented a workable plan that offers a reasonable amount of success.  *In re Haas*, 162 F.3d 1087, 1090 (11th Cir. 1998); *see also In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003) (noting that section 1129(a)(11) requires that "courts scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable").

Plans that involve pipe dreams or visionary schemes are not confirmable.  *In re Chapin Revenue Cycle Management, LLC*, 343 B.R. 722, 725 (Bankr. M.D. Fla. 2006).  Section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan.  *In re Nelson*, 84 B.R. 90, 93 (Bankr. W.D. Tex. 1988).

The Debtors' Plan is not feasible for two principal reasons, each of which is independently fatal to confirmation.

**A.    The Debtors Will Have Insufficient Funds to Implement the Plan**

The Debtors will lack sufficient funds to exit bankruptcy at consummation.  *See In re Repurchase Corp.*, 332 B.R. 336 (Bankr. N.D. Ill. 2005) (noting that the lack of verifiable funds as of the effective date of the plan renders the plan infeasible); *In re M&S Assocs., Ltd.*, 138 B.R. 845, 848-52 (Bankr. W.D. Tex. 1992); *see also In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 239-44 (Bankr. W.D. Tex. 2008).

14

The Debtors have no operating revenue. The ostensibly lucrative insider transaction with GALT that was to have occurred in March 2015 [17] never materialized.  The sole source of Plan funding is the asset sale to Gravity Midstream Corpus Christi, LLC ("Gravity") under the APA. The maximum proceeds from the Gravity sale are $100 million. The evidence at the Confirmation Hearing will show that the amounts that must be paid or reserved under the Debtor's "one hundred cent" Plan far exceed that amount.  The Debtors will be incapable of paying all creditors in full under the Plan, thereby also creating independent violations of §1129(a)(7),(8), and (9).

Plans that lack a commitment of funding must not be confirmed because they do not meet the feasibility requirement.  *See In re Ralph C. Tyler, P.E., P.S., Inc.*, 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993) (At the point of confirmation, a source of plan funding must be shown to be firm as it goes directly to feasibility.  Absent evidence of a firm commitment of financing, a plan does not meet the feasibility requirement).

### B.  The Debtors Do Not Own the Bay/Berry Agreements, and therefore Cannot Satisfy an Essential Requirement of the Plan and APA

The Plan and  APA are based upon the sale of substantially all property of Trigeant's estate, including the sale and assignment of the "Dock Use Agreement", as defined in this Court's April 8, 2015 *Order Granting Joint Request for Expedited Ruling on Ownership of Bay/Berry Agreements* (ECF No. 508) (the " Dock Order").

Gravity has repeatedly confirmed in open court that it will not close on the proposed purchase unless the Dock Use Agreement is included in the assets being conveyed.  The Debtors have recently granted Gravity the unfettered right to walk away from the transaction, without

---

[17] *See Debtors' Expedited Motion to Authorize Transactions Outside of the Ordinary Course of Business, etc*. (ECF No. 404).

15

financial penalty, at any time prior to confirmation.[18] However, in the Dock Order, this Court ruled that the Dock Use Agreement is not property of the estate and may not be sold pursuant to the Debtors' Plan. Thus, the Debtors are incapable of satisfying a material condition to closing of the APA, which, in turn, provides the sole means of funding the Plan. For this independent reason, the Plan violates § 1129(a)(11).

## V.     The Plan Violates § 1129(a)(3) Because It Was Not Proposed in Good Faith

§ 1129(a)(3) of the Code requires that a chapter 11 plan be proposed in "good faith." *See, e.g., In re Seaside Engineering & Surveying, Inc.*, 780 F.3d 1070 (11th Cir. 2015), where the court said:

> "While the Bankruptcy Code does not define the term, courts have interpreted 'good faith' as requiring that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code." *In re McCormick*, 49 F.3d 1524, 1526 (11th Cir.1995). Those purposes include preserving jobs in the community, allowing the business to continue to operate instead of liquidation, and achieving a consensual resolution between debtors and creditors. *In re United Marine, Inc.*, 197 B.R. 942, 947 (Bankr.S.D.Fla.1996). "Bad faith exists if there is no realistic possibility of reorganization and the debtor seeks merely to delay or frustrate efforts of secured creditors." *Id.* (citing *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir.1984)).

*In re Seaside Engineering, supra,* 780 F.3d at 1082.

The Plan is part of the Debtors' and Consenting Owners' "war" against BTB and HSIII. Although the Court is by now all too familiar with this history, the evidence at the Confirmation Hearing will reflect the litany of actions by the Debtors and the Consenting Owners that were specifically designed to delay, frustrate, and injure BTB, HSIII, and affiliated entities. This non-exhaustive list includes:

---

[18] *See Debtors' Expedited Motion to Approve (A) Amendment No. 5 to Plan Support Agreement, etc.* (ECF No. 402). This motion was granted by order dated March 9, 2015. (ECF No. 434).

- The filing of *Trigeant I*[19] ( coupled with an immediate emergency motion to force BTB to pay approximately $2 million for *its own property* ---the "heels" in the storage tanks at the refinery) at a time when Trigeant knew that BTB was preparing to seek permission to operate the refinery as a mortgage-in-possession ---- a program which would have prevented the shuttering of the refinery and enabled BTB to generate revenue at no cost or disadvantage to Trigeant;

- Trigeant's administrative insolvency and its crash-and-burn exit from *Trigeant I*;

- Execution of the APA contemporaneously with the "Limited Purpose Confidentiality and Common Interest Privilege Agreement" among the Debtors, Consenting Owners, and Gravity, identifying their "common interest" in the involuntary bankruptcy case against BTB;

- The Debtors' sponsorship of a Plan that purportedly provided a return to holders of equity security interests, but effectively prohibited competitive bidding;

- The Debtors' unsuccessful attempt to retain Berger Singerman, LLP ---- the Consenting Owners' "champions" in the war against HSIII ---- as general bankruptcy counsel to the Debtors in their fiduciary capacities as debtors in possession;

- The bizarre "ready-fire-aim" procedural gyrations in Adv. No. 15-1079, wherein the Debtors substituted in as plaintiffs after the Court questioned how a pending lawsuit by the Consenting Owners (the initial plaintiffs) could enable the Debtors to achieve their goal of delaying distributions to BTB;

- The manifold indicia of bad faith contained in the Plan itself, notably the contorted "Disputed Claims Reserve" provisions specifically designed to choke the flow of cash to BTB and perpetuate the Debtors' unblemished record --- dating back to 2007 --- of failing to pay their debts to BTB and other HSIII affiliates; and

- The Debtors' suggestion that their two most significant and unimpeachably valid liabilities ---- to AmCap and PDVSA ---- were no longer payable because of BTB's subsequent acquisition (for value) of ownership (AmCap claim) or an option to acquire (PDVSA) these claims.

"Section 1129(a)(3) 'speaks more to the process of plan development than to the content of the plan.'" *In re Quigley Co.*, 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010) (citing *In re Bush Indus., Inc.*, 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004)). First, courts evaluate whether the plan was "proposed with honesty." *In re United Marine, Inc.*, 197 B.R. 942, 947 (Bankr. S.D. Fla.

---

[19] *In re Trigeant, Ltd.*, Case No. 13-38580-EPK.

1996) (*citing Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re SM 104, Ltd.*, 160 B.R. 202 (Bankr. S.D. Fla. 1993)).  The second factor courts consider is whether the plan was proposed with "good intentions."  *United Marine, supra,* 197 B.R. at 947.  Finally, courts consider whether the proposed confirmation of the plan "will achieve a result consistent with the standards prescribed under the Code."  *Id.* (internal citations omitted).

The Plan fails these criteria.  The intention of the Plan is clear.  The Debtors and the Consenting Owners seek to use the platform of a Chapter 11 plan and the jurisdiction of this Court to violate the substantive contractual and legal rights of the Objectors, diminish or eliminate distributions to which they are legally entitled, and continue to engage in protracted litigation with them.  The Plan has not been proposed in good faith.

## CONCLUSION

The Plan fails to satisfy numerous requirements of § 1129. This Court should deny confirmation of the Plan.


Dated:  April 17, 2015               Respectfully submitted:

**KOZYAK TROPIN & THROCKMORTON, LLP**
*Counsel for Objectors*
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL 33134
Tel.: (305) 372-1800
Fax: (305) 372-3508
Email:  cwt@kttlaw.com
        dlr@kttlaw.com

By: /s/ *Charles W. Throckmorton*
    Charles W. Throckmorton
    Fla. Bar No. 286192
    David L. Rosendorf
    Fla. Bar No. 996823

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 17, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

By: /s/ *Charles W. Throckmorton*<br>Charles W. Throckmorton