UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:

TRIGEANT HOLDINGS, LTD., *et al.*,   Chapter 11 Case
                                      Case No. 14-29027-EPK
    Debtors.                         (Jointly Administered)
_____/

**DECLARATION OF JASON GOLDSTEIN IN SUPPORT OF
THE THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR
TRIGEANT, LTD., TRIGEANT HOLDINGS, LTD., AND TRIGEANT, LLC**

    I, Jason Goldstein, declare and state as follows:

    1.    I am the Chief Financial Officer of Gravity Midstream Corpus Christi, LLC (the "Purchaser"), the proposed purchaser of substantially all of the assets of the Debtors,[1] including that certain crude processing unit and terminal facility located in Corpus Christi, Texas, along with all related property interests (collectively, the "CPU").

    2.    This Declaration is being filed to provide evidence of good faith under section 363(m) of the Bankruptcy Code, the absence of collusion under section 363(n) of title 11 of the United States Code (the "Bankruptcy Code"), adequate assurance of future performance under section 365(b) of the Bankruptcy Code, and certain other evidence in support of confirmation of the Third Amended Chapter 11 Plan of Reorganization for Trigeant, Ltd., Trigeant Holdings, Ltd., and Trigeant, LLC (the "Plan").

    3.    In addition to serving as the Chief Financial Officer of the Purchaser, I have served as the Chief Financial Officer of Gravity Midstream, LLC ("Gravity"), the sole member of the Purchaser, since it was formed on June 25, 2013. I have also served as an Executive Vice

---

[1] The Debtors in these cases are Trigeant, Ltd., Trigeant Holdings, Ltd., and Trigeant, LLC.

President of Gulf Coast Asphalt Company, L.L.C. ("GCAC") since January 2010.  Prior to joining GCAC, I had 17 years' experience in the investment banking industry, with firms including Blossom Street Capital, APCO Capital (f/k/a WindRiver Capital), Donaldson Lufkin & Jenrette, Imperial Capital (f/k/a Dabney/Resnick) and Charterhouse Securities.  I received a Bachelor of Science in Economics with concentrations in Finance and Marketing from the Wharton School of the University of Pennsylvania, and a Masters of Business Administration from the MIT Sloan School of Management.

4. In my role as the CFO of Gravity, I was personally involved in the negotiations between Gravity and the Debtors regarding the sale of the CPU and certain other assets of the Debtors (collectively, the "Purchased Assets").  I have been present at substantially all of the meetings between the principals of Gravity and the Debtors where the terms of the transaction were discussed and negotiated.  Except where otherwise noted, all facts set forth in this declaration are based on my personal knowledge, information and belief.  If called upon to testify, I would testify competently to the facts set forth in this declaration.

A. **Qualifications of Gravity, the Purchaser, and the Declarant**

5. The Purchaser is a subsidiary of Gravity, a midstream energy company focused on the processing, storage, transportation, and distribution of crude oil and related petroleum products.  Gravity was formed in June 2013 by the Gravity management team and EnCap Flatrock Midstream Fund II L.P., an affiliate of EnCap Investments, L.P. ("EnCap") and Flatrock Energy Advisors, LLC (collectively, "EFM").

6. EnCap is a leading U.S. private equity firm focused exclusively on investing in midstream energy assets across North America.  Since its formation in 2008, EFM has raised three private equity funds and currently manages in excess of $5 billion of equity capital, provided primarily from large institutional investors such as university endowments, public

employees' retirement funds, insurance companies, and the like. Since 1988, EnCap has been a leading provider of private equity to the independent sector of the U.S. oil & gas industry and has raised 19 institutional oil and gas investment funds totaling approximately $27.5 billion.

7. Gravity's management team has a collective 75 years of experience in North American petroleum refining, terminalling and distribution, and they have successfully owned and operated heavy crude refineries and product storage facilities that included niche processing activities, blending capabilities, rail transloading, and ship, barge and truck loading and unloading.

**B.    Negotiations with the Debtors**

8. Around June 2014, Gravity and the Debtors entered into negotiations regarding the sale of the Purchased Assets.[2] On July 30, 2014, Gravity and the Debtors executed a Letter of Intent that contemplated that an affiliate of Gravity (ultimately identified as the Purchaser) would acquire the Purchased Assets for a purchase price of $100 million (the "Purchase Price"). The Letter of Intent further contemplated that the Debtors would commence these bankruptcy cases and that the sale of the Purchased Assets (the "Sale Transaction") would be conducted pursuant to a plan of reorganization for some or all of the Debtors.

9. On September 16, 2014, the Purchaser and Trigeant, Ltd. entered into an Asset Purchase Agreement (as amended, the "APA"). The Purchaser, Trigeant, Ltd., and the Consenting Owners (as defined in the Plan) also entered into a Plan Support Agreement (as amended, the "PSA").

---

[2]    In late 2013 through the middle of 2014, Gravity had discussions with Harry Sargeant III and BTB Refining, LLC, concerning the acquisition of the CPU. Those discussions did not lead to the execution of any definitive agreements.

10. The Purchaser was represented in the negotiations by Kaye Scholer LLP and other law firms that advised on matters of environmental and real estate law. The Debtors were initially represented by Berger Singerman LLP. Following this Court's ruling that Berger Singerman LLP could not serve as general bankruptcy counsel for the Debtors in this matter, the Debtors were represented by Greenberg Traurig, P.A., and Berger Singerman LLP continued to represent the Consenting Owners.

11. The APA, the PSA, and the related documents and amendments thereto, all of which have been filed with the Court, were the product of extensive, good faith, arm's length negotiations between the Debtors, the Consenting Owners, and the Purchaser, and there are no material agreements or understandings between the parties that have not been disclosed to the Court. None of the Purchaser, its agents, representatives, or advisors are an affiliate or insider of the Debtors.[3]

12. The sale price for the Purchased Assets was not controlled by any agreement by the Purchaser with any other potential purchasers that would cause or permit the APA or the Sale Transaction to be avoidable under section 363(n) of the Bankruptcy Code.

13. In order to support confirmation of the Plan and to ensure that the Debtors had sufficient working capital, GCAC agreed to provide, and provided, debtor-in-possession financing to the Debtors.

C. **Purchaser's Ability to Close; Waiver of Certain Conditions**

14. Subject to the Debtors' continued compliance with their obligations under the APA and PSA, and further subject to the satisfaction of the conditions to closing contained

---

[3] As has been previously disclosed in filings with this Court, more than five years ago, certain members of the Gravity management held positions at Trigeant. Arthur J. Brass, President of Gravity, held a senior executive and an ownership position at Trigeant, and Kenny Hucker, a Vice President of Gravity, supervised operations for Trigeant.

therein, the Purchaser is ready, willing and able to close on the APA and the Sale Transaction following confirmation of the Plan.

15. The Purchaser has demonstrated its financial capability to perform its obligations under the APA. Pursuant to that certain commitment letter dated September 16, 2014 (as amended, the "Equity Commitment Letter"), EFM, through its affiliate EnCap Flatrock Midstream Fund II, L.P., agreed to provide 96.57% of the Purchase Price, subject to the terms and conditions of the Equity Commitment Letter.[4] Gravity has the ability to draw those funds upon 10 business days' notice to EFM. Gravity intends to capitalize the Purchaser at the time of the closing in order to fund the Purchase Price and in respect of certain anticipated post-closing expenses.

16. The above facts further demonstrate the Purchaser's willingness and financial capability to satisfy its obligations under the Assumed Executory Contracts (as defined in the APA).

17. In addition, in light of developments over the course of the Debtors' bankruptcy cases, the Purchaser has determined that it will waive certain conditions to the APA and, contemporaneously with the filing of this Declaration, the Purchaser, the Debtors and the Consenting Owners are amending the APA to reflect these waivers. In addition, the Purchaser will grant corresponding waivers with respect to the closing conditions identified in Section 10.1(a) and 10.2(f) of the Plan.

18. Specifically, as a result of this Court's order [Docket No. 508] (the "Order") that the Dock Use Agreement (as defined in the Order) is not property of the Debtors' estates and,

---

[4] The remainder of the Purchase Price will be paid by Gravity Management, LLC and Gravity Coinvest Fund, LLC, affiliates of Gravity. Upon information and belief, each of these entities has the financial capability and the willingness to close on the Sale Transaction.

accordingly, cannot be sold by the Debtors, the Purchaser is waiving the conditions under the APA that the Debtors assign the Dock Use Agreement to the Purchaser at the closing of the APA.

19. The Purchaser, with the consent of the Debtors, has also held discussions directly with certain third-party counterparties to agreements with the Debtors. As a result of its discussions with Union Pacific Railroad, the counterparty to certain track lease agreements with Debtor Trigeant, Ltd., the Purchaser is waiving the conditions under the APA that the Debtors assign certain contracts with Union Pacific Railroad to the Purchaser at the closing of the APA.[5]

20. In addition, the Purchaser and Trigeant are amending the APA with respect to the Heels located at the Acquired Real Property (as defined in the APA) to make it clear that such Heels must either be abandoned by HIII and the HIII Parties (each as defined in the APA) or, if not, removed from the Acquired Real Property, at no cost to the Purchaser, no later than five (5) days after the entry of the Confirmation Order.

21. Other than as set forth above, all other conditions to the closing of the APA remain in effect.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 1, 2015

By: _____
Jason Goldstein

---

[5] Specifically, the Purchaser is prepared to waive this condition with respect to that certain Track Lease Agreement, dated December 10, 2001, and that certain Industry Track Contract, dated April 2, 2007.